Mr. Naqvi described Raheela as an educated woman who came to the United States ten years before him, when she was 8. Mr. Naqvi also reported that Raheela had attended Queens College and had become more "Americanized" than he was. He stated that in the beginning they had a very good relationship and they often went on vacations during his four weeks off from the MTA to places such as Canada and Virginia.

In 1993, four years after his marriage, Mr. Naqvi had saved enough money to purchase a home in Queens. Both of his parents, as well as his older brother, younger brother, and one sister, moved into the new home. He explained that although his wife did not mind his parents living with them, she did not like his siblings living there.

Mr. Naqvi described his wife as a jealous woman. He recalled that she had been jealous of a female co-worker she believed was interested in him. Of more significance, he stated, was an issue his wife had with a woman named Abida, also a cousin of his. Reportedly, prior to move to the U.S., Abida, had wanted to marry him. Years later, during a family visit to Pakistan, Mr. Naqvi's wife grew suspicious of Abida when they visited Karachi in 1994, which is where Abida and her family lived.

During that visit, Mr. Naqvi reported, Abida paid his family a visit and greeted his wife by saying, "hello sister." He reported that he and Abida started talking, with the door open, about her work in medicine and recalled that Raheela checked in the room several times before asking him "why did you do this to me?" He stated that Raheela had brought him to another room where she started crying and accusing him of flirting with Abida.

Although Mr. Naqvi left early the next morning, Raheela stayed for a few more weeks before going back to Punjab with their sons. He stated that he sent her money and called her every day, but when she returned to New York, she immediately resumed asking him about "what he had done" with Abida.

Meanwhile, Mr. Naqvi reported, Irfan Naqvi, a maternal cousin ten years his junior, came to the United States in 1991 or 1992. He and the Naqvi's became good friends. As was customary, Mr. Naqvi willingly helped out a family member and helped his cousin find a job, and that Irfan lived at Raheela's father's house for two years, include proximity to their own. As a result, he and his wife had almost daily contact with Irfan. He stated that he would often work-out, play cricket, and go on picnics with Irfan.

Mr. Naqvi described Irfan as someone who was not educated and held "odd jobs" such as a fruit vendor or mechanic. He reported that Irfan worked with his brother-in-law "for a few years." Mr. Naqvi explained that Irfan married a woman named Fatima unbeknown to the rest of the family, as the union had not ben

approved. Mr. Naqvi reported that Irfan "has a hot temper" and he had witnessed Irfan "using his hand" on his brother or sister. Once, he stated, he witnessed Irfan trying to choke his father. In addition to witnessing such actions, Farkhanda, Irfan's sister, would tell Mr. Naqvi and Raheela about the arguments. However, when later questioned about these actions, Farkhanda denied that her brother was a violent person. At sentencing, before the Honorable Ken Holders, she reportedly stated that her brother "never even touched once my father."[2]

During the examination, however, Mr. Naqvi reported an incident to demonstrate that Irfan was, in fact, a violent and furtive man. He recalled that he had not seen or heard from Irfan for a couple of days when Irfan's father called Mr. Naqvi and reported that Irfan had been missing. Some time later, Mr. Naqvi received a call from Irfan who was incarcerated at the time. Irfan initially told Mr. Naqvi that he had "gotten into a fight with someone" and needed $5,000 for bail. Mr. Naqvi asked his brother-in-law, Moshin, to go with him to the jail. When they arrived at the jail that evening and spoke to the authorities, they were told that Irfan had hit his son. Two hours later, Irfan was released and told Mr. Naqvi that he had hit his 8-month-old son after he had an argument with the baby's mother about food. Irfan requested that Mr. Naqvi did not tell his family about the abuse and his arrest. Through such experiences, Mr. Naqvi began to develop an image of Irfan as a violent, unpredictable and dangerous man.

As Irfan had alienated his family through an unsanctioned marriage, Mr. Naqvi, again eager to meet cultural and family obligations, attempted to intervene with Irfan's father to implore him to accept Irfan and his new wife into the family., To that end, he enlisted the help of Raheela's brother, Hasan, and spoke to Irfan's father a "few weeks" later. In effort to support Irfan, Mr. Naqvi and Raheela visited Irfan and his family every weekend. Mr. Naqvi also reported that Irfan's wife would visit their home and that she told Raheela that Irfan was abusive; Fatima also sometimes told Mr. Naqvi this directly. Mr. Naqvi reported that Irfan admitted to being physically abusive of his wife, explaining that it was because she was cheating.

In addition to having problems with Fatima, Mr. Naqvi reported, Irfan's father asked him to speak to Irfan about moving out "because he was creating a lot of problems." Mr. Naqvi stated that he and his family continued to visit Irfan. He reported that things were getting worse between Irfan and his wife, eventually leading to a separation and a request for a divorce. Mr. Naqvi advised Fatima to accept the divorce offered by Irfan. After the divorce, Irfan returned home to live with his parents and had meanwhile been fired from his job because he had reportedly been accused of stealing from them. As these events unfolded before Mr. Naqvi's eyes, his impression of Irfan as a dangerous man was cemented.

---

[2] Sentencing Minutes, Transcribed by Donna Conti, dated 9/24/09

In 1996, following his separation, Irfan started visiting Mr. Naqvi's home more frequently. He explained that, in his culture, if a male friend or cousin comes to visit a household and the husband is not there, that person is expected to leave. However, Mr. Naqvi reported, his sons told him that "Uncle Irfan" had been over and had visited with his wife alone. Though maybe only a *faux-pas* by American standards, by Mr. Naqvi's and his culture, this was an affront.

Mr. Naqvi reported that, at the end of 1996, he became a partner in a diner near the Cypress Hill subway station, in order to make a better living and "do more for my family." Mr. Naqvi reported that he conferred with Raheela, who agreed it was a good idea and also agreed she would work in the diner part-time. He stated that Irfan found out about the business venture and wanted to be a partner too, but that Irfan did not have the necessary money to buy in, though Mr. Naqvi was unsure he wanted Irfan as a partner to begin with. Instead, Mr. Naqvi partnered with a friend, Ehsan, and told Irfan that he did not have enough money to join them.

Mr. Naqvi explained that he began working at the diner a few times a week, usually by purchasing merchandise for the restaurant and sometimes helping out in the diner after his MTA shift. Now, away from home more frequently, he noticed that Irfan visited his wife more frequently (as told by his son), and believed that Irfan was angry that he had not taken him as a partner. On one occasion, his son told Mr. Naqvi that Irfan had been in their bedroom. When Mr. Naqvi confronted his wife, Raheela explained that she had asked him to fix the television. When Mr. Naqvi the asked his wife if something was going on between she and Irfan, his wife retorted, "Do you have any women on your mind?" Mr. Naqvi believes that Irfan had been poisoning Raheela's mind by telling her that he had been cheating on Raheela. She also reportedly told her husband that Irfan was "like [her] brother." Despite the accusations, Mr. Naqvi and his wife were still having a sexual relationship, though with much reduced frequency.

Mr. Naqvi reported that his wife "one day said, 'I have no feelings for you.'" He told her he believed it was because she had feelings for someone else. Raheela accused him of being involved with other women, and asked for "some time" to think. It was at that time that he and his wife stopped being sexually intimate. He reported that after a few weeks, she asked him "why don't you give me a divorce?" Mr. Naqvi explained that, in his culture, parents would need to approve of a divorce and Raheela knew that they would not approve because they knew of no obvious reason for one.

Mr. Naqvi related that over the next few months, enlisting the help of Raheela's brother, Hasan, and her father, to speak to Raheela and to get her to stop her behavior, but that Raheela would not admit to her infidelities. Mr. Naqvi believed that Irfan was manipulating Raheela and giving her strength to resist her family. Now,

Mr. Naqvi believed, Irfan was stealing his wife away from him and threatening the very fabric of his family.

One day, Mr. Naqvi explained, he was scheduled to work from 1 pm to 9 pm rather than his usual, later shift. He reported that he got home at 9:30 pm and Raheela was surprised to see himm as she was unaware of the change in Mr. Naqvi's schedule. Not seeing the children, Mr. Naqvi inquired about their whereabouts, to which his ex-wife stated that they were at her mother's. Raheela told to Mr. Naqvi to pick up his children, to which he agreed, once he had changed out of his uniform first. When he went to do so, he saw a large pile of clothes in the closet. He saw the pile move and knew instantly that someone was hiding there. In fact, he knew who that person was.

Looking closely, Mr. Naqvi noticed that Irfan was hiding under the pile of clothes. Rather than confronting Irfan directly, he decided to speak to Hasan first. He stated that he called Hasan, who was a detective, and asked him to pick up his children on the way to his house. When the children arrived, Mr. Naqvi sent them to their rooms and asked Hasan to come into the bedroom to confront Irfan. By then, Irfan was in the closet wearing pajama bottoms. Mr. Naqvi reported that Irfan then got up and pushed him. Hasan stepped between the two men and asked Irfan why he was there. Irfan replied, "Raheela is my wife and I'm going to take her with me tonight." After Irfan pushed Hasan, Hasan reportedly drew his gun and told Irfan to leave. Mr. Naqvi explained that Irfan would not leave until Raheela came upstairs and asked him to go. At this time, Irfan threatened Mr. Naqvi and Hasan, "I'll leave, but I'll see both of you." Mr. Naqvi was horrified, angry and hurt by the incident. The fact that Irfan did not leave cowering and ashamed, but rather had left making a clear threat to him scared Mr. Naqvi.

Mr. Naqvi stated he and Hasan followed Irfan out. On his way out, Mr. Naqvi recalled, Irfan asked Raheela to go with him. After he intervened, Irfan threatened Hasan by saying, "I know your dark secret too" and eventually left. According to Mr. Naqvi, Hasan then confronted his sister Raheela who asked Mr. Naqvi for one more chance. Thinking of his three children, he agreed. He stated that Raheela promised him, "I know what I have to do, and everything will be alright." Mr. Naqvi said that he requested Irfan no longer be involved with the family, and that she had to reverse "100%."

One hour after Irfan had left the home, Irfan reportedly called Raheela to tell her "If Tahir [Naqvi] gives you a divorce, I'll leave you alone" and also to threaten to expose their affair to the rest of the family. That evening, Mr. Naqvi reported, his ex-wife was so scared that she woke up at two or three in the morning and told him she thought Irfan might set the house on fire. At that time, she agreed to the Order of Protection that Hasan had suggested, and went back to bed. Mr. Naqvi, shaken, stayed up to make sure nothing happened. The next morning, Raheela had changed

her mind and no longer wanted an Order of Protection secured against Irfan. Instead, she said she would speak to Irfan on the phone.

To get some distance from this conflicted situation, Mr. Naqvi reported, he suggested to his wife that they get away from New York for a short while. He suggested going to Pakistan, but Raheela believed Irfan would find them because he has family there. He then suggested London or Canada, and Raheela agreed to go to Canada with the children and his sister-in-law for ten days.

Mr. Naqvi reported that he continued to go to work and decided to not tell his or Raheela's family what had happened, as it would bring shame to both of them, "especially for her." He added that he was angry at the time at both Raheela and Irfan, and that "any husband would be ashamed." Consistent with his culture, Mr. Naqvi felt ashamed with himself, embarrassed before others, and angry at Irfan. He felt "like I was stabbed in the back." However, Mr. Naqvi maintained, "I wanted to do what's right" and maintain appearances.

Mr. Naqvi reported that after Raheela and the children returned from Canada, they returned to having a more normal relationship. He took the opportunity to tell her "I meant what I said" and suggested that they should go to Mecca to renew their commitment to one another. He made the reservations to go, but "a few days later Raheela says, 'We're not going…I'm not ready yet.'" Mr. Naqvi again suggested a family vacation to Florida for two weeks, which Raheela agreed to and he bought the tickets. By that time, Raheela had gone back to work at the electric store and told Mr. Naqvi that she had requested the time off. However, one day before the trip, she said she was not going because she "wasn't ready."

Mr. Naqvi explained that after the "closet incident," he could not get the incident out of his mind, repeatedly playing images of the scene in his head. He grew increasingly scared for his life because of the type of person that Irfan was and that he had threatened him in a credible manner. Overcome with feelings of fear and panic, he purchased a gun for $300. In a constant state of fear, shame and anger, Mr. Naqvi began keeping the gun on him "all the time," fearing an imminent attack from Irfan.

Mr. Naqvi reported that he heard that Irfan had gone to England for several days and that he would continue on to Germany. He stated that Irfan's family was not suspicious because Irfan was not in the United States; however, Mr. Naqvi later found out that Irfan had moved to Queens and had told only Raheela. Mr. Naqvi noted that Raheela had been coming home two or three hours late from work, and that they had stopped being intimate. He also reported that a tenant to whom he rented a room in their basement had told him that he had seen "a guy in a hoodie" in the kitchen, but that he did not know who it was. Suspecting that Raheela had resumed seeing Irfan, Naqvi confronted her, but she said nothing was going on. Mr.

Naqvi decided to again speak with her parents. Mr. Naqvi recalled feeling as though he was living in a nightmare. And that Irfan had become a monster set out to destroy his family.

In early 1998, Mr. Naqvi enlisted the assistance of a customer to help him record Raheela's phone calls with Irfan, which he suspected were occurring daily. Mr. Naqvi's suspicions were borne out, as recordings confirmed the frequency of calls made between his wife and Irfan. He listened to the recordings daily, often hearing details of their intimacy and of their relationship. This daily ritual became a form of torture for Mr. Naqvi. Each day, he would be flooded with images of his wife with Irfan, of the infidelity he was witnessing and of the monster that was destroying his life and family. Unable to keep such harrowing material to himself, Mr. Naqvi told Hasan about the recordings, who reportedly told him to continue taping. Through the taping he found out that Irfan's brother and sister were helping Irfan with his romantic pursuit of Raheela. Reflecting just how emotional an experience it had been -and still was- when discussing the tapes, Mr. Naqvi became tearful and stated "oppression is worse than slaughter." He recalled being emotionally overwhelmed by the messages, which showed, in his opinion, that Irfan was controlling Raheela. When asked to clarify, Mr. Naqvi reported that he had heard Irfan instructing Raheela to go to bed before Mr. Naqvi came home, to take different cars even to family events, and that she could make food for Mr. Naqvi, but was not allowed to put it on the table.

Mr. Naqvi remembered feeling "like a dead man walking." Mr. Naqvi recalled that he felt numb and disconnected, or *dissociated,* in psychiatric parlance, as he was being "tortured mentally, emotionally in my own home." He reported feeling depressed, lonely, ashamed, hurt and sad. These feelings remained with him whether he was listening to the tapes or not. He obsessed about Irfan, the content of the tapes and the ongoing infidelity he felt he was a witness to. These feelings permeated every aspect of his life and functioning. He lost the ability to focus, concentrate and make sound decisions. What was happening to him personally deeply affected every other aspect of his life. He recalled making mistakes at work, such as being short on money and having to use his personal money to replace it, and not answering when his family called. He was distracted, lost focus and drive, and grew to feel helpless and hopeless. Always having been a hard worker, he began contemplating no longer working, "because what's the purpose of working when my family was being destroyed in front of me."

In addition to emotional difficulties, Mr. Naqvi also reported physical symptoms. He stated that he had "no emotions to give" and remembered "eating just to eat," which resulted in him losing twenty-five to thirty pounds, consistent with symptoms of a Major Depressive Disorder. He also recalled problems sleeping, which left him weak and fatigued. Mr. Naqvi grew forgetful and withdrawn at work. On certain occasions, he grew suicidal. Scared by such feelings, he sought the support of a friend, Eshan, to tell him "if something happens to me, give this money to my

family." Sometimes, Mr. Naqvi reported, he felt that "I wish he [Irfan] would have killed me."

By 1998, Mr. Naqvi reported, he had no interactions with his wife aside from conversations regarding the children. He recalled that his "whole concern was my three kids" and he told Raheela that he would give her a divorce and the house, but that he wanted custody of the children, even though he would allow her to see them any time. Mr. Naqvi stated that he "didn't want Irfan involved with the kids." Although Raheela filed for divorce in 1998, her family told Mr. Naqvi not to sign the papers.

Meanwhile, conversations between Irfan and Raheela continued and Mr. Naqvi continued to listen to them regularly. Of note, Mr. Naqvi's ongoing exposure to such material, akin to the trauma of watching the 9/11 tragedy over and over, became itself traumatic and fueled profound alterations in his mental state, consistent with a diagnosis of PTSD (Posttraumatic Stress Disorder). Mr. Naqvi reported that Irfan was pushing Raheela to be with him and leave Mr. Naqvi. Irfan said it was "taking too long." Irfan also made threatening statements about Mr. Naqvi, such as "there's no way back... who ever comes between you and me..." Mr. Naqvi noted that Irfan was also giving Raheela deadlines, such as by when she needed to move out of the family home.

These tapes, which were in Urdu, were translated and transcribed by Mr. Naqvi's oldest stepdaughter. A review of these transcripts confirm that Irfan Naqvi told Raheela to not serve her husband dinner, not to make him lunch for work, "act so mean and rude to him that he knows, and thinks you hate him," and to go to bed before Mr. Naqvi came home. Additionally, Irfan made several threats to Raheela, including taking his own life by saying things such as "where should I go and die?" and "I should commit suicide and tape it so that you can see it." In the tapes, Irfan also commented that he is willing to do something that will "be bad for everyone" because he "wouldn't tolerate it anymore." In one conversation, he appeared to be setting deadlines for Raheela to move out of her house. In this conversation, Irfan stated, "Since I'm leaving I'll go to any extent. And I'll explode this bomb I am carrying with me. If anyone stops I'll kill myself and kill him too." It is inferred that "him" refers generally to "anyone who stands in my way," but specifically to Mr. Naqvi. Irfan stated later, "I should to something to harm them...I'll deal with him. If he does anything he will regret it."

Mr. Naqvi recalled thinking, "maybe he thinks I'm the problem" and believed "before he does something stupid, I should go talk to him." He stated that he found out where Irfan lived through a friend who had followed his wife to Irfan's apartment in Queens.

# MR. NAQVI'S RECOLLECTION OF THE INCIDENT

Mr. Naqvi recalled wanting to speak to Irfan for some time and choosing August 14, 1999 to speak to him because he believed Irfan would be receptive, as his sister was to get married that day. He stated that he wanted to speak to Irfan outside, in a public place, so as to protect himself from any harm from Irfan. He repeated that his only "intention was to talk to him." Mr. Naqvi drove to Irfan's apartment, knowing that he would leave at some point to go to his sister's wedding. He recalled waiting for approximately two hours about a half block away from Irfan's apartment. He remembered that he brought the newspaper, a drink, and something to eat while he was waiting in the parking lot. He also reported that "my mission was my kids." He recalled feeling very anxious.

Mr. Naqvi felt that he was "between a rock and a hard place," because on one hand, he wanted his family to remain intact, but on the other, he also wanted Irfan to tell Raheela to accept the divorce and to let him have his children, so that the pain and torture would stop. When asked how he felt that day, Mr. Naqvi responded, "Mentally, I was not there." He recalled feeling disconnected from his emotions, as in a daze. He also recalled being overwhelmed by a two-year accumulation of fear, shame, humiliation and anger. In one tape, Mr. Naqvi recalled repeatedly in his mind, Irfan had told Raheela "Tahir has no balls."

Mr. Naqvi recalled watching Irfan coming out of his home and opening up his car windows and trunk because of the heat. At that time, Mr. Naqvi started the car, drove just past Irfan, and shut off the engine. He remembered that Irfan was standing by the trunk of his own car, about ten feet away. Mr. Naqvi got out of his car and called his name, to which Irfan responded, "What the hell are you doing here?" Mr. Naqvi reported that he said, "I came to talk about my family" and Irfan replied, "There's nothing to talk about. I know you have been here before, and this time I'm ready for you." Mr. Naqvi recalled that Irfan came towards him and pushed him to the ground. In Mr. Naqvi's mind, he was now facing the monster he had grown so afraid of.

Overwhelmed with fear, and overcome with years of accumulated anger, shame and embarrassment, Mr. Naqvi got back up, saw Irfan come towards him again and took out his gun. He remembered telling Irfan, "Back off. I'm not here to hurt you. I just want to talk." He reported not being familiar with the gun, but recalled that it was a revolver. He stated that he froze for a moment and "then Irfan put his hand on the gun and we started wrestling." It was during this struggle, Mr. Naqvi explained, that he shot Irfan in the stomach, though he did not realize it at the time, as Irfan continued to struggle with him, as if nothing had happened. Irfan, seemingly unstoppable, confirmed in Mr. Naqvi's mind that he was indeed a monster.

By this point, Mr. Naqvi explained, he became afraid that Irfan would get the gun and shoot him. He remembered that his grip was loose, and remembered looking at a taller and stronger Irfan who began moving toward him. Mr. Naqvi recalled shooting Irfan once in the shoulder, but "that's all I remember." He stated that the last thing he remembered was Irfan falling down, but did not remember the third shot. He stated, "My mind was empty. I didn't know what to do." Mr. Naqvi recalled that he began walking towards his car, but doubled back when he realized that the keys to his car had fallen out of his pocket during the struggle.

An autopsy report indicates that Irfan Naqvi died of "multiple gunshot wounds to head and torso with perforation of brain."[3] These wounds include a gunshot wound to the head, gunshot wound to the right shoulder, and a gunshot wounds to the abdomen (causing two wounds from the bullet that entered and exited the body). In addition, the autopsy indicates "blunt force injuries on the left side of face and both knees," including abrasions and lacerations on Irfan's eyelids, forehead, and cheek.

Mr. Naqvi pointed out that, "If I wanted to kill him, why go in broad daylight? I knew where he lived. I could have come at night."

A 15-year-old girl who was on her way to church at the time of the instant offense[4] identified Mr. Naqvi from a photo array as the person she observed with the gun who shot a man on the ground.[5] This witness account suggested that Mr. Naqvi approached Irfan from behind and shook him by the shoulders.[6] She recalled that she heard two gunshots and next saw the victim crawling towards the sidewalk when the perpetrator "grabbed the victim by the legs or pants." The witness heard another shot, and recalled that the "perp then picked up the victim from behind...dragging the victim to the sidewalk and dropped the victim face down...The perp then pointed the gun down, at the victim's head and fired two shots. The perp then ran to a car that was double parked next to where the victim was standing." When questioned nearly six years later, the witness stated, "I'll never forget that day."[7]

After Mr. Naqvi got into his car, he drove "two or three blocks. Then I couldn't drive anymore," as the adrenaline wore off and Mr. Naqvi came back to his senses and realized the enormity of what he had done. He parked without paying attention as to where and walked to a subway station in Queens where he took the train. He then called his older brother and told him, "I don't know if he's dead or alive. I just know he went down." He recalled that he "was scared" and was not sure "who would believe me about what happened." His brother advised him to go to

---

[3] Autopsy report, Office of Chief Medical Examiner, Performed by Heda Jindrak, MD, dated 8/16/99
[4] Sentencing Minutes, Transcribed by Donna Conti, dated 9/24/09
[5] Police Report, New York Homicide Unit, Detective Jeremy Lucas, dated 8/16/99
[6] Police Report, New York Homicide Unit, Detective JM Toole, dated 8/14/99
[7] Police Report, New York Homicide Unit, Detective Dolan, dated 2/10/05

Manhattan, where he met with his brother-in-law and friend in the evening. Mr. Naqvi stated, "They gave me bad advice. They told me to leave the city."

## ACTIVITIES & INVESTIGATIONS
## SUBSEQUENT TO THE INSTANT OFFENSE

After the incident, emotionally spent, Mr. Naqvi was still feeling disconnected, "empty and going through the motions," as his friends and family told him what to do. He recalled that his brother went back to Mr. Naqvi's house to get his passport as well as money. Mr. Naqvi stated that he did not know anyone in Miami, but that was the first bus out of New York. He recalled calling his brother-in-law a day or two later to find out what happened. Mr. Naqvi reported that he stayed in Florida for the next five days before going to Los Angeles, San Diego, Mexico, and then on to Spain. Throughout all of this, he recalled, that although he "knew the reality of killing someone," he still felt numb for the next "few months to a year."

After Spain, Mr. Naqvi went to stay with a friend's brother in France for ten days and then friends in Belgium for one year. He recalled that his friends tried to cheer him up by introducing him to women or going out to drink, but his "three kids were always in my mind. That's why I was alive."

Mr. Naqvi reported that he attempted to contact his family after one year "because I can't live without my kids." He hoped that his family would bring the children to visit him in Europe so that he "could have a purpose," but his children were too young at the time. Mr. Naqvi thus decided to return to the United States to surrender himself, though his family told him to stay in Europe. Despite their objections, Mr. Naqvi returned to the U.S. in September 2000 and his friends helped him hire a lawyer. Mr. Naqvi settled in Atlanta, Georgia where he tried to find work and earn money to hire an attorney.

While in Georgia, Mr. Naqvi met and married Saima Naqvi on June 8, 2005. Saima had three daughters from a previous marriage and moved to New Jersey after Mr. Naqvi was arrested.

Mr. Naqvi reported that he saw his own children on and off for the next three to four years when they did not have school and Raheela was away. He was able to see them three or four times a year. Meanwhile, Raheela had wanted to sell the house, which required Mr. Naqvi to give her power of attorney to do so. Thus, she had a friend contact him and the two exchanged calls. Mr. Naqvi would return her calls from pay phones, with a calling card, or pre-paid phones, which the police eventually tracked down using subscriber information.

In a five-page letter to his ex-wife written after the instant offense, Mr. Naqvi insightfully expressed his feelings and concerns.[8] In it, he described the ways in which he noticed Raheela being "remote controlled" by Irfan, and participating in actions that aided in damaging their family. These thoughts, written in a private note to Raheela, were consistent with what Mr. Naqvi reported to this examiner. Additionally, Mr. Naqvi spoke of the anguish and suffering he endured for "three long years" during which he was "imprisoned" and "cruelly…assaulted, brutalized and humiliated in my own home with the blessing of my own wife." He described his belief that his ex-wife hid the affair purposefully from others, and did not fulfill her duty as a wife and mother but rather participated in an "illicit relationship." Mr. Naqvi specifically pointed that Raheela took his children away from him, as well as hurt her father.

In this letter, Mr. Naqvi also expressed a concern that his ex-wife will attempt to put "dirt on [him]" as a way to excuse her misbehaviors. Still, he also acknowledged that he was "glad for one thing, at least you are loyal to someone…Do not betray him, at least. Keep it up, devil has advocates too." In this statement, Mr. Naqvi explains that he was betrayed by his wife and that Irfan was an evil being. He goes on to write Raheela that she has taken his life from him and that his life belongs to Allah and to his children, whom he says are the reason he is still alive. He also appeared to accept responsibility for his actions, and asked that Allah forgive Raheela for her sins and mistakes.

An ongoing police investigation confirm several points Mr. Naqvi made to this examiner, specifically in reference to his whereabouts[9] after the murder, as per their surveillance, research, and interviewing of several members of the Naqvi family and possible witnesses.[10] As reported by Mr. Naqvi, police records indicate that he called his brother, Tariq, before leaving the state. This report also confirmed that Tariq gave his brother money as Mr. Naqvi had requested.[11] Records confirm that Mr. Naqvi worked at the Transit Authority for several years prior to the instant offense and indicate, through a search of his vehicle, that Mr. Naqvi had been reading the newspaper in his car prior to approaching Irfan. An interview with Irfan's brother, confirmed that Irfan was having an affair with Mr. Naqvi's wife and that Mr. Naqvi was the "only person" with whom Irfan took issue.[12]

Raheela reported to police that she had fallen in love with Irfan and requested a divorce from Mr. Naqvi, who refused.[13] She also reported that she knew Mr. Naqvi was recording her telephone calls, and that he also had her followed. Finally, Raheela

---

[8] Letter from Mr. Naqvi to Raheela Naqvi, no date
[9] Police report, New York Homicide Unit, Detective Dolan, dated 5/4/05
[10] Police report, New York Homicide Division, dated 8/16/99-3/28/06
[11] Police report, New York Homicide Division, Detective Jeremy Lucas, dated 8/16/99
[12] Police report, New York Homicide Division, Detective Jeremy Lucas, no date
[13] Police report, New York Homicide Division, Detective Jeremy Lucas, no date

indicated to the police that Mr. Naqvi "on several occasions… did tell her that it would be worth going to jail to kill Irfan and why don't you tell him to stop hiding [sic] and fight like a man." She stated that these threats to kill Irfan for breaking up the family were "constant."

In another report, Raheela stated that she believed Mr. Naqvi had been planning to kill Irfan "well in advance."[14] She also reported that her marriage was in trouble before she began a relationship with Irfan, and that her ex-husband had began to spoil the children so that, in her opinion, he could secure their allegiance.

Police records also indicate that Raheela had found out about Mr. Naqvi's visits to his children and had contacted the police with details.[15] Raheela indicated that either Mr. Naqvi or a friend would show up to get the children after two or three hours of calling the house. She believed that Mr. Naqvi had done this "three or four" times since the murder, and on one occasion came with Mahmood Adnan, a friend of the family. On his last visit in June 2005, Raheela reported to the police that Mr. Naqvi told his children that he was low on cash and needed to work for a while, such that he would not be able to see them "for a few months."

Police attempts to gather incriminating evidence against Mr. Naqvi from his past employers, search warrant of his car, or to speak with him in person, appear to have produced negative results. Although some reports indicate that Mr. Naqvi was seen in or near New York through the month after the instant offense, other, later reports, indicate that he left New York to stay with family and friends.

Police records indicate that Mr. Naqvi had moved to Georgia and assumed the name "Samuel Sam Shah."[16] Through contacting known friends of "Sam," the police were able to ascertain where he had worked previously, as well as where he may be living, though by the time they interviewed the manager of the trailer park, Mr. Naqvi had already moved away. They interviewed two individuals living in the same area as Mr. Naqvi, Jim and Brenda Fortner, as well as old friends of Mr. Naqvi, including Mahmood Adnan and Eshan Kahn. The police additionally attempted to meet a past business partner and once roommate of Mr. Naqvi, Djaved Ioussaf, but he was out of town visiting family. They instead interviewed his wife, Rhonda, who reported that they had lived with "Sam" and, after they were married and moved out, her husband had instructed her to destroy wedding photos that "Sam" was in.[17]

In addition to speaking with friends past and present, police interviewed Mr. Naqvi's girlfriend, Deborah Elaine Tiller, in April of 2005.[18] She reported that she

---

[14] Police report, New York Homicide Unit, Detective Dolan, dated 3/22/04
[15] Police records, New York Homicide Unit, Detective TJ Wrat, dated 8/9/05
[16] Police records, New York Homicide Unit, dated 9/23/05
[17] Police Report, New York Homicide Unit, Detective Dolan, dated 2/10/05
[18] Police Report, New York Homicide Unit, Detective Dolan, dated 4/14/05

knew him as "Sam Suleman Shah" and met him in late 2001, when he was working at a gas station. "Sam" exchanged numbers with Ms. Tiller and they began dating. She reported that "Sam" was later transferred to work in a convenience store in Claremont, that he went to visit his sister in New Jersey, and that at some point she began staying over at his apartment. Ms. Tiller stated that she had last spoken with "Sam" around Thanksgiving of 2004, at which time he told her that he was here illegally and believed INS was coming to the store where he worked. At another point, he told her he might be moving overseas. Regarding the instant offense, Ms. Tiller reported that she had not known of any murder but that "Sam" had told her he and his wife got a divorce because she was having an affair with his first cousin.

Mr. Naqvi made efforts to communicate with the police through a friend, Mahmood Adnan, in hopes of arranging a time for his to surrender himself should they be able to offer a charge of involuntary manslaughter.[19] A warrant for Mr. Naqvi's arrest was issued on Tuesday, March 21, 2006. On the same day he was apprehended. Mr. Naqvi waived extradition and returned to New York on March 23, 2006.[20]

The Honorable Richard Brown stated at sentencing that he believed the crime to be planned and indicative of a "plotting evil man."[21] The Judge also opined this to be "one of the most senseless homicides that I ever came across" and highlighted Mr. Naqvi's attempt to flee, which caused him to be "out of the lives of your children in a consistent fashion for at least nine years." The judge also believed Mr. Naqvi's statement of fear for his life to have been "never credible" and placed blame on Mr. Naqvi for not being "more cooperative in your wife's decision to go through with a divorce."

At sentencing, Mr. Naqvi plead to the court, "You have to understand I was extremely emotionally disturbed. I was not a normal – I was not in a normal state of mind. I was under a lot of pressure. And I did not intend to kill Irfan that day."[22] Also, a good friend of Mr. Naqvi later reported to the police that Mr. Naqvi was "so despondent [during the time leading up to the instant offense] that he thought that Tahir was suicidal."[23]

Mr. Naqvi was not, and still is not, a violent man. In a tape referenced by Mr. Naqvi's attorney, Daniel Mentzer, Esq., at sentencing but whose transcript was not made available, Irfan discussed with Raheela that he had no concern for Mr. Naqvi who was "not the violent type, he's not going to kill us, he's not going to kill me, he's

[19] Police report, New York Homicide Unit, Detective Dolan, dated 4/21/05
[20] Police records, Complaint Follow-Up Report, Sgt. James Hanrahan, dated 3/28/06
[21] Sentencing Minutes, Transcribed by Donna Conti, dated 9/24/09
[22] Sentencing Minutes, Transcribed by Donna Conti, dated 9/24/09, pp. 21-22
[23] Police report, New York Homicide Unit, Detective Dolan, dated 3/2/05

not going to do anything violent, he's not that type, he doesn't have the guts to do that."[24]

# CURRENT MENTAL STATUS EXAMINATION

Mr. Naqvi is a 53-year-old Pakistani-American male who presented for his interview as well groomed and adequately nourished. He was wearing a prison uniform. Mr. Naqvi had speech of normal tone and speed.

Mr. Naqvi's thought processes were logical and goal directed. Mr. Naqvi denied any auditory or visual hallucinations. He additionally denied any suicidal or homicidal ideation.

Mr. Naqvi was alert and oriented in all spheres. His thinking appeared concrete and his fund of knowledge appeared normal. His concentration and attention were good. He appeared to be of average to high intelligence and his affect, or expressed emotional tone, was appropriate.

Mr. Naqvi reported that he is currently not on psychiatric medications, but instead walks to help relieve his sadness. Both at sentencing and in his interview with this examiner, Mr. Naqvi expressed regret and remorse for his actions, and the pain and suffering he has caused to his family.[25]

# DIAGNOSIS AND FORMULATION

## Axis I
## (Clinical syndromes)
## Major Depressive Disorder, Resolved

## Axis II
## (Personality and developmental disorders)
## None

## Axis III
## (Medical issues)
## None

Tahir Naqvi is a 53-year-old Pakistani-American male with no significant history of drug use or psychiatric symptomatology. He was always a hard-working

---

[24] Sentencing Minutes, Transcribed by Donna Conti, dated 9/24/09, p. 18
[25] Sentencing Minutes, Transcribed by Donna Conti, dated 9/24/09, p. 21

man devoted to his immediate family, his extended family, his religion and culture. He has no prior history of violence and no history of legal problems. The offense conduct stands out as an aberration in this man's life.

In the years prior to the offense, Mr. Naqvi suffered in silence as his wife engaged in an illicit affair with his cousin, the victim in this case. He was afraid to approach his family with the news of the affair because it would disgrace him and his entire family and would bring shame to them all. The man she was having an affair with was, in Mr. Naqvi's eyes, a brutal, dangerous and violent man who had little concern for family or culture. As years went by, in Mr. Naqvi's mind, evidence of the affair kept piling up, culminating in tape recordings of frequent conversations between his wife and her lover. Mr. Naqvi was repeatedly re-traumatized as he listened to his wife speaking romantically with her lover, making plans to meet him, and succumbing to his orders to act rudely to Mr. Naqvi. All the while, Mr. Naqvi grew to believe that the victim would eventually cause him harm, as he felt he had repeatedly threatened to. In Mr. Naqvi's mind a monster had taken control of his wife and was destroying his wife, his family and his children. Mr. Naqvi grew to fear the victim, as he felt threats to his well-being were becoming imminent.

In addition to the pain Mr. Naqvi experienced because of the affair, he has expressed on numerous occasions and through various mediums – privately and in front of court – that he felt his wife was being "remote controlling"[26] by Irfan and feared that Irfan posed a threat to them both, as Irfan had told Raheela on several occasions that he would "deal with him[Mr. Naqvi]. If he does anything he'll regret it."[27]

By the time of the offense, Mr. Naqvi was suffering, in this examiner's psychiatric opinion, from a Major Depressive Disorder. Symptoms of depression, fear, suicidality, helplessness, hopelessness, insomnia, lack of appetite, loss of concentration and focus, combined with a general loss of coping skill and of an ability to reflect rationally, are all consistent with this psychiatric diagnosis.

In addition, at time of offense, Mr. Naqvi's mental state was further disturbed and clouded by the added, gradual and unrelenting trauma of seeing the illicit affair repeatedly play out before his very eyes.

These two psychological stresses limited his behavioral options by giving him tunnelvision and impairing his capacity to reflect on his behavior and consider other options. As such, as years of pain and suffering suddenly came to the surface on the day of the offense, Mr. Naqvi became so emotionally overwhelmed by feelings of shame, embarrassment, fear and anger that he lost all rational control at the moment

[26] Letter from Mr. Naqvi to Raheela Naqvi, no date
[27] Selected transcribed phone conversations between Raheela Naqvi and Irfan Naqvi, Recorded by Tahir Naqvi, no dates

of the offense. In fact, as is not uncommon in such situations, Mr. Naqvi became so overwhelmed by his emotions that he entered a dissociated mental state, characterized by an odd sense of calm detachment. This is the psyche's mechanism to isolate overwhelming feelings from the individual's conscious mind. The emotions and their impact remain, just outside of the person's conscious awareness. Individuals in such a dissociated mental state often describe feeling as though they are an automaton or watching themselves in a video.

It is this examiner's opinion, with a reasonable degree of medical certainty that Tahir Naqvi, at the time of the incident was functioning under the influence of an Extreme Emotional Disturbance.

At the time of the offense, Mr. Naqvi had believed, for some time, that his wife had been having an affair with the victim. This belief, at least through Mr. Naqvi's eyes, was supported by a number of facts and incidents that he had witnessed, and believed proved that his wife was having an affair with a man that had proven himself to be dangerous, manipulative, and a real threat to Mr. Naqvi. This situation, by itself, might objectively cause any individual to become overwhelmed with feelings of anger, fear and shame. If, however, one applies the overlay of cultural issues in this case and, standing in Mr. Naqvi's shoes, undergoes months of torture while listening to his wife and her lover have telephone conversations revealing the intimacy of their relationship, then the loss of control Mr. Naqvi manifested not only arouses sympathy, but appears to be quite understandable.

Given the circumstances that Mr. Naqvi found himself in, his conduct appears to have been directly influenced by an Extreme Emotional Disturbance. The fact that his loss of control did not occur at a point in time immediately following a specific event involving his wife and her lover does not detract from the fact that he suddenly lost control of his rational thinking and behavior because of the overwhelming nature of the feelings he suddenly experienced, feelings that suddenly and even inexplicably, overwhelmed him on the day he chose to confront Ifran. The mental anguish and trauma that Mr. Naqvi experienced over the years gradually affected his mind and finally it overwhelmed him on the day of the offense.

Though Mr. Naqvi had intended to confront Ifran to discuss a resolution of the situation—a course of conduct consistent with Mr. Naqvi's passive and non-confrontational personality- he became overwhelmed with all the feelings of fear, angerand ultimately ragethat had accumulated for years. It was that explosion of repressed emotions, released for the first time because Mr. Naqvi flet empowered by having a gun in his hand, that caused this tragic event. Hence, in my medical opinion, to a reasonable degree of medical certainty, Mr. Nagvi suffered a mental and emotional breakdown during that final encounter that caused him to shoot Ifran while acting under Extreme Emotional Disturbance.

Thank you very kindly for referring this matter to my attention.

Respectfully submitted,

Alexander Sasha Bardey, M.D.
Diplomate in Psychiatry, American Board of Psychiatry and Neurology Diplomate
in Forensic Psychiatry, American Board of Psychiatry and Neurology Clinical
Faculty, Department of Psychiatry, New York University Medical Center Adjunct
Assistant Professor, Department of Psychiatry and Behavioral Sciences
New York Medical College

# *EXHIBIT E*

## SUPREME COURT - STATE OF NEW YORK
## CRIMINAL TERM PART TAP C- QUEENS COUNTY

PRESENT:

**HONORABLE KENNETH C. HOLDER,**
**Justice**

Ind. No. 2848/2006

THE PEOPLE OF THE STATE OF NEW YORK, :

                              Respondent,       :    Motion: To vacate judgment
                                                     of conviction
              -against-                         :

TAHIR NAQVI,                                    :

                              Defendant.        :

Richard Langone, Esq.
For the motion

Edward D. Saslaw, Esq., ADA
Opposed

Upon the foregoing papers, and in the opinion of the Court herein, the motion to vacate judgment of conviction is denied, in part, and an evidentiary hearing is granted to establish whether a favorable plea was offered by the People to defendant; if so, whether counsel communicated the plea to defendant; and whether or not defendant was prejudiced as a result of counsel's alleged failure to advise him of the plea offer (*see Lafler v Cooper* (__ US __, 132 S Ct 1376 [2012]) and *Missouri v Frye* (__ US __, 132 S Ct 1399 [2012]).

DATE: July 11, 2013

_____
KENNETH C. HOLDER, J.S.C.

MEMORANDUM

# SUPREME COURT, QUEENS COUNTY
# CRIMINAL TERM, PART TAP C

THE PEOPLE OF THE STATE OF NEW YORK

                          **Respondent,**

**TAHIR NAQVI,**

                          **Defendant.**

: **BY** Kenneth C. Holder, JSC

: **DATED** July 11, 2013

: **IND. NO.** 2848/2006

On June 25, 2009, defendant was convicted, following a jury trial, of Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree.

On September 24, 2009, he was sentenced to an indeterminate prison term of from twenty-five years to life for second-degree murder, and determinate prison terms of fifteen years with five years post-release supervision and seven years with three years post-release supervision, for the second- and third-degree weapon-possession convictions, respectively, and all to run concurrently.

He filed a notice of appeal to the Appellate Division, Second Department, but has not perfected his appeal.

1

On or about December 18, 2012, he filed the instant motion seeking to vacate his judgment of conviction pursuant to CPL 440.10(1)(h), 440.20, and 440.30, alleging that he was denied the effective assistance of counsel at his trial and sentence because counsel failed to investigate and present an extreme emotional disturbance ("EED") defense, either rather than or in addition to the justification defense he advanced at trial. In support of this claim, defendant has submitted the report of a clinical psychiatrist who interviewed him in February 2012 and reviewed the case and concluded that at the time of the crime in August 1999, defendant was functioning under the influence of an extreme emotional disturbance.  Defendant also has submitted a notarized letter claiming that counsel failed to inform him of any offer to plead guilty to Manslaughter in the First Degree to dispose of the charges against him and that he had told counsel that he wanted the best plea deal possible and did not want to go to trial.[1]

The People oppose the motion arguing that: 1) the motion should be summarily denied pursuant to CPL 440.10(2)© because the effectiveness of defendant's counsel is a matter that is apparent on the record and, accordingly, should be reviewed by the appellate court when he perfects his appeal; 2) his claim that trial counsel failed to consider the EED defense should be summarily denied because it is "made solely by the defendant and unsupported by any other affidavit or evidence, and under these and

---

[1]    The People stated in their affirmation in opposition to defendant's 440 motion that "[p]rior to trial, the People advised defense counsel that it would consent to dispose of the case by defendant's plea of guilty to Manslaughter in the First Degree, but defendant rejected that plea offer."

all the other circumstances attending the case, there is no reasonable possibility that such allegation is true" (CPL 440.30[4][d]); 3) the claim should be denied because the record reflects that counsel provided meaningful representation and his choice to assert a justification defense, rather than an EED defense should not be second-guessed simply because it was ultimately unsuccessful.

For the following reasons, the motion to vacate judgment is denied, in part, and an evidentiary hearing is granted on the *Lafler v Cooper* (__ US __, 132 S Ct 1376 [2012]) and *Missouri v Frye* (__ US __, 132 S Ct 1399 [2012]) issue.

## CONCLUSIONS OF LAW

A judgment of conviction is presumed valid, and the party challenging its validity has the burden of coming forth with allegations sufficient to create an issue of fact (*People v Session*, 34 NY2d 254, 255-56 [1974]).  While the production of contrary evidence will satisfy the burden of going forward and eliminate the presumption of regularity from the case, bare allegations are insufficient to carry this evidentiary burden (*supra* at 256).

Criminal Procedure Law 440.30(4)(b) allows a court to deny a motion to vacate judgment if the motion is based on the existence or occurrence of facts and does not contain sworn allegations substantiating or tending to substantiate all of the essential facts necessary to decide the motion (*People v Brown*, 56 NY2d 242, 246 [1982]; see

3

*People v Taylor*, 211 AD2d 603 [1st Dept 1995]; *People v O'Hara*, 9 Misc 3d 1113[A] [Sup Ct, Kings Cty 2005][denying motion to vacate judgment without a hearing because the moving papers did not contain sworn allegations or an affidavit from a person having actual or personal knowledge of the underlying facts]).

What constitutes effective assistance of counsel varies according to the unique circumstances of each representation (*People v Benevento*, 91 NY2d 708, 712 [1988]). Generally, so long as the evidence, the law, and the circumstances, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will be met (*People v Henry*, 95 NY2d 563 [2000], citing *People v Benevento*, *supra* at 712; *People v Baldi*, 54 NY2d 137,147 [1981]).

To establish that counsel failed to provide meaningful representation, a defendant must "'demonstrate the absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct" (see *People v Caban*, 5 NY3d 143, 152 [2005], quoting *People v Rivera*, 71 NY2d 705, 709 [1988]).

In addition, he must establish that as a result of counsel's alleged shortcomings, he did not receive a fair trial because counsel's conduct was both "egregious and prejudicial" (*People v Benevento*, *supra* at 713). This prejudice component "focuses on the fairness of the process as a whole," rather than on the particular deficiency's impact

4

on the outcome of the case (*People v Ozuna*, 7 NY3d 913, 915 [2006]; *People v Henry*, *supra* at 566; *People v Benevento*, *supra* at 714).

Thus, in applying the meaningful representation standard, "courts should not confuse true ineffectiveness with losing trial tactics or unsuccessful attempts to advance the best possible defense" (*People v Henry*, *supra* at 565). "The Constitution guarantees a defendant a fair trial, not a perfect one" (*People v Henry*, *supra*, citing *Delaware v Van Arsdall*, 475 US 673, 681 [1986]). Indeed, "[i]solated errors in counsel's representation generally will not rise to the level of ineffectiveness, unless the error is so serious that defendant did not receive a 'fair trial'" (*People v Henry*, *supra* at 565-66, citing *People v Flores*, 84 NY2d 184, 187 [1994]). Disagreement with trial strategies, tactics or the scope of possible cross-examination, weighed long after the trial, is insufficient (*People v Benevento*, *supra*; *People v Benn*, 68 NY2d 941, 942 [1986]).

Claims of ineffective assistance of counsel may be denied without delving into the factual accuracy of the allegations where an inspection of the trial record reveals that the factual basis, if true, would at most show a tactical error by counsel, as opposed to denial of meaningful representation (*see People v Benevento*, *supra*; *People v Satterfield*, 66 NY2d 796 [1985]).

Under the federal standard, defendant must show that counsel's performance fell below an objective standard of reasonableness and that "there is a reasonable

5

probability that but for counsel's . . . errors, the result of the proceeding would have been different" (*Strickland v Washington*, 466 US 668, 687-88, 694 [1984]). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" (*Strickland v Washington*, *supra* at 694).

"The Sixth Amendment right to effective assistance of counsel extends to the consideration of plea offers that lapse or are rejected" (*Missouri v Frye*, 132 S Ct 1399, 1402-04 [2012]; *Lafler v Cooper*, 132 S Ct 1376 [2012]). Defense counsel has a duty to communicate formal offers by the prosecution to accept a plea on terms and conditions that are favorable to the accused (*Missouri v Frye*, *supra* at 1402). Under *Strickland*, even if a defendant can establish that counsel's performance was deficient under the performance prong, he must also establish that he was prejudiced, that is, that there is a reasonable probability both that he would have accepted the more favorable plea offer had he been afforded effective assistance of counsel, and that the plea would have been adhered to by the prosecution and accepted by the court (*see Missouri v Frye*, *supra* at 1402-03).

To the extent that defendant claims that his trial attorney was ineffective for failing to investigate and consider presenting an EED defense at trial, his claim in that regard relies entirely upon his own self-serving affidavit stating that his attorney failed to do so. Under these circumstances, the Court finds that defendant's moving papers are insufficient to raise an issue of fact with respect to whether counsel, in fact, investigated

6

and/or considered an EED defense and, accordingly, the motion to vacate judgment based on counsel's failure to investigate and consider an EED defense is summarily denied (see CPL 440.30[4][b]; People v O'Hara, supra).

Nevertheless, a review of the trial record reflects that counsel was prepared, amply familiar with the case and pursued a legitimate trial strategy of establishing a justification defense based upon the factual background of the case and defendant's version of the events. Before trial, counsel filed appropriate motions seeking discovery and suppression of statements and identification testimony. He appropriately challenged the admissibility of defendant's statements at the suppression hearing that had been granted as a result of the omnibus motion.

At trial, and in keeping with his strategy, he participated in jury selection, delivered a cogent opening statement, cross-examined witnesses and impeached them where appropriate, and presented a defense in which he called defendant to testify and succeeded in obtaining a ruling allowing specific acts of violence by the victim that were known to the defendant to support defendant's claim that he reasonably feared for his life when he shot the victim and did so in self defense. Finally, counsel gave a strong summation that focused on the evidence that supported his client's claim of self defense.

Based upon all of these circumstances, there is no doubt that defendant was provided meaningful representation under the New York standard. Under the federal

7

standard as well, defendant has not demonstrated that counsel's actual performance fell below an objective standard of reasonableness and that there is a reasonable probability that the verdict would have been more favorable to defendant had counsel chosen to present an EED defense.

Accordingly, the motion to vacate judgment on ineffective-assistance grounds with respect to trial counsel's failure to present an EED defense is denied.

The People, in their affirmation in opposition to the 440 motion, stated that an offer for defendant to plead guilty to Manslaughter in the First Degree had been communicated to defendant's attorney at some point before trial. Defendant has submitted a notarized letter stating: 1) that his trial attorney, Daniel Mentzer, never informed him before or during the trial that the People had offered a plea; 2) that he had told his attorney to get him the best plea offer possible; and 3) that he did not want to go to trial.

Under the circumstances, an issue of fact has been raised with respect to whether or not the People offered defendant a plea bargain and/or whether or not his trial attorney advised him of the plea offer. Under *Missouri v Frye* (*supra*) and *Lafler v Cooper*, defense counsel has a duty to communicate favorable plea offers to a defendant and, under certain circumstances, the failure to do so may constitute ineffective assistance of counsel.

8

Accordingly, an evidentiary hearing is ordered to establish whether a favorable plea was offered by the People to defendant; if so, whether counsel communicated the plea to defendant; and whether or not defendant was prejudiced as a result of counsel's alleged failure to advise him of the plea offer.

Order entered.

The clerk of the court is directed to forward a copy of this order to the attorney for the defendant and to the District Attorney.

_____
KENNETH C. HOLDER, J.S.C.

# *EXHIBIT F*

1

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF QUEENS:   CRIMINAL TERM:   PART   TAP C

THE PEOPLE OF THE STATE OF NEW YORK,

-against-                                  Indictment No.
                                           2848/06
TAHIR NAQVI,                               440 HEARING

                Defendant.
---------------------------------x
                                October 4, 2013
                                125-01 Queens Boulevard
                                Kew Gardens, New York 11415

B E F O R E:

        THE HONORABLE KENNETH C. HOLDER

A P P E A R A N C E S:

        RICHARD A. BROWN, ESQ.,
        District Attorney, Queens County
        BY: EDWARD SASLAW, ESQ.,
            - and -
        PATRICK O'CONNOR, ESQ.,
        Assistant District Attorneys

        RICHARD M. LANGONE, ESQ.,
        Attorney for the defendant


                        Nancy Samms,
                        Senior Court Reporter

R-001

---

2

Proceedings

        THE COURT CLERK:   Number one on the calendar, 2848
of 2006, Tahir Naqvi.

        MR. SASLAW:   For the People, Richard Brown by
Edward Saslaw.

        THE COURT:   Good morning.

        MR. LANGONE:   Richard Langone, 600 Old Country
Road, Garden City, New York for Tahir Naqvi.

        THE COURT:   For the defendant is present before
the Court.   Mr. Langone had filed papers which this Court
had ruled upon, and his papers had requested a vacating of
the judgement of the conviction in this case.   The Court's
ruling was that the motion to vacate the judgment of the
conviction is denied in part, and the Court determined and
decided to have an evidentiary hearing in order to
establish whether or not a favorable plea offer had been
offered by the People to the defendant, and, if so, whether
counsel communicated the plea to the defendant and whether
or not the defendant was prejudiced as a result of
counsel's alleged failure to advise him of the plea offer.

        You have how many witnesses, sir?

        MR. LANGONE:   I'm going to call Mr. O'Connor, the
prosecutor in the case, I'm going to call the defendant
Tahir Naqvi and his present wife Saima Naqvi.

        THE COURT:   All right.   People?

        MR. SASLAW:   Depending on I guess how the hearing

R-002

NS

Proceedings                                          3

1    goes, the only witness I would have would be the original

2    defense attorney who is currently on trial.

3          THE COURT:  Thank you.  You may call your first

4    witness, sir.

5          MR. LANGONE:  Your Honor, I would call Mr. Patrick

6    O'Connor.

7    P A T R I C K   O' C O N N O R, having been duly-sworn, was

8    examined and testified as follows:

9          THE COURT OFFICER:  The People call Patrick

10   O'Connor, from the Queens District Attorney's office.

11         THE COURT:  Good morning, Mr. O'Connor.

12         THE WITNESS:  Good morning, Judge.

13         THE COURT:  Your witness, counsel.

14   DIRECT EXAMINATION

15   BY MR. LANGONE:

16   Q     Good morning, Mr. O'Connor.

17   A     Good morning.

18   Q     You were the prosecutor in the matter of the People

19   versus Tahir Nagvi?

20   A     Yes, I was.

21   Q     And you had this case pretty much from the beginning;

22   is that correct?

23   A     That is incorrect.

24   Q     Okay.  From when did you have it?

25   A     Approximately I would guess June of 2008.  I know I

                                                      NS

O'Connor-Defense-Direct                              4

1    had the case as of that time.  I did not have the case -- I did

2    not indict the case.

3    Q     Okay.  Did you have it for preliminary hearings?

4    A     Yes.

5    Q     So you had it at some point after the indictment

6    until the conclusion; is that correct?

7    A     Correct.

8    Q     So -- and your supervisor at the time was who?

9    A     Brad Leventhal.

10   Q     Prior to the hearing in this matter, there was some

11   correspondence between you and Mr. Saslaw and myself; is that

12   correct, with respect to this matter?

13   A     I'm sorry.  I missed the first part of your question.

14   Q     You, on September 26 of 2013 at 11 A.M. did you send

15   an e-mail to Mr. Saslaw stating that there was a plea offer that

16   was made in this case?

17   A     I can't testify as to the time, but, yes, I did send

18   an e-mail to Mr. Saslaw to that effect around that time.  It

19   sounds right.

20   Q     Okay.  And you had indicated in that e-mail that

21   there was a plea offer of between 22 or 23 years; is that

22   correct?

23   A     That is correct, that's my memory.

24   Q     Do you remember which one it was or --

25   A     I don't remember exactly.  I know it was less than

                                                      NS

O'Connor-Defense-Direct

5

1    25, and it was at least 21 as I'm thinking here, somewhere
2    around 21, 22, 23, but it was less than 25 which was the
3    original offer.
4    Q    So it could have been as low as 21 years.  Did you
5    memorialize the offer anyplace in your records?
6    A    I did not memorialize it other than in my memory.  I
7    did not write it down.
8    Q    Now, it's my understanding that your supervisor had
9    told you to make that offer; is that correct?
10   A    He had advised me prior to the case going to trial,
11   we discussed the case and possible plea dispositions, and he
12   said that he authorized me to offer 21 years, 22 years, I forgot
13   exactly which one.
14   Q    You were basically opposed to it?
15   A    I was not opposed to, I was surprised by it.
16   Q    Because he said it was somewhat of a crime of
17   passion, was that it?
18   A    That's correct.
19   Q    And so this was -- do you know approximately when the
20   plea offer was made?
21   A    Well, I wouldn't categorize it as a crime of passion,
22   I would categorize it as a situation where, as Brad Leventhal
23   said, the victim had slept with the defendant's wife.  It wasn't
24   a crime of passion in the sense that the crime occurred when the
25   -- when the shooting occurred the defendant was feeling any

O'Connor-Defense-Direct

6

1    passion because that was clearly not the case.
2    Q    Well, Mr. O'Connor, wasn't it your words Brad cut him
3    a break because it was somewhat a crime a passion?
4    A    Somewhat.
5    Q    I am using your word.
6    A    Somewhat a crime of passion but not really.
7    Q    Okay, it's like being a little pregnant?
8    A    No, it's not like that.  You are either pregnant or
9    you are not.
10   Q    Okay.  So in any event do you know when that offer
11   was made, sir?
12   A    I know all I can say for sure it was offered sometime
13   prior to trial.  It was made -- it was developed sometime prior
14   to trial, and it was conveyed prior to the actual start of the
15   trial to defense counsel.
16   Q    Any sense of how much --
17   A    No, I just know days, maybe weeks, but definitely
18   prior to the day that the case was set to start trial.  The
19   offer was developed, and it was communicated to defense counsel
20   Q    Okay.  So during the time -- Mr. Naqvi was
21   incarcerated for a few years at that point in time?
22   A    That's correct.
23   Q    And for all that time up until this time shortly
24   before trial there was no plea communicated; is that correct?
25   A    Excuse me?

O'Connor-Defense-Direct

7

1  Q  You said you offered a plea shortly before trial, it
2  was formulated and developed sometime shortly before trial?
3  A  There was a plea developed before trial, but the plea
4  that I was referring to specifically in my answer was the plea
5  of 21 years. Prior to the plea offer of 21 years, there was a
6  plea offer of 25 years, a manslaughter in the first-degree plea
7  with the offer of 25 years.
8  Q  And that was -- when was that plea made?
9  A  That was the plea offer when I inherited the case,
10  sometime in 2008 I think it was.
11  Q  And to whom did you make that plea offer?
12  A  I can't say that I specifically communicated with the
13  defendant's counsel with that plea offer. I inherited the case,
14  and when I inherited the case, the information I received was
15  that the plea offer was a manslaughter in the first-degree plea
16  and 25 years.
17      I don't know -- I can't say that that plea -- I
18  cannot say that I conveyed that offer to defense counsel. I
19  would assume of course that it was by the prior assistant who
20  had the case before me, but --
21  Q  Was that prior plea memorialized?
22  A  Yes, I memorialized in the case synopsis that I
23  prepared on February 9 of 2009.
24  Q  And the subsequent offer that was made which was you
25  said between 21 and 23 years, now that is -- that offer we know

O'Connor-Defense-Direct

8

1  was shortly before trial, but we don't know when, right?
2  A  That is correct.
3  Q  And that offer is communicated to who?
4  A  Mr. Daniel T. Mentzer.
5  Q  Okay. Where was that offer communicated?
6  A  That I can't tell you. It could have been over the
7  phone, it could have been in the hallway, it could have been
8  somewhere either on the phone or in the courthouse somewhere.
9  Q  Okay. But you didn't memorialize that?
10  A  No, I did not.
11  Q  That was just you were given those marching orders so
12  to speak from your supervisor, and you relayed that to
13  Mr. Mentzer?
14  A  I relayed the information to Mr. Mentzer.
15  Q  And so you just know you did it, we don't know when
16  or where or the circumstances in which it occurred?
17  A  You have asked me that for the third time, and my
18  answer is the same.
19  Q  I am trying to see if there is anyway to jog your
20  recollection?
21  A  No, I have been thinking about the case, and I don't
22  remember.
23  Q  When did Mr. Mentzer say to you when you said that,
24  when you relayed that offer?
25  A  He either said -- well, I'm sure he didn't say no.

O'Connor—Defense—Direct

9

1   He either said --
2   Q   Don't assume for me.
3   A   I know he did not say no. I know that for a fact he
4   did not say the words, no, that offer is rejected.
5   Q   Okay. Is that as far as your recollection takes you?
6   A   Either he said I will convey that communication to my
7   client and get back to you, or I don't think he is going to take
8   it, but I will tell him about it, one or the other.
9   Q   You are not sure?
10   A   One or the other.
11   Q   Well, sir, if you are saying it is I'm not sure he
12   will take it --
13   A   Either Mr. Mentzer said, I will convey the offer, but
14   I don't think he is going to take it, or he just said, I will
15   convey the offer to my client and see what he does, either one
16   or the other. I know he did not outright say, no, that's
17   rejected.
18   Q   Subsequent to that did he get back to you?
19   A   Yes, yes.
20   Q   When?
21   A   Sometime before at some point before the case was on
22   in court when we started, at some point. It could have been a
23   right before the case was called, it could have been a week
24   before or a day before, or a couple of days before, but I know
25   for a fact it was before. I remember for a fact it was before

O'Connor—Defense—Direct

10

1   we approached the bench, and the, trial was going to start.
2   Q   So it was on the day you were picking the jury?
3   A   Like I said, I don't know if it was on that day or
4   the day before or a week before, I just know it was sometime
5   before we went to the bench because I knew when we went to the
6   bench, that the defendant was rejecting the offer.
7   Q   Did you communicate that to the judge?
8   A   I believe, yes, we did, myself and Mr. Mentzer when
9   we approached the bench prior to the start of the trial, we
10   discussed or we were asked by the judge what's the offer here,
11   what can we do to dispose of the case, and it was communicated
12   from my memory that both me and Mr. Mentzer communicated to the
13   judge that the offer was 21 years or 22 years or 23, that the
14   defendant was rejecting it, and we are ready to go to trial, and
15   that was it.
16          MR. LANGONE: Your Honor, I would just move with
17   respect to the defendant. the hearsay statements that were
18   the statements were to his attorney since Mr. O'Connor
19   never spoke to the defendant that those be stricken as
20   hearsay.
21   A   I didn't testify to that.
22          MR. SASLAW: I didn't hear anything of the sort.
23          MR. LANGONE: He said that the defendant rejected
24   the offer.
25   A   The defense attorney, sorry, let me rephrase.

11

O'Connor-Defense-Direct

1    MR. SASLAW: He said we advised the Court that the

2    plea offer was rejected.

3    A    Let me rephrase:    I don't communicate with the

4    defendant while he was represented by counsel, and I did not do

5    that in this case.    I have never spoken to Mr. Tahir Naqvi, and

6    I never heard him speak, except when he testified at trial, so he

7    never communicated anything to me prior to trial.

8    MR. LANGONE: I understand, just making it clear

9    --

10   THE COURT:    I understand what you are saying if

11   the record bears that out, I will take that into

12   consideration; but I don't recall hearing the statement

13   being made.

14   MR. LANGONE:    Okay.    You know the hearsay rules --

15   THE COURT:    I understand.

16   Q    During the trial itself, were any further -- first of

17   all, did Mr. Mentzer ever come back with a counteroffer to you?

18   A    No, not that I remember.

19   Q    Okay.    And during the trial itself, were there any

20   other plea negotiations?

21   A    Not that I remember.

22   Q    But you are sure there was an offer communicated to

23   counsel at least?

24   A    Yes.

25   Q    Of between 21 to 23 years on the man one; is that

---

12

O'Connor-Defense-Direct

1    correct?

2    A    That is my memory, yes.

3    Q    Thank you.

4    MR. LANGONE:    No further questions, Judge.

5    THE COURT:    Thank you.    Anything?

6    MR. SASLAW:    Just one question.

7    CROSS EXAMINATION

8    BY MR. SASLAW:

9    Q    The plea offer, the charge that the defendant was --

10   would have pled guilty to if it he accepted the pled guilty was

11   what?

12   A    Manslaughter in the first degree.    It was always

13   manslaughter in the first degree.

14   MR. SASLAW:    Thank you.

15   THE COURT:    Thank you.

16   Thank you, Mr. O'Connor.

17   THE WITNESS:    Thank you, your Honor.

18   (Witness excused.)

19   THE COURT:    Call your next witness, counsel.

20   MR. LANGONE:    I will call Tahir Naqvi.

21   T A H I R    N A Q V I, having been duly sworn, was examined and

22   testified as follows:

23   THE COURT OFFICER:    The defense calls Tahir,

24   T-A-H-I-R, Naqvi, N-A-Q-V-I.

25   THE COURT:    You may proceed.

Tahir Naqvi-Defense-Direct

13

```
 1   DIRECT EXAMINATION
 2   BY MR. LANGONE:
 3   Q   Mr. Naqvi, hello.
 4   A   Hi.
 5   Q   Sir, prior to the instant offense, did you ever have
 6   any prior criminal history?
 7   A   No.
 8   Q   Ever arrested before?
 9   A   Never.
10   Q   When were you arrested on this case?
11   A   To be exact March 21, 2006.
12   Q   Where were you arrested?
13   A   In Georgia.
14   Q   And at the time you were arrested in Georgia, what
15   was your marital status?
16   A   At that time I was married to my current wife, Saima.
17   Q   How long had you been involved with Miss Naqvi at
18   that time?
19   A   Before my arrest?
20   Q   Yes.
21   A   I would say probably one year.
22   Q   Before your arrest in this case, did you tell your
23   current wife that you were a fugitive?
24   A   Yes, I did.
25   Q   What did you tell her?
```

Tahir Naqvi-Defense-Direct

14

```
 1   A   I told her what happened, you know, that I was
 2   involved into this incident.
 3   Q   Did you tell her that you killed someone?
 4   A   Right, and --
 5   Q   Did you tell her you were in trouble?
 6             MR. O'CONNOR:  Objection, leading.
 7             THE COURT:  First of all, turn this mic to you a
 8   little bit.  Okay.  Speak into that one.  I will allow it.
 9             MR. LANGONE:  I will try to move it along, your
10   Honor.
11             THE COURT:  You may continue.
12   Q   Did your wife know that you were wanted in New York
13   for this killing?
14   A   Yes, she did.
15   Q   At some point while you were living in Georgia, what
16   were you doing in Georgia?
17   A   I used to work in the convenience store, gas station.
18   Q   And where did you meet her, where was she working?
19   A   I met her in Union, Georgia.  We used to work for the
20   same boss.  He used to have four different stores so I used to
21   work in one store, and she used to work in another store, that's
22   the way I met her.
23   Q   Now, at some point -- did you leave the United States
24   after this crime was committed, you fled?
25   A   Yes, I did.
```

Tahir Naqvi—Defense—Direct

```
 1   Q   And you subsequently came back?
 2   A   Yes.
 3   Q   Why did you come back?
 4   A   Well, I was trying to surrender, you know, and I did
 5       have a lawyer.
 6   Q   Who was your lawyer?
 7   A   The first one was Sam Schmidt.
 8   Q   He was in New York?
 9   A   He was in downtown New York.
10   Q   When you contacted Mr. Schmidt, what did you ask
11       Mr. Schmidt to do for you?
12   A   I just told him what happened, and I was trying to
13       surrender, and he should get a plea deal for me, I will
14       surrender.
15   Q   You wanted to surrender, but you wanted a plea deal?
16   A   Right.
17   Q   Did you subsequently speak to a detective in New
18       York?
19   A   Yes.
20   Q   What did you tell the detective?
21   A   The same thing.
22   Q   You told him what?
23   A   That I would like to plea offer, and, you know, if I
24       get the deal, I will surrender.
25   Q   And they told you what?
```

---

Tahir Naqvi—Defense—Direct

```
 1   A   They told me that we don't make the plea offer until
 2       you are —
 3   Q   In other words, they are not going to bargain with a
 4       fugitive?
 5   A   Right, that's right.
 6           MR. O'CONNOR:  Objection.  Is he testifying or Mr.
 7       Naqvi testifying?
 8           THE COURT:  Sustained.
 9   Q   What did he tell you?
10   A   He said he cannot make the deal while I am fugitive.
11   Q   Okay.  So now at some point you got arrested,
12       correct?
13   A   Right.
14   Q   And were you married by then?
15   A   Yes, I was.
16   Q   And were you living with Saima your present wife?
17   A   Yes, I was.
18   Q   And when you were arrested, where were you brought?
19   A   I was brought to the local precinct in Georgia.  I
20       stayed there for two days, and then I was extradited to New York
21       City.
22   Q   And where were you kept in New York?
23   A   In Rikers Island.
24   Q   And while you were an inmate at Rikers Island, did
25       someone subsequently make any recommendations with respect to
```

1  hiring a lawyer?

2  A.  Yes, of course.

3  Q.  Okay. Tell us about it.

4  A.  Well, when I came to Rikers Island, first of all, I

5  don't know anything about the criminal law, not at all, and when

6  I came to Rikers Island, you know, I talked to different inmates

7  and, you know, they told me that I am supposed to have a good

8  lawyer, so --

9  Q.  Did someone recommend Mr. Mentzer to you?

10  A.  Yes. There were two inmates that go on trial, and he

11  bring those two trial on justification defense in Bronx County,

12  and they are the one who recommended me his name.

13  Q.  Did you contact your wife to notify him?

14  A.  Yes, I did.

15  Q.  And did you retain him?

16  A.  Yes, I did.

17  Q.  What purpose initially did you retain him for?

18  A.  Well, to make the plea offer, to get the plea offers.

19  Q.  And he subsequently came to see you?

20  A.  Yes, he did.

21  Q.  On Rikers?

22  A.  Yes.

23  Q.  And do you remember when?

24  A.  Well, I will say --

25      MR. LANGONE: Strike that.

1  Q.  He came to see you?

2  A.  Yes, he did.

3  Q.  Were you indicted already?

4  A.  At that point, yes.

5  Q.  And when he came to see you, what did he say?

6  A.  Well, when he came to see me, I said I don't want to

7  go on trial, please try to get me the best offer you can, and he

8  said he don't make the plea deals, he is a trial lawyer so we

9  will go on trial.

10  Q.  And did he tell you -- what did he tell you about

11  your case?

12  A.  Well, when he listened to the tapes I have, he bring

13  those tapes a couple of times to Rikers Island with a tape

14  recorder, and I listened to those tapes, and I transferred for

15  him and after listening to those tapes he said that I have very

16  good justification defense, and that's the defense it's going to

17  be.

18  Q.  Did he also read the letter you wrote to your wife?

19  A.  Yes, sir, he definitely did.

20  Q.  So he told you that he is a trial lawyer?

21  A.  Yes.

22  Q.  And that -- did he say he could beat this case?

23  A.  That's what he said.

24  Q.  Did he say how confident he was he could beat this

25  case?

19

Tahir Naqvi-Defense-Direct

1   A   Well, he said he has at least seven or eight cases on
2   justification, and some of the cases they are more difficult
3   than this case, so he was like that kind of confident.
4   Q   He gave you high assurances that he could beat the
5   case?
6   A   Yes.
7           MR. SASSAN: Objection.
8           THE COURT: I will allow it. Well, sustained as
9   to high assurance. I don't know what that means.
10   Q   Now, how many times did he visit you in Rikers
11   Island?
12   A   I will say probably between six to eight times at
13   least, if not more.
14   Q   And each time that he came there, what was the
15   purpose of the visit?
16   A   Well, to prepare for the trial.
17   Q   So he was talking to you about trying the case?
18   A   Right, all the time.
19   Q   So give us an example of what was he talking about
20   when he came to talk about trying the case?
21   A   You know, he told me that we are going for
22   justification defense, right, so he bring the tapes few times,
23   we listened together, and that's what he told me that we will be
24   going for justification, so he used to ask me different
25   questions, I used to answer him, you know.

R919   NS

20

Tahir Naqvi-Defense-Direct

1   Q   Did he ever tell you your justification defense was
2   weak?
3   A   He never told me, no.
4   Q   Did he ever tell you that it will be difficult
5   winning this trial?
6   A   He never told me, no.
7   Q   Did he ever discuss with you the possibility of a
8   lesser included offense?
9   A   No.
10   Q   Did he ever discuss with you an alternative defense,
11   like extreme emotional disturbance?
12   A   Never.
13   Q   Now at some point you had asked him should you be
14   examined by a psychiatrist?
15   A   Yes. I told him when I met him, I said, listen, when
16   this thing happened, I black out, you know, and should I see the
17   psychiatrist. And he said it's not necessary, you know, it's
18   not necessary.
19   Q   And why was it not necessary?
20   A   Because he thought that --
21           MR. O'CONNOR: Objection, your Honor, to him
22   testifying as to what --
23           THE COURT: Sustained.
24   Q   Did he say anything as to why it was not necessary?
25   A   Because he was confident by the justification

R920   NS

Tahir Naqvi-Defense-Direct

21

1 defense.

2     THE COURT: He was what confident about what?

3     THE WITNESS: Justification defense.

4     THE COURT: Thank you.

5 Q At any point during the trial, did he ever discuss a

6 manslaughter plea bargain to you?

7 A Never.

8 Q At any point, at any time since you had retained him,

9 did he discuss with you a manslaughter plea bargain offer?

10 A Never.

11 Q He never told you initially that they were offering

12 you 25 years?

13 A Never.

14 Q Never told you later on that they were offering you

15 between 21 and 23 years?

16 A He told me nothing about that plea offer, never.

17 Q But he said he had won seven or eight cases on

18 justification; is that correct?

19 A Right.

20 Q And he thought he could win yours, based on the tapes?

21 A That's what he said.

22 Q How many times did your wife visit you?

23 A She used to visit me sometime, few times a week, and

24 sometime at least once a week when I was in like three and a

25 half years, so I would say like over a hundred times maybe.

Tahir Naqvi-Defense-Direct

22

1 Q During any of the times that she came to visit you,

2 did she never relay to you that, Mr. Mentzer had spoken to her

3 about a plea bargain?

4 A No, she never talk about that.

5 Q When you were talking to -- while you were in Georgia

6 before your arrest, and you were talking to her about the case;

7 is that correct?

8 A Right.

9 Q And you had said you hired Mr. Sam Schmidt; is that

10 correct?

11 A I told her, you know, I have a lawyer, you know. I

12 probably didn't give her the name but --

13 Q But it was Sam Schmidt?

14 A It was Sam Schmidt.

15 Q And you had spoken to Sam Schmidt, right?

16 A Yes, I did, on the phone.

17 Q And tell us again what did you ask Sam Schmidt to do

18 for you?

19 A That I will try to make a deal, and then I will

20 surrender.

21 Q You knew you were going to go to jail; is that

22 correct?

23 A Definitely, most definitely.

24 Q Sir, at this time of the trial in this case, were you

25 willing to accept a plea to manslaughter in the first degree?

23

Tahir Naqvi-Defense-Direct

1    A.   Yes, I was.

2    Q.   Were you willing to accept a sentence of between 21

3  and 23 years, an indeterminate sentence of between 21 and 23

4  years?

5    A.   Definitely.

6        MR. LANGONE:  I presume it's indeterminate, your

7  Honor, as a first offender.

8        THE COURT:  I don't recall.

9    Q.   You were willing to accept the sentence of 21 to 23

10  years?

11    A.   That's right.

12    Q.   Since your incarceration, sir, have you had any

13  disciplinary history?

14    A.   Never.

15    Q.   No trouble, no fights?

16    A.   Never.

17    Q.   Have you made any accomplishments in prison?

18    A.   Yes, I did a few short courses, I finished my GED in

19  Rikers, I did hazardous course, like chemical.

20    Q.   Hazardous material?

21    A.   Right.  Then I did some building maintenance, right

22  now I am doing the print shop.

23    Q.   If you had the opportunity to accept a manslaughter

24  plea now and accept a sentence of 21 to 23 years, would you take

25  it?

---

24

Tahir Naqvi-Defense-Direct

1        MR. SASLAW:  Objection, that's a silly question.

2        THE COURT:  Sustained.

3        MR. LANGONE:  Is that a silly question?

4        MR. SASLAW:  Yes, what difference does it, make

5  what he thinks today?

6        MR. LANGONE:  It's in the nature of the relief

7  available.

8    Q.   Had you been offered a plea bargain, sir, would you

9  have spoken to your wife about it?

10    A.   Oh, yes most definitely.

11        MR. SASLAW:  Objection, your Honor.  This is all

12  speculation on what might have happened and so on and so

13  forth.

14        THE COURT:  That's probably outside of what I need

15  to decide.  That's not helpful to me at all.

16        MR. LANGONE:  Okay.  Your Honor, at this point I

17  have no further questions.

18        THE COURT:  Thank you.  Do you have any questions?

19        MR. O'CONNOR:  Yes, just briefly.

20  CROSS EXAMINATION

21  BY MR. O'CONNOR:

22    Q.   Hello, Mr. Naqvi.

23    A.   Hi.

24    Q.   Mr. Naqvi, you have testified that you left this

25  country after the crime in question in this case, correct?

Tahir Naqvi-Defense-Cross

25

```
 1    A    Yes, I did.

 2    Q    But you came back, correct?

 3    A    Yes.

 4    Q    And how long were you in this country after you came

 5    back before you were apprehended by the police for this crime?

 6    A    A little over six years.

 7    Q    And during that six year period, were you entirely in

 8    the United States?

 9    A    I'm sorry?

10    Q    Were you during that, six year period just inside the

11    United States, did you leave the country again?

12    A    No.

13    Q    And you testified that when you came back to this

14    country six years before being apprehended on this crime, you

15    were trying to surrender yourself?

16    A    Yes.

17    Q    So when you first came over to this country after

18    leaving, when you first set foot in the United States, your

19    testimony is that you were trying to surrender yourself?

20    A    When I say I'm trying --

21    Q    I didn't ask you what you meant.   I said were you

22    trying to surrender yourself when you stepped off the plane when

23    you came back to this country after the crime in this case.

24    A    That's the main reason I came back.

25    Q    During your six year stay here in the United States
```

Tahir Naqvi-Defense-Cross

26

```
 1    before the police caught up with you, you had conversations with

 2    the police on the telephone, correct?

 3    A    Yes, one time.

 4    Q    Fair to say that when you were working during that

 5    six year period in the various convenience stores where you

 6    worked, you occasionally served police officers in uniform.

 7    correct?

 8    A    I served police officers in uniform?

 9    Q    Yes.  They came into the store, they bought things,

10    correct?

11    A    Yes, probably I did, yes.

12    Q    You did not surrender yourself to any of those police

13    officers, did you, sir?

14    A    I do have a lot at that time.

15    Q    Sir, my question is during that six year period when

16    you were working in convenience stores waiting on uniformed

17    police officers, did you surrender yourself at any point in time

18    to them?

19    A    I did not.

20    Q    Now, at some point in time you say that Daniel

21    Mentzer became your defense attorney, correct?

22    A    Right.

23    Q    And do you remember how long he was your defense

24    attorney before the trial started?

25    A    I will say about over two years.
```

1  Q  So he represented you for approximately two years?

2  A  At least two years, yes.

3  Q  And during that two year period you had several

4  conversations with him about this case, correct?

5  A  Yes.

6  Q  And you discussed with him your possible defenses in

7  this case during this time, correct?

8  A  Not possible. I mean, he is the one because I don't

9  know anything about the defenses at that time.

10 Q  But -- let me rephrase the question.

11 You discussed with him your defenses in this case,

12 justification, for instance?

13 A  Right.

14 Q  Okay. And that was during that two year period,

15 right?

16 A  Um-hum.

17 Q  And at no point in time during this two year period

18 when you were represented by Mr. Mentzer, did Mr. Mentzer ever

19 discuss with you pleading guilty to the crime with which you

20 were charged, correct?

21 A  He never did.

22 Q  Mr. Mentzer, was he appointed by the state or did you

23 hire him?

24 A  My family hired him.

25 Q  Your family hired him?

1  A  Right.

2  Q  Who in your family hired him?

3  A  My wife.

4  Q  Your wife was paying him then?

5  A  Correct.

6  Q  And the money that she was paying him was your money?

7  A  Some of it, not all of it, because my sister and

8  brothers paid him, too.

9  Q  But some of the money was coming from you?

10 MR. LANGONE:  Objection, your Honor.  Not relevant

11 as to where the money was coming from.

12 THE COURT:  I will allow it.

13 A  Right.

14 Q  You stated that prior to hiring Mr. Mentzer you had

15 discussions with fellow inmates about hiring Mr. Mentzer,

16 correct?

17 A  Right.

18 Q  So it's fair to say that you discussed your case with

19 other inmates you were incarcerated with at the time, correct?

20 A  Right.

21 Q  And they actually went so far as to give you advice

22 about attorneys, correct, correct?

23 A  Yes.

24 Q  Okay. Is it fair to say that since as you say you

25 were so inexperienced in legal matters before you were arrest --

Case 1:16-cv-06870-WFK   Document 12-2   Filed 09/15/17   Page 43 of 143 PageID #: 609

Tahir Naqvi-Defense-Cross

29

1   you were apprehended on this case, that you discussed with these

2   inmates what you were charged with, your crime, correct?

3   A    Right.

4   Q    You discussed with them their cases, correct?

5   A    Yes, we do sometimes, yes.

6   Q    And you discussed with them what their attorneys did

7   in their cases, correct?

8   A    Right.

9   Q    And you heard about how some of them, their attorneys

10  had been successful in prosecutions, correct?

11  A    Right.

12  Q    So you generally just discussed criminal cases with

13  the inmates you were incarcerated with during that period of

14  time between when you were apprehended on this crime and the

15  trial, correct?

16  A    Right.

17  Q    And during those conversations, did you ever discuss

18  with any of the inmates plea dispositions or plea bargains that

19  they had engaged in in their cases?

20  A    No, I never talked about -- when I was talking to the

21  inmates, the only thing I was interested was that I went the

22  best defense lawyer.  Okay, so some inmates, as you said, they

23  have successes, they offered his name, Mr. Mentzer, I mean he

24  beat their case, so they gave me his name, and that's why we

25  hired him.

R.029

NS

---

Tahir Naqvi-Defense-Cross

30

1   Q    When you were discussing cases in general with these

2   inmates while you were incarcerated, did you discuss with them

3   what charges they were being faced with, the people you were

4   discussing the cases with?

5   A    Right.

6   Q    And this was at Rikers Island, correct?

7   A    Yes.

8   Q    So everyone that you spoke to, they hadn't been

9   convicted of crimes yet, but they were pending trial, right?

10  A    Right.

11  Q    And when you had these discussions, isn't it true

12  that they discussed with you what the prosecution in their cases

13  were offering them, correct?

14  A    No, I don't remember that, no.

15  Q    You don't remember -- any of the inmates you spoke to

16  in-depth about your case, and while you were there, you don't

17  remember discussing with them at all what their charges were and

18  how much time they were facing?

19  A    I'm not talking about every inmate.  I am talking

20  about two particular inmates who gave me his name.  I am talking

21  about those.

22  Q    Okay.  Those two inmates, did you discuss with them

23  their charges, what crimes they were charged with and what time

24  they were offered and what time they were facing, did you have

25  those discussions with those two inmates?

R.030

NS

Case 1.16-cv-06870-WFK   Document 12-2   Filed 09/18/17   Page 45 of 143 PageID #: 611

```
 1    A     I don't remember that.
 2    Q     Is it possible, it is possible then that in your
 3  talking with these inmates, you did discuss with them what times
 4  they were being charged -- how much time they were facing, how
 5  much time they were being asked to do by the prosecution: fair
 6  to say that that possibly could have been discussed, right?
 7    A     All they told me about they are going on trial.
 8    Q     But it is your testimony that in the two years' that
 9  Mr. Mentzer was your defense attorney, he never spoke to you
10  about any possible plea disposition in your case, that's your
11  testimony, right?
12    A     Never, ever, yes.
13    Q     Because -- and I don't want to misphrase you here,
14  because Mr. Mentzer told you that as a defense attorney for you
15  --
16          MR. O'CONNOR:  Withdrawn.
17    Q     That as a defense attorney in general his job is just
18  to do trials and not to discuss plea offers with his clients; is
19  that correct?
20          MR. LANGONE:  Objection, misstates the testimony.
21          THE COURT:  I will allow it.
22    A     Can you say again?
23    Q     Your testimony is that he told you that he doesn't
24  discuss plea offers with his clients, he only does trials; is
25  that correct?
```

```
 1    A     He said he don't make the plea deals, he go for
 2  trial, yes.
 3    Q     I'm sorry, what did you just say he said what?
 4    A     He said, he told me that he is an attorney, and go he
 5  goes on trial.
 6    Q     He doesn't do plea deals?
 7    A     Obviously, yes.
 8    Q     So when you were sitting there in prison for those
 9  two years being charged with this crime, did it ever occur to
10  you that maybe you should hire an attorney, a defense attorney
11  who specifically specializes in only doing plea deals and not
12  trials, did that ever cross your mind?
13    A     When your defense lawyer giving you assurance that we
14  will go on trial, and we can beat this trial, then you have no
15  reason to go for plea offer.
16    Q     Why don't you try answering my question?
17          MR. LANGONE:  He just did, your Honor.
18          MR. O'CONNOR:  Nonresponsive, your Honor.
19          THE COURT:  Did you hear the question he asked
20  you?
21          THE WITNESS:  Yes.
22          THE COURT:  Can you answer that?
23    A     That's what I said because he always give me the
24  Impression --
25    Q     My question, sir, was in the two years while you were
```

Tahir Naqvi-Defense-Cross

33

1    pending trial, did it ever occur to you to hire an attorney, one
2    of these defense attorneys out there who only does plea deals as
3    well as or in place of Mr. Mentzer who is, one of those defense
4    attorneys who only does trials, did that thought ever occur to
5    you?
6       A    Okay.  With all due respect, sir, I do not have as
7    much money as you think that I can go to -- if I don't like this
8    lawyer, I can go to somebody else.  I have very limited
9    resources.
10      Q    I did not ask you whether or not you did or attempted
11   to do so.  My question is did you ever think of doing so?
12      A    I have no sources, no way I can think about that.  I
13   have no more sources.
14           THE COURT:  He has answered it.
15      Q    When you were incarcerated for the two years in
16   Rikers Island, fair to say that you saw people inmates at Rikers
17   Island who were there at one point, and then they got released
18   or moved on, correct?
19      A    Right.
20      Q    People coming in and out of Rikers Island that you
21   were acquainted with, correct?
22      A    Um-hum.
23      Q    Fair to say that some of those individuals took
24   pleas, and they went upstate to do their time while you were
25   incarcerated in Rikers, correct?

R033                                                            NS

Tahir Naqvi-Defense-Cross

34

1       A    Yes.
2       Q    So while you were in Rikers Island, you were familiar
3    with the concept, correct me if I'm wrong, that people charged
4    with crimes can engage in plea negotiations and get plea deals
5    to dispose of their cases, correct?
6       A    That's right.
7       Q    You knew that, right?
8       A    Oh, yeah.
9       Q    Did you ever try to speak to Mr. Mentzer about
10   getting one of these plea deals that you knew about when you
11   were incarcerated for that two year period of time?
12      A    He never talk to me about the plea deal.
13      Q    My question is did you, did you, knowing about plea
14   deals, did you ever confront Mr. Mentzer and say, hey, can you
15   get me a plea deal here, did you ever do that?
16      A    Okay.  When he came to see me first time, that was my
17   first question, I don't want to go on trial, get me the best
18   plea offer you can, and he answered me that I'm a trial lawyer
19   and I have a very good justification case.
20           THE COURT:  Mr. Naqvi, we heard that already.
21           Answer the question he just asked you.
22      A    I answered the question already, I asked him.
23      Q    That's the only time you asked him, the first time
24   that you met him was the only time that you asked him about
25   getting a plea deal, correct?

R034                                                            NS

1   A   Right.
2   Q   So for the rest of that two year period when
3       Mr. Mentzer was representing you, you never had any
4       conversations with him whatsoever about plea dealing, correct?
5   A   The reason I did not do that because he gave me --
6   Q   I did not ask you the reason why. I asked you is
7       that true?
8   A   From what I remember, yes.
9   Q   And your testimony is that Mr. Mentzer told you that
10      you had a very good justification defense; is that your
11      testimony, sir?
12  A   Right, sir.
13  Q   And in fact he told you that he was so confident in
14      yourself defense case --
15          MR. O'CONNOR:  Withdrawn.
16  Q   That he was so confident in yourself defense of
17      justification, that it wasn't necessary to do any kind of
18      psychological testing on your black out, right?
19  A   Correct.
20  Q   It's fair to say that you did tell him before trial
21      about these so-called black outs?
22  A   Right.
23  Q   In fact, at trial you testified that during the
24      course of your killing the victim in this case, you had one of
25      your black outs, correct?

1   A   Right.
2   Q   So Mr. Mentzer knew about that, correct?
3   A   Of course.
4   Q   And Mr. Mentzer never, ever told you that your case
5       was weak, correct?
6   A   He never told me.
7   Q   Did he ever discuss with you any holes that he saw in
8       your case, any flaws, any problems in your case for you?
9   A   No.
10  Q   Okay. Let me rephrase that and make it clear.
11      Did he ever discuss with you any possible problems
12      with getting a jury to accept your justification self defense,
13      defense?
14  A   No.
15  Q   He just told you it was a winner, right?
16  A   He said, you know, the way he gave me the impression,
17      he said I have very good justification defense, and he can beat
18      the case.
19  Q   Oh, he told you he could win the case; is that what
20      you said?
21  A   Right.
22  Q   In fact, I believe you said that -- he told you that
23      he was confident in winning the case, correct, correct?
24  A   Yes, sir.
25  Q   Confident with winning the case pursuing a

Tahir Naqvi-Defense-Redirect

37

```
1    justification defense; correct?
2        A    Right.
3            MR. O'CONNOR:  No further questions, your Honor.
4            THE COURT:  Counsel?
5    REDIRECT EXAMINATION
6    BY MR. LANGONE:
7        Q    Mr. Naqvi, while you were in Rikers Island, did you
8    learn about snitches and informants?
9        A    Yes.
10       Q    Do inmates ordinarily speak to each other about their
11   cases?
12           MR. O'CONNOR:  Objection, your Honor, to what's
13   ordinarily done.
14           THE COURT:  Yes, direct it to what's going on
15   here.
16       Q    Did the inmates you were interacting with on Rikers
17   Island, were they customarily, commonly telling each other about
18   their cases?
19           MR. O'CONNOR:  Objection, your Honor.
20           THE COURT:  I will allow it.
21       A    Yes, they do.
22       Q    Now, you had befriended, did you say, just a couple
23   of inmates?
24       A    Yes, basically I cannot number them, but yes, three
25   of them.
```

Tahir Naqvi-Defense-Redirect

38

```
1        Q    And they told you about their cases also?
2        A    Of course.
3        Q    Did you ever run into any inmates where no plea
4    offers were made, where they had to go to trial?
5        A    Yes.
6        Q    Where the offer was take the charge, and that was it?
7        A    I mean the few inmates they just go on trial, they
8    have no offer.
9        Q    No offers?
10       A    Right.
11       Q    So when were you on Rikers what year, seven years
12   ago?
13       A    Yes, since March '06.
14       Q    Has your English improved during the time in the last
15   seven years?
16       A    Maybe little bit, you know.  I am in this country
17   almost 26 years so that's the only language I speak basically.
18       Q    But do you have any problems at all in translations
19   when you hear people speaking English?
20       A    Sometimes I do, I mean I have good English, but that
21   don't mean that I am going to understand each and every word
22   because that's not my native language, you know.
23       Q    So when your lawyer told you, Mr. Mentzer told you
24   that you had a very good self defense, and that he could beat
25   the case, did you from that point on think it was necessary to
```

1  consider a plea bargain?

2  A  No.

3  Q  You didn't surrender for a long time, Mr. O'Connor is

4  right, I mean you were out there for six years as a fugitive?

5  A  That's right.

6  Q  And why should this judge believe that you would have

7  surrendered had you had a plea offer?

8  MR. SASLAW: Objection, your Honor.

9  THE COURT: Sustained.

10  Q  Why didn't you surrender earlier, sir?

11  A  Why I did not?

12  Q  Yes.

13  A  That's the main reason I came back to the United

14  States, that I would like to surrender. In the meantime I had a

15  lawyer, and I tried to make a plea deal.

16  Q  You were afraid about how much time you might be

17  facing if you surrendered, sir?

18  A  Were I afraid to surrender?

19  Q  Yes.

20  A  I mean I want to surrender, yes, but of course I'm

21  afraid, you know, when you are facing 25 to life, you know, you

22  are afraid.

23  Q  You knew you were going to jail, right?

24  A  Oh, yes, definitely.

25  Q  And the issue was really --

1  A  Because when you make the offer you get sometime,

2  right, so of course you are going to jail, you are facing the

3  time, you know.

4  Q  And your family when -- where did you go?  Pakistan?

5  A  No, I go to Europe.

6  Q  And your family were communicating with you, right?

7  A  Yes, on the phone.

8  Q  And they were telling you that you were being charged

9  with murder?

10  A  Yes. As a matter of fact, they discouraged me to

11  come back.

12  Q  They discouraged you not to come back?

13  A  Right, they said you are facing long time, and I

14  said, no, I will come back.

15  Q  Are you sorry for what you did, sir?

16  MR. O'CONNOR: Objection, your Honor.

17  THE COURT: Sustained.

18  MR. LANGONE: No further questions.

19  THE COURT: Anything else?

20  MR. O'CONNOR: One.

21  RECROSS EXAMINATION

22  BY MR. O'CONNOR:

23  Q  Just so we are clear, Mr. Naqvi, when you first came

24  into this country, you hired an attorney to work out a plea deal

25  for you with the police prior to your surrendering, correct?

1  A. Not with the police, with the DA.

2  Q. With the DA, I'm sorry?

3  A. Um-hum.

4  Q. So you knew enough before you were apprehended in

5  this case to hire an attorney specifically for the purpose of

6  engaging in plea negotiations?

7  A. Right.

8  Q. With the DA's office, correct?

9  MR. O'CONNOR: No further questions.

10  MR. LANGONE: No further questions.

11  THE COURT: You may step down.

12  MR. LANGONE: At this point, your Honor, I will

13  call Mrs. Naqvi. She is out in the hall.

14  THE COURT: You may.

15  (Whereupon, there was a brief pause in the

16  proceedings.)

17  THE COURT OFFICER: Witness entering.

18  THE COURT: Thank you.

19  S A I M A   N A Q V I, having been duly sworn, was examined and

20  testified as follows:

21  THE COURT OFFICER: The defenses calls S-A-I-M-A

22  Naqvi, Mercer County resident.

23  THE COURT: Good afternoon, ma'am.

24  THE WITNESS: Good afternoon.

25  THE COURT: I will ask you to move your chair up

1  slightly and speak directly into the microphone so we can

2  hear you. Thank you.

3  DIRECT EXAMINATION

4  BY MR. LANGONE:

5  Q  Hello, Mrs. Naqvi.

6  A  Hi.

7  Q  I need you to speak loud so that everyone can hear

8  you. I know you have a little bit of a language barrier so if

9  any questions I ask, you are not sure of, tell me you don't

10  understand, I will rephrase it, okay?

11  A  Okay.

12  Q  First of all, have you ever been arrested?

13  A  No.

14  Q  Have you ever been sued?

15  A  No.

16  Q  Any tickets, parking tickets?

17  A  No.

18  Q  What do you do for a living?

19  A  I work in Quik Chek Corporation.

20  Q  What do you do for them?

21  A  I'm a food service manager over there.

22  Q  You are married to Mr. Naqvi; is that correct?

23  A  Correct.

24  Q  And you have three children from a prior marriage?

25  A  Right.

Saima Naqvi-Defense-Direct

43

1  Q  How old are they?

2  A  They are 22, 17 and 15.

3  Q  We have a couple of them here now?

4  A  Right.

5  Q  How old were they when you met Mr. Naqvi?

6  A  Six and seven and nine.

7  Q  Where did you meet?

8  A  In Georgia.

9  Q  You met in Georgia, while you were both working?

10  A  Right.

11  Q  When you became involved with him, at some point he

12  asked you to marry him?

13  A  Right.

14  Q  What year was that?

15  A  I said yes.

16  Q  I know you said yes.  What year did you say yes?

17  A  2005.

18  Q  That was in Georgia?

19  A  Yes.

20  Q  Before he asked you to marry him, did you -- did he

21  tell you about his problem?

22  A  Yes.

23  Q  What did he tell you?

24  A  That he killed somebody.

25  Q  And that he killed a person in New York?

---

Saima Naqvi-Defense-Direct

44

1  A  Right.

2  Q  And that he was a fugitive in New York?

3  A  Right.

4  Q  Did he ever tell you that he was justified in what he

5  did?

6  A  No.

7       MR. O'CONNOR:  Objection, your Honor.

8       THE COURT:  Sustained.

9  Q  He told you about the case, what happened?

10  A  Yes, he told me.

11  Q  Now, what did you say to him when he told you that he

12  was a fugitive in New York?  What did you advise him to do?

13       MR. O'CONNOR:  Objection; leading, your Honor.

14       THE COURT:  No, it does not suggest the answer.

15  You may answer.

16  A  To surrender.

17       THE COURT:  What was that?

18       MR. LANGONE:  To surrender.

19       THE COURT:  Thank you.

20  Q  What did he say in response to that when you urged

21  him to surrender?

22  A  He said he wanted to surrender, but he is scared.

23  Q  After he was arrested and brought back to New York,

24  you followed him here?

25  A  Right.

Saima Naqvi-Defense-Direct                                    45

```
 1   Q   Where do you live at present?
 2   A   In Trenton, New Jersey.
 3   Q   You are living there with your children?
 4   A   Yes.
 5   Q   At some point after he was arrested and was in Rikers
 6   Island, did he notify you -- you were visiting him often,
 7   correct?
 8   A   Right.
 9   Q   How much would you visit him?
10   A   Like three times per week.
11   Q   Did you see him three weeks per week for the entire
12   time that he was on Rikers?
13   A   Yes.
14   Q   That was over how many years?
15   A   Three and a half years.
16   Q   At some point did he discuss with you, was it early
17   on that he discussed with you about the possibility of retaining
18   an attorney?
19   A   Right.
20   Q   Did he give you the name of someone?
21   A   Yes.
22   Q   Who was that person?
23   A   Daniel Mentzer.
24   Q   Did you contact Mr. Mentzer?
25   A   Right.
```

Saima Naqvi-Defense-Direct                                    46

```
 1   Q   And did you meet with him?
 2   A   Yes.
 3   Q   Now, tell us what went on at the first meeting with
 4   Mr. Mentzer?
 5   A   I talked to him about the case, and he said that he
 6   is a trial lawyer, and he will go for the trial.
 7   Q   Okay.  He said he is a trial lawyer.  Did he say
 8   anything about the merits of the case or the strength of the
 9   case?
10   A   Yes, he said he will win the case.
11   Q   He told you he would win the case.  Did he tell you
12   how much it would cost to win the case?
13   A   Yeah.
14   Q   How much would it cost?
15   A   $40,000.
16   Q   So you paid him $40,000?
17   A   Right.
18   Q   Did he say -- was there an agreement, did you sign
19   something for him?
20   A   Yes, I did sign some papers, but the amount was not
21   on the paper.
22   Q   The what?
23   A   The amount, like 40,000 was not on the paper.
24   Q   So it was 40,000 for the trial, did he speak to you
25   about plea bargaining at all?
```

1   A   Not at all.
2   Q   Did he tell you that there would be a different fee
3   if you did not go to trial?
4   A   No.
5   Q   Just that it was a fee of $40 for the trial?
6   A   Yes.
7   Q   Did you ever hear of plea bargaining before?
8   A   No.
9   Q   You are from Pakistan also?
10  A   No.
11  Q   Where are you from?
12  A   From Pakistan.
13  Q   That's what I meant. You are from Pakistan?
14  A   Right.
15  Q   How many times did you meet Mr. Mentzer?
16  A   Two times.
17  Q   You only met him twice?
18  A   Right.
19  Q   When was the second time you met him?
20  A   When I paid him money.
21  Q   Okay. So you paid him in installments?
22  A   Right.
23  Q   And the second time you paid him was before trial?
24  A   Right.
25  Q   How soon before trial?

1   A   like three months before trial.
2   Q   Did he mention anything about that the case was weak?
3   A   No, never.
4   Q   Did he say anything -- what did he tell you during
5   the second meeting, what was he saying?
6   A   He said he will win the case.
7   Q   Did he tell you anything about past victories or
8   anything like that?
9   A   Yes, he said he won one case, that's it.
10  Q   He said he won one case previously?
11  A   Right.
12  Q   This type of case, justification?
13  A   Right.
14  Q   And did you go to his office to give him the money or
15  he met you or what?
16  A   I went to his office.
17  Q   How long was the meeting?
18  A   Like 15 minutes.
19  Q   So he basically just took the money?
20  A   Right.
21  Q   And said that he could win the case?
22  A   Right.
23  Q   Did he mention anything about plea bargaining to you?
24  A   No.
25  Q   During the three and a half years you were visiting

Saima Naqvi-Defense-Direct

1   your husband, did he ever --- did your husband ever say anything
2   about Mr. Mentzer saying there was a plea bargain offer?
3        A.   No.
4        Q.   Now, did you attend the trial in this case?
5        A.   Yes.
6        Q.   And you would see Mr. Mentzer in the hall during the
7   trial proceedings?
8        A.   Yes.
9        Q.   Did he ever once tell you that we should think about
10  plea bargaining or the case is weak?
11       A.   No.
12       Q.   When was the next time you heard from Mr. Mentzer?
13       A.   Before the last day of trial he called me.
14       Q.   And what did he say to you?
15       A.   He said don't come to the trial.
16       Q.   And why?
17       A.   He said he going to lose the trial.
18       Q.   That he was going to lose the trial?
19       A.   Yes.
20       Q.   And what did you say to him?
21       A.   I said you are telling me now that we are going to
22  lose the trial?
23       Q.   Because he never discussed with you the possibility
24  of pleading this case?
25       A.   No, no.

Saima Naqvi-Defense-Direct

1        Q.   Based upon your history with your husband at the time
2   he was in Georgia, did he express a desire to take a plea on
3   this case?
4        A.   No.
5        Q.   Your husband never spoke about pleading guilty while
6   he was in Georgia?
7        A.   No, he said he wanted to surrender, that's what he
8   said.
9        Q.   That's all you know?
10       A.   Yes.
11       Q.   Okay.
12            MR. LANGONE:   I have no further questions.
13            THE COURT:   Counsel, any questions?
14            MR. O'CONNOR:   Yes, your Honor.
15  CROSS EXAMINATION
16  BY MR. O'CONNOR:
17       Q.   Miss Naqvi, good afternoon.  If I ask you any
18  questions you don't understand, you let me know, okay?
19            Now, Miss Naqvi, you hired Mr. Mentzer to represent
20  Tahir Naqvi on this case, right?
21       A.   Right.
22       Q.   And did you hire Mr. Mentzer to do any legal services
23  for you personally?
24       A.   No.
25       Q.   So Mr. Mentzer was strictly hired for the sole

Case 1:16-cv-06870-WFK   Document 12-2   Filed 09/15/17   Page 55 of 143 PageID #: 621

Saima Naqvi-Defense-Cross

51

1 purpose of representing Mr. Tahir Naqvi, correct?

2 A Right.

3 Q And after you hired Mr. Mentzer, were you ever privy

4 to his conversations with Tahir Naqvi about the facts of this

5 case or about this case between when you hired him and when the

6 trial had ended?

7 A I can't understand you please.

8 Q Let me rephrase that.

9 Were you ever present, you, Mr. Tahir Naqvi and

10 Mr. Mentzer, were the three of you ever present and discussing

11 this case in any, shape or form?

12 A Like together?

13 Q Yes.

14 A No.

15 Q So you aren't privy, or you -- I used that word again

16 I'm sorry. You don't know --

17 MR. O'CONNOR: Withdrawn.

18 Q You were not present for any communications between

19 your husband, Mr. Tahir Naqvi and his attorney, Mr. Daniel

20 Mentzer, correct?

21 A Right.

22 Q So you can't give any testimony or say anything

23 whatsoever about what the two of them talked about at any point

24 in time, correct?

25 A Well, when he saw him, sometimes he call me after

Saima Naqvi-Defense-Cross

52

1 that.

2 Q Who called you?

3 A Mentzer.

4 Q But my question is you were never present?

5 A No.

6 Q Never heard any conversations between Mr. Mentzer and

7 your husband, Mr. Tahir Naqvi, correct?

8 A Correct.

9 Q And Mr. Mentzer wasn't hired to be your attorney,

10 right?

11 A Right.

12 Q And you also stated that Mr. Mentzer communicated to

13 you when you hired him that he was going to win the case?

14 A Right.

15 Q Did Mr. Mentzer ever communicate to you any doubt

16 about his ability to win the case before the last day of trial?

17 A No.

18 Q So the day before the last day of trial was the first

19 time Mr. Mentzer ever said anything to you about the possibility

20 of being unsuccessful in the defendant's case?

21 A Right.

22 Q Correct?

23 A Correct.

24 Q So prior to that time, Mr. Mentzer communicated to

25 you that he was confident that he was going to win this case?

1    A:  Right.--

2    Q   Did you discuss with Mr. Mentzer the facts of this

3        case?

4    A   I don't know so much about this stuff, so whatever he

5        told me, I just believed him.

6    Q   Well, my question is did Mr. Mentzer ever discuss

7        with you what happened when Mr. Tahir Naqvi killed the victim in

8        this case, what happened at that time?

9    A   I can't understand that question.

10       MR. LANGONE:  Your Honor, first of all, I

11       respectfully object, and I think it's irrelevant for the

12       purposes of whether there was a plea offer made here and

13       whether that was communicated to Mrs. Naqvi.

14       THE COURT:  That was almost what you were asking

15       too, right?

16       MR. LANGONE:  I don't know what aspect you are

17       talking about, Judge.

18       THE COURT:  The aspect about whether or not a plea

19       offer being communicated for your client.

20       MR. LANGONE:  Withdrawn.

21       THE COURT:  All right.

22   Q   Did you ever speak with Mr. Mentzer about what the

23       defendant, your husband, was being charged with about the

24       killing?

25   A   Right, yes.

1    Q   Excuse me?

2    A   Like murder?

3    Q   Yes, about the murder, did you ever speak to him

4        about that?

5    A   No.

6    Q   So let's see if I get this straight, Daniel Mentzer

7        never discussed with you anything about the facts of the murder,

8        what the defendant was being charged with, what he allegedly

9        what he was supposed to have done, correct?

10   A   No.

11   Q   He never did that, right?

12   A   No.

13   Q   And he never talked to you about any plea

14       negotiations either, right?

15   A   No.

16   Q   In fact, he barely talked to you at all about the

17       facts of the case, correct?

18   A   He did talk to me about him, like he go and see him,

19       and that's it.  He didn't tell me about the case.

20   Q   Okay.  So the only things you discussed with

21       Mr. Daniel Mentzer the defense attorney for Mr. Tahir Naqvi was

22       scheduling, correct?

23   A   Correct.

24   Q   When he was going to meet Mr. Naqvi in prison,

25       correct?

Saima Naqvi-Defense-Cross

55

```
 1    A.      Yes.
 2    Q       And the fee, of course, that he was charging,
 3    correct?
 4    A.      Correct.
 5    Q       So it's no surprise that he did not talk to you about
 6    any plea negotiations, right, correct?
 7    A.      Correct.
 8    Q       Thank you.
 9            THE COURT:  Counsel?
10    REDIRECT EXAMINATION
11    BY MR. LANGONE:
12    Q       You visited your husband three times a week for three
13    and a half years, correct?
14    A.      Right.
15    Q       You had a close relationship with your husband?
16    A.      Right.
17    Q       Do you still have a close relationship with him?
18    A.      Right.
19    Q       Do you stand by him?
20    A.      Of course.
21    Q       Your husband never spoke to you about a plea offer at
22    any point, did he?
23    A.      Never.
24            MR. O'CONNOR:  Asked and answered and beyond the
25    scope of my cross-examination.
```

Saima Naqvi-Defense-Redirect

56

```
 1            THE COURT:  Sustained.
 2    Q       Now, you met Mr. Mentzer just twice, right?
 3    A.      Right.
 4    Q       And on neither occasion did he mention any plea
 5    bargains to you?
 6    A.      No.
 7            MR. O'CONNOR:  Objection, asked and answered.
 8            THE COURT:  Same question.  Sustained.
 9            MR. LANGONE:  Just one second, your Honor.  I am
10    just trying to collect my thoughts.
11            THE COURT:  Sure.
12            (Whereupon, there was a brief pause in the
13    proceedings.)
14    Q       To this day, ma'am, do you know the difference
15    between a plea bargain and a trial?
16    A.      No.
17            MR. LANGONE:  No further questions.
18            THE COURT:  Thank you.  Thank you, ma'am.  You may
19    step down.
20            (Witness excused.)
21            THE COURT:  Anymore witnesses, counsel?
22            MR. LANGONE:  I have no more witnesses, your
23    Honor.
24            THE COURT:  Do you rest?
25            MR. LANGONE:  I rest.
```

1   THE COURT: Okay.
2   MR. LANGONE: I do have with all due respect I
3   don't know what the government's position is in terms of
4   rebuttal, but I would note for the record that I had --
5   first of all that there is no evidence of any sort in the
6   prosecution's files, in the trial proceedings in this
7   matter or anywhere that I am aware of that there was any
8   plea bargain communicated to my client. I put two phone
9   calls into --
10  THE COURT: Do you have the minutes right before
11  the trial?
12  MR. LANGONE: I have the trial minutes. My
13  understanding is that there is nothing on the record so if
14  there is something off the record with respect to --
15  THE COURT: I am just asking you.
16  MR. LANGONE: I have the minutes of the trial. I
17  am doing the appeal in the case.
18  THE COURT: So at the point right before the trial
19  began before we start selecting a jury to the point we
20  start selecting, do you have those minutes?
21  MR. LANGONE: Yes, I will provide them.
22  THE COURT: Can I see them?
23  MR. LANGONE: Yes, absolutely. It was an 18(b)
24  assignment, but I believe the voir dire is on that.
25  MR. SASLAW: It was an 18(b) assignment?

1   MR. LANGONE: No, I apologize. We got partial
2   poor person relief with respect to the transcript. Anyway,
3   your Honor, I made two phone calls to Mr. Mentzer leaving
4   messages, and he never returned my calls. The District
5   Attorney has spoken to him and supposedly he had said he
6   did convey the plea offer to my client, but he never
7   provided an affidavit, and he is not present here now, and
8   it is my understanding that he is dealing with another
9   hearing in the Bronx on an identical issue with another
10  client.
11  MR. SASLAW: The source was me, and what I said
12  was he has -- the reason Mr. Mentzer is not here today is
13  that he advised me he is before Supreme Court in the Bronx
14  before a judge named Carter on a pending homicide case -- I
15  think he said a homicide case that's about to go to trial.
16  So not a hearing about the facts or anything like that.
17  MR. LANGONE: But there was representation made
18  that he is dealing with the same scenario in another
19  instance.
20  THE COURT: I didn't hear that.
21  MR. LANGONE: That's what I got --
22  THE COURT: That's not what he said just now.
23  MR. SASLAW: Mr. Mentzer told me he has a client
24  where there are plea negotiations basically, that's what I
25  am talking about.

1   THE COURT: Nonetheless --
2      MR. LANGONE: Nonetheless, your Honor, the point
3   is I think this attorney -- the rule in New York State
4   clearly is that there is no presumption in favor of an
5   attorney even in the event of an affirmation by an attorney
6   with respect to veracity and credibility on these matters.
7   Here we don't have that, and as far as I'm concerned, we
8   have an attorney basically trying to avoid the situation --
9   let me finish.
10     THE COURT: Let him finish.
11     MR. LANGONE: My burden based on the appellate
12  division decisions, and I am looking at Radcliff
13  R-A-D-C-L-I-F-F 298 A02d 533 2d Department, we can.
14  demonstrate our preponderance of the evidence of the case
15  based upon the testimony of Mr. Naqvi, the wife, and I have
16  a representation from the government that in fact there was
17  a plea offer made.  The prosecutor obviously has no
18  information as to whether that's conveyed.
19     We have a situation here, Judge, where Mr. Naqvi
20  from day one knew that he was going to serve time in jail
21  based on this case.  He had a lawyer that came in and said
22  give me $40,000, I will try the case, and I will beat it
23  because I have won several of these in the past on
24  justification; the evidence in the record is that he did
25  not tell him about the weakness of the case.  The

1   prosecution even recognized that there was some indicia of
2   emotional disturbance here even if it didn't rise to the
3   level of the EED defense, the case law is quite clear that
4   justification and extreme emotional disturbance are in fact
5   compatible defenses, they were not incompatible, they are
6   not inconsistent so with respect to the case being weak
7   with respect to justification which it clearly was, not
8   pursuing the EED defense, your Honor, in my estimation,
9   this lawyer was so filled with himself because he had won
10  other justification case trials in the past --
11     THE COURT: Okay.  One moment.
12     (Whereupon, there was a brief pause in the
13  proceedings.)
14     THE COURT: You may continue.  I'm sorry.
15     MR. LANGONE: Thank you.  My point is the attorney
16  here had a certain level of uberis with respect to his
17  ability to win a justification case that came before him.
18  It certainly was tried in that manner in this case.  The
19  fact that there is nothing on the record or anywhere
20  memorialized with respect to a plea offer of manslaughter,
21  it's respectfully submitted that that goes some distance in
22  demonstrating that the offer was never made in the murder
23  case.
24     The fact that this lawyer has not provided the
25  District Attorney with an affidavit contesting the veracity

Proceedings                                                              61

1   of the allegations is further evidence of the bona
2   fide-ness of our position, and, Judge, you know, when you
3   look at it, when you look at it, the facts as they are laid
4   out that the DA can't deny that he spoke to a prosecutor
5   and says give me a plea deal while he was in Georgia. Yes,
6   he hid, he ran, he was afraid, people do that, but he was
7   asking the prosecutor give me a plea deal, and the
8   prosecutor said, we don't deal with fugitives, you have to
9   come in an see how it goes. But he knew there were
10  consequences, he was ready to accept consequences for his
11  actions. He stands ready now to accept consequences for
12  his actions.
13      THE COURT: Well, he already has. We are past
14  that.
15      MR. LANGONE: Yes, Judge. With all due respect, I
16  submit based upon the totality of the case and from the
17  beginning coming back there knowing that he has to face the
18  piper because he can't stay away from his children and
19  trying to hire Mr. Schmidt to negotiate a plea deal speaks
20  to a prosecutor trying to work it out, I'm not saying the
21  fact that he didn't turn himself in was improper, it was
22  wrong, and he is obviously dealing with it, but with
23  respect to him being amenable at the time to accept the
24  plea bargain offer, when you take the totality of those
25  factors into account clearly this defendant knowing that he

Proceedings                                                              62

1   is in trouble, knowing what he did clearly he would have
2   accepted the plea offer at the time had he been aware of it
3   that it was for manslaughter and for a sentence of 21
4   years.
5       THE COURT: I'm just curious: If you have someone
6   who left the country, who then returns, who knows that he
7   at some point has to "face the music", but who is either
8   making calls or making inquiries about turning himself in,
9   and the statement is given to him that no one is going to
10  negotiate with him until he is -- obviously no one is going
11  to negotiate against themselves, he is not present, they
12  are not going to give him a number.
13      Inherent in that, doesn't it suggest in his mind
14  if he were to turn himself in that he would get some kind
15  of deal? So why would that thinking, that thought process
16  after six years why would that come to a screeching halt
17  just because he meets a lawyer who says that he wins cases,
18  is that reasonable?
19      MR. LANGONE: Well, if the lawyer is telling him
20  who is a novice to the law telling him this is a slam dunk
21  justification case, that he listened to the tapes, that he
22  has read the letter that the defendant wrote to his wife as
23  to the circumstances, listening to the salacious tapes, and
24  the lawyer says I can beat this case, anybody in jail if
25  you have someone telling you I can beat the case, that's

Proceedings

1  what they want to hear. Nobody wants to stay in jail.
2  That's a natural inclination, you really can beat the case?
3  They are not from the country, he does not speak the
4  language that well --
5
6          THE COURT: He speaks it fine.  I understand him
7  perfectly.
8          MR. LANGONE: You also understand about the
9  Pakistan culture the closeness -- listen, he wanted to get
10  the best outcome that he could get, the best outcome if a
11  lawyer tells me he can get me out of jail, I can beat this
12  case, and I have done this before, and I know the facts of
13  this case, and we can beat it, it will cost $40,000 to beat
14  it, a lot of people think if you pay for a lawyer and get a
15  retained lawyer, you will get better justice, better
16  service, better outcome.  He is believing I will pay this
17  guy $40,000, and he could win the justification defense.
18          Now, listen, that doesn't minimize any sorrow for
19  what he has done, it doesn't vitiate it, but it's a natural
20  inclination to want to get out.  Innocent people plead
21  guilty in Rikers Island.  So the fact that he believes what
22  the lawyer tells him, and he is not just believing it from
23  the lawyer, he has another guy telling him this guy won
24  another case on justification, he has a strong reason to
25  believe that.

          THE COURT: Well, did he say he won on

63

NS

Proceedings

1  justification or he won it?
2          MR. LANGONE: No, he said it was on justification.
3  Read the testimony.  He said it was on justification,
4  that's a strong reliance factor.  I'm not going to sit here
5  for one second and say that, yes, what he knew he should
6  have turned himself because it would have been better for
7  him at that point to do that in any event to surrender,
8  it's easy to say, but to walk yourself into the jail, you
9  know, when you don't know how much time you will be
10  serving, when you do that is a very frightening thing, and
11  I submit we know that flight is the weakest form of
12  evidence with respect to culpability.  We know that even
13  innocent people, aid he is not innocent, we know that
14  innocent people will flee on the circumstances.  It's
15  fearful, it's scary.
16          His position was approach avoidance, approach
17  avoidance.  Emotionally he was trying to deal with it and
18  psychologically the reality it's easier to try to deny the
19  situation in his mind and not cope, but that does not mean
20  that when the pressure was on that he wouldn't make the
21  right decision, and the pressure was on, and when the
22  pressure was on, the lawyer instead of doing the right
23  thing, any lawyer worth his salt, with the overwhelming
24  evidence in a case as this was, your Honor, I want the
25  record to be clear there was a plea offer in this case and

64

NS

Proceedings                                                                 65

1    the defendant is declining it because there was no chance
2    of justification on this case, and it was frivolous to even
3    go forward with it.
4         I think just based on that, Judge, that this was a
5    case where the clearly there should have been some
6    representations on the record with respect to any plea
7    offer that was made, and I don't believe there was one made
8    to this defendant.  Thank you, your Honor.
9         THE COURT:  Noted.
10        MR. SASLAW:  I'm not going to repeat the many
11   things I said in the papers.  I didn't ask for an
12   affidavit.  I have no burden in this.  The People have no
13   burden at this point.  The burden shifting ended when the
14   defendant was convicted.  The law is that they have to
15   prove, not just from the defendant's mouth, they have to
16   prove that he received ineffective assistance of counsel,
17   and you know the reason for that rule is it's very simple:
18   For a defendant to do what he we saw the defendant do
19   today, say, hey, I don't know anything about any plea
20   offer.
21        The facts of this case so contradict the
22   testimony.  The facts that we have heard here, a person is
23   trying to surrender, you know, the one thing that he wants
24   to know is what time he is going to get.  He did not have a
25   conversation with a prosecutor, he had a conversation with

---

Proceedings                                                                 66

1    a detective who is not in a position to negotiate time with
2    him, and the idea that any lawyer would not convey a plea
3    offer and rather go to trial because he thinks he can beat
4    the case is beyond comprehension, beyond belief.
5         However, if the Court wishes, I will call
6    Mr. Mentzer.  I don't believe that I have a burden.  I
7    don't believe there is any need for his testimony, but I
8    can understand why the Court might want to meet him.  And
9    if that's the case, he believes that the judge he is in
10   front of does his calendars on Tuesdays and possibly we
11   could do this Tuesday, if the Court is available.  The only
12   problem I'm not in, in the morning because I'm the AD.
13        THE COURT:  No, Tuesday I'm in the middle of a
14   trial.  The only days that are available are Fridays.  He
15   is not available on Friday, that gentleman?
16        MR. SASLAW:  He will be available on some day on
17   Friday assuming his trial is completed.  That's the only --
18   as I said, I am prepared to go forward and argue this.
19        THE COURT:  I prefer to hear from him.
20        MR. SASLAW:  Okay.  Let's continue it to a day --
21   not next Friday because I'm not available next Friday, but
22   perhaps two Fridays from now or something like that.
23        THE COURT:  That's fine.  This won't take long.
24   We don't need him here for long.
25        MR. LANGONE:  Can we do this in the afternoon,

Case 1:16-cv-06870-WFK   Document 12-2   Filed 09/18/17   Page 63 of 143 PageID #: 629

Proceedings                                           67

1   your Honor?
2      THE COURT:  No, the morning.
3      MR. LANGONE:  So the 18th you are looking at?
4      MR. SASLAW:  No, not the 18th.  I can't do the
5   18th.  I'm okay with the 25th.
6      THE COURT:  We can do the 25th.
7      MR. LANGONE:  I cannot do the 25th.  I am in the
8   Southern District on the 25th in front of Judge Torres.
9      THE COURT:  The first?
10     MR. SASLAW:  Yes.
11     MR. LANGONE:  November 1st.
12     THE COURT:  All right.  The case is a continued to
13  November 1.
14     MR. SASLAW:  Thank you, your Honor.
15     (Matter adjourned to November 1, 2013.)
16     *   *   *   *   *   *   *
17     The foregoing is certified to be a true and
18  accurate transcript of the original stenographic minutes
19  taken of this proceeding.

*[signature]*

Nancy Samms, SCR

NS

---

INDEX                                                 68

2   P A T R I C K   O' C O N N O R
3   DIRECT EXAMINATION                               3
4     BY MR. LANGONE                                 3
5   CROSS EXAMINATION                                12
6     BY MR. SASLAW                                  12
7   T A H I R   N A Q V I
8   DIRECT EXAMINATION                               13
9     BY MR. LANGONE
10  CROSS EXAMINATION                                24
11    BY MR. O'CONNOR
12  REDIRECT EXAMINATION                             37
13    BY MR. LANGONE
14  RECROSS EXAMINATION                              40
15    BY MR. O'CONNOR
16  S A I M A   N A Q V I
17  DIRECT EXAMINATION                               41
18    BY MR. LANGONE
19  CROSS EXAMINATION.                               42
20    BY MR. O'CONNOR
21  CROSS EXAMINATION                                50
22    BY MR. O'CONNOR
23  REDIRECT EXAMINATION                             55
24    BY MR. LANGONE

NS

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF QUEENS:   CRIMINAL TERM:   PART TAP-C

-------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

      -against-

                            Indictment No.
                            2848-06
TAHIR NAQVI,                      Hearing

                Defendant.

-------------------------------x

                125-01 Queens Boulevard
                Kew Gardens, New York 11415.
                December 6, 2013

B E F O R E:

        THE HONORABLE KENNETH C. HOLDER
                      JUSTICE

A P P E A R A N C E S:

        HON. RICHARD A. BROWN, ESQ.,
        District Attorney, Queens County
        BY: EDWARD SASLAW, ESQ.,
            Assistant District Attorney

        RICHARD LANGONE, ESQ.,
        Attorney for the Defendant

                MARIA E. EDMOND, RPR
                Senior Court Reporter

1

---

                        Proceedings.

        THE CLERK: This is indictment 2848 of 2006, Tahir

Naqvi.

        Appearances, please.

        MR. SASLAW: For the People, Richard A. Brown by

Edward D. Saslaw.

        MR. LANGONE: Richard Langone, 600 Old Country

Road, Garden City, New York, for Mr. Naqvi.

        THE CLERK: Sir, you are Tahir Naqvi?

        MR. NAQVI: Yes, sir.

        THE CLERK: Thank you.

        THE COURT: This is a continued hearing and,

People, I believe it's your opportunity to put on any

evidence you'd like the Court to consider.

        MR. SASLAW: People call Mr. Mentzer.

        THE COURT: Thank you.

        COURT OFFICER: Remain standing, face the clerk.

raise your right hand.

D A N I E L   M E N T Z E R, having been duly sworn, was

examined and testified as follows:

        THE CLERK: Be seated please.

        COURT OFFICER: Sir, in a loud, clear voice please

state your name, spelling your last name and the agency that

you work for.

        THE WITNESS: Daniel, Mentzer, M-E-N-T-Z-E-R,

Mentzer & Sheindlin, LLC, in Westchester.

2

Mentzer - The People - Direct                3

```
 1              THE COURT:  Good morning, sir.

 2              THE WITNESS:  Good morning, your Honor.

 3      DIRECT EXAMINATION BY

 4      MR. SASIAN:

 5      Q    What do you do for a living?

 6      A    I'm an attorney.

 7      Q    Do you specialize in any particular area?

 8      A    Criminal law.

 9      Q    How many -- just give us a ballpark figure of how many

10      criminal defendants you've represented?

11      A    Well over a thousand.

12      Q    Do you represent any defendants in homicide cases?

13      A    Yes.

14      Q    Can you give us an idea what percentage of that, or a

15      number?

16      A    Seventy or eighty.

17      Q    Okay.  Have all those cases been tried?

18      A    No.

19      Q    How do they get resolved if they're not tried?

20      A    The defendant takes a plea, in one or two of them,

21      they've been dismissed on request of the prosecution.

22      Q    Did you ever meet a person named Tahir Naqvi?

23      A    Yes.

24      Q    Do you see him here today?

25      A    Yes.
```

---

Mentzer - The People - Direct                4

```
 1      Q    How did you meet him?  In what capacity?

 2      A    I represented him on a homicide charge here in Queens.

 3      Q    In representing Mr. Naqvi did you discuss, did you

 4      negotiate or discuss any possible disposition of the case with

 5      the District Attorney's office?

 6      A    I did, yeah, yes.

 7      Q    Tell us a little bit about that.

 8      A    Well, I spoke with Patrick O'Connor, who was the

 9      assigned Assistant District Attorney in the case to find out

10      whether or not they were making an offer, and they had, they

11      did.

12      Q    What was the offer?

13      A    The offer was, as I recall, 25 years, on a Manslaughter

14      in the First Degree.

15      Q    Did you discuss that offer with Mr. Naqvi?

16      A    Yes.

17      Q    And was he interested in accepting that offer?

18      A    No, he was not interested in taking any more than 10.

19      Q    What recommendation, if any did you make to him

20      concerning that offer?

21      A    I'm not sure I understood the question.

22      Q    Well, did you make any recommendation to him as to

23      whether or not he should accept that plea offer?

24      A    I don't recall.

25      Q    Did you discuss with Mr. Naqvi any possible defenses to
```

Mentzer - The People - Direct          5

1    the crime he was charged with?

2    A.   Yes.

3    Q    And what defenses did you discuss with him?

4    A.   I believe I discussed all the defenses, that he didn't

5    commit the crime, justification and extreme emotional

6    disturbance.  But, I would add this though with respect to an

7    extreme emotional disturbance defense, where we were with the

8    plea offer and Mr. Naqvi's unwillingness to accept Manslaughter

9    in the first Degree and 25 years I didn't consider extreme

10   emotional disturbance to be a good option, considering we would

11   be in effect conceding the very charge to which he wouldn't

12   accept the plea of guilty to.

13   Q    In other words, if the case, if the defense of extreme

14   emotional defense was accepted he would be guilty of the same

15   crime that he could just plead guilty to without a trial?

16   A.   Exactly.

17   Q    So the case went to trial?

18   A.   It did.

19   Q    And the defendant was convicted?

20   A.   He was, yes.

21        MR. SASLAW:  I have no further questions.

22        THE COURT:  Your witness, Counsel.

23        MR. LANGONE:  May I use the podium, your Honor?

24        THE COURT:  Certainly.

25        MR. LANGONE:  Appreciate it.

RJT3                                     me

---

Mentzer - The People - Cross           6

1    CROSS-EXAMINATION BY

2    MR. LANGONE:

3    Q    Hello, Mr. Mentzer.

4    A.   Good morning, Mr. Langone.

5    Q    Who referred Mr. Naqvi to you?

6    A.   I had tried the homicide trial of a man named Usama

7    Murza (phonetic), and I believe, as I understand it, Usama Murza

8    was incarcerated in the same facility as Mr. Naqvi and when Mr.

9    Murza's trial concluded I was then retained by Mr. Naqvi.

10   Q    What was the defense of Mr. Murza's trial?

11   A.   Justification.

12   Q    Did you win in that case?

13   A.   Yes.

14   Q    And who did you first contact with respect to

15   representation of Mr. Naqvi?

16   A.   I believe it was Mr. Naqvi's wife who first contacted

17   me.  I'm not sure about that, but I believe that's the one with

18   whom I had the most communication, I believe she was the one who

19   first contacted me.

20   Q    And do you recall, do you recall a conversation you had

21   with her?

22   A.   No.

23   Q    And after you spoke with her did you go and visit Mr.

24   Naqvi?

25   A.   I don't remember, but that's probably what I would have

RJT4                                     me

Mentzer - The People - Cross                                    7

1    done;
2    Q      And did she retain you prior to the time you went to
3    visit him?
4    A.     I believe so,
5    Q      You're not sure, you just believe so?
6    A.     I'm not sure, but I think as a result of the Murza
7    verdict I think they were interested in retaining me.
8    Q      On justification, yeah.
9    A.     Now, when you went to see Mr. Naqvi --
10   file, Mr. Naqvi's file from another lawyer?
11   A.     I don't remember.  Likely, I would have.
12   Q      Do you remember -- obviously you remember, do you
13   remember reviewing a file prior to getting anything from the
14   District Attorney's office?
15   A.     I don't remember.
16   Q      And did you have Mrs. Naqvi sign a retainer agreement?
17   A.     I probably did, yes.
18   Q      And do you remember how much the retainer was for?
19   A.     I remember what I received for the case, yes.
20   Q      What did you receive?
21   A.     I received an upfront fee, I believe of $15,000, and
22   -- I didn't receive all of it, I split it with the co-counsel
23   that I had on the case.
24   Q      That's fine.  But the retainer called for one fee; is
25   that correct?  Did you have a separate fee for plea and a

Mentzer -- The People - Cross                                    8

1    separate plea for trial or did you just have one fee?
2    A.     One fee.
3    Q      Now, had you, was that the only other justification
4    case you won or did you ever win another one?
5    A.     I probably won 10 or 11 of them.
6    Q      On justification?
7    A.     On justification, yeah.
8    Q      Now, when you went to see Mr. Naqvi --
9    A.     Oh, excuse me -- prior to -- I'm sorry to interrupt,
10   but prior to that time, probably six or seven.
11   Q      Six or seven.  Within a certain -- how long within the
12   time prior to the time you met Mr. Naqvi?
13   A.     Maybe eight or nine years.
14   Q      So within eight or nine years you had those six or
15   seven?
16   A.     Correct.
17   Q      And the most recent of which was right before he
18   retained you?
19   A.     Right before he retained, exactly, yes.
20   Q      Now, when you went to see Mr. Naqvi, had you -- the
21   first time you see him had you already gone through the District
22   Attorney's discovery material?
23   A.     I don't think I had received it by that point, by the
24   point in time in which I spoke with Mr. Naqvi.  I could be wrong
25   about that, but I don't think I received the full packet until

1 after I had met with him.
2    Q   Okay.  And what was your evaluation of his
3 justification defense?
4    A   I didn't think it was a good justification defense.
5    Q   Did you tell him that?
6    A   Oh, yes.
7    Q   And when did you -- do you recall having that
8 conversation with him?
9    A   Throughout my representation of him.  I don't think
10 there was any misconception that that was a good justification
11 defense.
12    Q   You told him that the prognosis was grim with respect
13 to that defense?
14    A   I don't know if I used those words, but yes, we were
15 well, he understood that that was a tough defense.
16    Q   And you made no representations that you thought that
17 you could exonerate him on the basis of that defense?
18    A   No.  I just wanted to add we had a lot of the discovery
19 in the case, including a very crucial witness who was, who
20 seemed to be unbiased who happened to be walking in the street
21 at the time when she claims to have observed the homicide.
22    Q   Okay.  But then you do not recall -- was that your
23 testimony previously, that you do not recall whether or not you
24 recommended that he take a plea bargain?
25    A   I don't recall whether I told him he should take 25

1 years or not, that's his decision, but I always give my clients
2 my assessment of the case.  I always give them my assessment of
3 the case before a trial.
4    Q   Did you negotiate with the District Attorney, did you
5 go back and forth with the District Attorney asking for a lower,
6 to try to get them to go lower?
7    A   We did a little bit.  I had, my recollection is that he
8 probably would have come down a year or two but we were nowhere
9 close because Mr. Nagyi was unwilling to accept more than 10
10 years.
11    Q   And did he he tell you why he was just limited to 10
12 years, why he wouldn't accept more than 10 years?
13    A   Yes.  It was an age factor, that I recall pretty well,
14 that -- at the time I think he was 51 or 52 and he felt by
15 accepting 25 years that it was just too long of a period of
16 time, that it would essentially incapacitate him.
17    Q   Did you explain to him the difference between 25 to
18 life and 25 years?
19    A   Yes.
20    Q   You told him the parole consequences, the differences
21 in terms of parole eligibility?
22    A   I would imagine I did.  I explained to him about the
23 consequences of a 25 year plea.
24    Q   You imagine, or can you say that you can recall?
25    A   I've done that in every one of my cases, particularly a

Mentzer - The People - Cross

11

1  homicide. I don't recall the specific conversation that we had

2  at what time or what place, but I imagine we had several of

3  them.

4  Q    So on Man 1 with 25 year sentence when would he be

5  eligible for parole?

6  A    Well, he'd do 6/7 of that time, which would be -- I

7  didn't do the math, 20 --

8  Q    Is it a determinate sentence for a Man 1?

9  A    It is a determinate sentence.

10 Q    And you told him what the consequences would be of a 25

11 to life sentence?

12 A    Yes.

13 Q    Did you make any memo, did you record in any fashion

14 the plea offer that was made? Did you make a note of it?

15 A    I don't know if I did, I don't know if I did.

16 Q    Did you place anything on the record with respect to a

17 plea offer that was made?

18 A    I don't know.

19 Q    Never wrote a letter to the client indicating that

20 there was a plea offer, or you don't recall that?

21 A    I don't recall.

22 Q    Now, you told this defendant that his chances of

23 justification were, winning on that were slim, it's your

24 testimony that you never considered an EED defense because it

25 would subject him to a potential penalty of greater than 10

Mentzer - The People - Cross

12

1  years?

2  A    Well, that's not the only reason, but that was a

3  driving force because he had been rejecting an offer of a plea

4  to Manslaughter in the First Degree, and that's what the

5  ultimate goal of an EED defense would be, to get the jury to

6  believe that your client is guilty of Manslaughter in the First

7  Degree.

8  Q    But on Manslaughter in the First Degree, sir, the judge

9  has the discretion to sentence less than 10 years; correct?

10 A    He does, yes.

11 Q    Did you tell that to Mr. Nagvi?

12 A    I don't recall telling him that. I didn't see in a

13 case like this that a judge was likely to sentence him to a

14 period of less than 10 years.

15 Q    But that's not my question, my question is do you

16 recall telling him?

17 A    I don't recall telling him anything.

18 Q    And what was your position with respect to the

19 viability of an extreme emotional disturbance defense?

20 A    I didn't think it was a good defense in this case.

21 Q    Did you investigate that?

22 A    In part to -- well, I've handled other cases wherein I

23 prepared cases for --

24      THE COURT:  I'm sustaining that.  I don't want

25 this to bleed over into another area that I see you're going

1  in. This is a narrow focus.

2  MR. LANGONE: Okay, your Honor.

3  Judge, could we have a side-bar for one second?

4  THE COURT: Sure.

5  (At this time, a side-bar is held, on the record.)

6  MR. LANGONE: Your Honor, there are a couple of

7  aspects to this motion; one part of it is that EED defense

8  is a complimentary defense to justification and it's a way

9  to mitigate when you have a weak justification defense. My

10 position is how do you know, and I'm trying to bring out,

11 trying to establish that he believed in this justification

12 defense because he had won his cases and he did not tell

13 this defendant, did not advise this defendant to take a plea

14 offer to manslaughter because he thought he was going to win

15 the justification. That's why he didn't want to seriously

16 consider an EED defense.

17 That is with respect to the first part of this

18 motion.

19 THE COURT: That's a lot to try to show. You're

20 trying, you want to bring out his whole record of what

21 he's --

22 MR. LANGONE: Not entirely, just want to show he

23 didn't do the basic, the rudiments of what it takes to do an

24 EED defense, Judge.

25 The second part of it, second part of this motion,

1  your Honor, is that there was ineffective assistance of

2  counsel with respect to sentencing. The EED information,

3  the evidence was relevant and pertinent with respect on the

4  People versus Sweet to the defendant's whole character to

5  the circumstances of this case. It kind of mitigates the

6  finality of it in terms of what was going on. I just want

7  to develop it sufficiently, so that, because in the prior,

8  your prior decision you didn't rule on that aspect of the

9  motion. You said you'd consider it and I just want to, you

10 know, because I'm going to ask you to reargue on that, I'm

11 going to ask you to reconsider because you didn't decide it

12 and, you know -- I'm just trying to make the record as

13 quickly as possible, trying to give him whatever relief I

14 can, Judge.

15 MR. SASLAW: On the second part of that, let me

16 just say that Judge Holder was the judge presiding over the

17 entire trial.

18 THE COURT: It is not like I don't remember.

19 MR. SASLAW: Everything that happened at the trial

20 everything that pertains to it, other then, I suppose

21 somebody's medical diagnosis, was brought out at the trial.

22 So, I mean --

23 MR. LANGONE: I understand that, but here's my

24 point, under People versus Sweet, you look at the whole

25 character, you look at the whole person, the whole

1  circumstances in. --
2      MR. SASLAW: If you could make an ineffective
3  claim, good luck.
4      MR. LANGONE: I mean, that's, the case law says
5  it. There's --
6      MR. SASLAW: All Sweet says is that a judge could
7  consider all sorts of factors, it doesn't say that a defense
8  lawyer has to bring up stuff that's outside the trial
9  record.
10     MR. LANGONE: For purposes of sentencing.
11     MR. SASLAW: Has to?
12     MR. LANGONE: Well, I think if it's there and you
13  don't do it it's ineffective counsel.
14     MR. SASLAW: I think, you could second guess it,
15  but, I guess that is why we are having an argument.
16     THE COURT: How far --
17     MR. LANGONE: Just few more questions. I'm not
18  going far, just give me a little leeway, Judge, please.
19     THE COURT: I'll take it question by question.
20     MR. LANGONE: I'm not going far, not going to make
21  it a big drawn out...
22     THE COURT: Okay.
23     (Back in open court.)
24     THE COURT: Okay, Counsel the only issue for me to
25  decide in this case is whether or not this gentleman

1  conveyed the offer to this defendant, this EED stuff, it's
2  not part of this, I'm not opening up to that.
3      MR. LANGONE: Okay.
4      THE COURT: You have an exception.
5      MR. LANGONE: Okay, your Honor, thank you.
6  Q   Counsel, did you inform Mr. Naqvi's wife of the plea
7  offer in this case?
8  A   Yes.
9  Q   And not asking for the truth of the matter but what did
10 she say to you?
11 A   I don't recall if she, if she had an opinion on it or
12 what she might have said. Obviously it wasn't conveying the
13 offer to her, I was just notifying her of what the offer was, I
14 conveyed the offer to Mr. Naqvi.
15 Q   Okay. So my question though is did you speak to her
16 specifically directly with respect to any plea offer?
17 A   Yes.
18 Q   You recall that?
19 A   I don't recall the date and time, but I, every case
20 I've ever handled, especially one of this magnitude, would want
21 to let the family, if they're involved in the case, know what
22 the offer is.
23 Q   But you have no specific recollection of this case. I
24 understand you generally do it, but in this case do you have a
25 recollection?

Mentzer - The People - Cross          17

1    A.    No.

2    Q.    Is this the first time that a defendant has claimed,

3    ever claimed that you did not inform him?

4          THE WITNESS:  Sustained.

5          THE COURT:  Okay, go ahead.

6          THE WITNESS:  I would like to answer that.

7    A.    I'd like to answer.

8    Q.    Go ahead, sir.

9    A.    You're going to ask me if this is the first time that a

10   defendant ever claimed that I didn't inform him of an offer?

11   Q.    Yes.

12   A.    It would be the first time.

13   Q.    Thank you.

14         MR. LANGONE:  Your Honor, may I just have one

15   second to confer with my client.

16         THE COURT:  Certainly.

17         (Pause in proceedings.)

18   Q.    Mr. Mentzer, final question to you.  Is it your

19   practice, do you ordinarily, in your practice put plea offers on

20   the record?

21   A.    I'm not sure I understand the question.  Plea offers

22   that are rejected, that are...

23   Q.    Correct.

24   A.    Generally I would, but I'm not looking to protect

25   myself in that situation, and I think that's the purpose of what

R.085                    me

Mentzer - The People - Cross          18

1    that does is to protect the lawyer.

2    Q.    Generally, you would?

3    A.    I don't know if I always, if I generally do.  I think,

4    probably I -- I think it's generally the prosecutor that puts it

5    on the record, and they like to see that the defendant has, is

6    rejecting an offer on the record, I believe generally that's

7    the way it's done.  I don't believe I would have, affirmatively

8    go out of my way to say, I just want the Court to know that my

9    client is rejecting this particular offer, because, I think, as

10   I said, I think that just benefits me, it doesn't benefit the

11   defendant.

12   Q.    Okay, sir.  And at the conclusion of the case you had

13   made a request for Manslaughter in the Second Degree as a lesser

14   included offense?

15   A.    I believe I did.

16   Q.    And was that pertaining in any way to the defendant's

17   position on time, what was that related to?

18   A.    On time, what time period?

19   Q.    Sentence.

20   A.    Oh, on time.

21   Q.    Yeah, what was your reasoning?

22   A.    I wanted the jury to consider any lesser alternative.

23         MR. LANGONE:  No further questions, your Honor.

24         THE COURT:  The question before regarding the,

25   what he generally does, I'm striking that.

R.086                    me

1   MR. LANGONE: Sure.
2   THE COURT: Question and the answer.
3   MR. LANGONE: Okay.
4   MR. SASIAN: I just have one question.
5   THE COURT: Okay.
6   REDIRECT EXAMINATION BY
7   MR. SASIAN:
8   Q   Did you, in your conversations with the defendant's
9   wife, did you tell her that you don't engage in plea
10  negotiations?
11  A   No.
12  MR. SASIAN: I'm done.
13  MR. LANGONE: No further questions.
14  THE COURT: You're done, take care.
15  THE WITNESS: Thank you.
16  (At this time, the witness is excused and exits
17  the courtroom.)
18  THE COURT: Anything else, People?
19  MR. SASIAN: No, People rest.
20  THE COURT: People rest.
21  MR. LANGONE: Defense rests, your Honor.
22  THE COURT: Argument.
23  MR. LANGONE: Yes, your Honor, if I may.
24  THE COURT: Sure. I'll hear you.
25  MR. LANGONE: Your Honor has heard the testimony,

1   I'd indicate, Judge, reiterating what we spoke about last
2   time is that this defendant came back to the U.S.. he was a
3   free man in Europe, essentially a fugitive, but he was free,
4   he was out, and he's a man who couldn't live without his
5   children. He came back to this country knowing he's in
6   trouble, knowing there's going to be a penalty to be paid,
7   obviously, afraid to surrender, not knowing what that
8   potential penalty might be, and as I discussed the last
9   time, I think that kind of approach, avoidance, even when
10  people are wrong, they do something wrong -- nobody really
11  wants to go to jail, even though sometimes you know you have
12  to, I believe he came back to this country knowing that he
13  was going to have to serve time, that he, there was a
14  penalty, there was a price that had to be paid, your Honor,
15  and I think that that goes a long way in terms of what his
16  state of mind was with respect to accepting responsibility
17  and the taking of the plea in this case. He hired a lawyer
18  to negotiate a plea, and there was obviously, it wasn't
19  going forward because the District Attorney and the police
20  were not going to negotiate with a fugitive, which is quite
21  understandable. At the time when he is apprehended, he
22  meets somebody in Rikers Island who says, I've got this
23  great lawyer, you've got a justification defense, he's
24  talking to guys in jail, and, hire, this guy, he'll get you
25  out.

Proceedings                                                                                       21

1    The testimony has been that Mr. Mentzer has
2    already stated himself that he's won, several of these cases
3    on the grounds of justification, he gets a retainer fee, it
4    was our understanding of $40,000. The agreement is it's a
5    trial fee, it is, there is no two fees there, one for plea,
6    one for trial, the idea is he's going to try this case on a
7    justification. Mr. Mentzer, the family says that he never
8    told us of a plea offer, he never told us of a specific plea
9    offer. Mr. Mentzer speaks about 25 years; the government
10   has said, well, it might have been 21 years offer, but he
11   may not recall that.
12        Mr. Mentzer, his testimony just now is that he
13   doesn't advise, he doesn't recall advising Mr. Nagvi to take
14   the plea, even though, even though he thinks there's a weak
15   justification defense, did you advise him to take the plea,
16   I don't recall, where on the same hand he's saying that he's
17   not pursuing an EED defense, notwithstanding that, there's a
18   weak justification defense because he is concerned that the
19   potential penalty for Man 1 is 25 years.
20        THE COURT: You're not saying he didn't tell him
21   what the plea offer is.
22        MR. LANGONE: Right.
23        THE COURT: You're saying he just didn't advise
24   him to take it.
25        MR. LANGONE: Correct, your Honor, which is

Proceedings                                                                                       22

1    another part of that analysis, under Lafler (phonetic), is
2    that you have to, effective representation requires weighing
3    the strength and weaknesses of the case, conveying that
4    information to the client, then telling the client, well,
5    listen, these are the options, you take the plea, and if you
6    take a plea, Mr. Mentzer says it's a determinate sentence of
7    6/7. There's no indication that he told Mr. Nagvi that.
8    He says he told the defendant, well, you could also face 25
9    to life, but he's not, he's not advising the defendant,
10   saying, listen you're better off to do this, this is in your
11   best interest to take this, you can get out earlier, you
12   know, there's less implications, no life parole, that kind
13   of stuff.
14        So with all due respect, even if you took Mr.
15   Mentzer's testimony as credible, I think that there are, his
16   advice was deficient to Mr. Nagvi with respect to what the
17   likelihood was going to be by the difference in going to
18   trial and taking the plea.
19        THE COURT: And how do you, I'm just curious, how
20   do you factor in Mr. Mentzer's statement that with respect
21   to your client now that your client was not interested in
22   anything that was less than 10 years.
23        MR. LANGONE: Well, I think that if Mr. Nagvi
24   understood the difference between the impact of what 25 to
25   life was and a 21 year determinate, or, I'm not even sure if

Proceedings                                      23

1   you can get an indeterminate sentence, I don't know
2   personally, but that, if -- he said, I didn't really talk to
3   him about it, I didn't really push him on it, I didn't
4   really, you know, work him on it, because, guess what, it's
5   the lawyer's obligation to really impress upon the client,
6   because, nobody wants to go to jail, that's a big sentence,
7   to impress upon the client, hey, this is your life, this is
8   a life sentence that you're going to get and 25 years means
9   you you just go to the parole board and you may not get out
10  until 35 years, as opposed to, on 25 years you do 6/7 and
11  you get out on that, that could be 20 years, which is a huge
12  difference in a person's life, and especially if it was 21
13  years, which is in fact the offer of sentence.
14      So I think that the his testimony with respect to
15  the advice was woefully inaccurate. The notion that you
16  don't consider the EED defense because the potential is more
17  than 10 years, with all due respect, Judge, I think that
18  that is when they, when we know that in a Man 1 as a first
19  offender that the Court would have the discretion to
20  sentence him to less than that. So --
21      THE COURT: Less than the --
22      MR. LANGONE: To less than 10 years, if the Court
23  were predisposed to it.
24      So I think that idea, it just doesn't make sense,
25  your Honor. What I'm saying is that it's very, it seems

Proceedings                                      24

1   clear from the evidence and from Mr. Mentzer's own testimony
2   that he felt pretty confident that he was going to try this
3   case, that he had beaten a whole bunch of justification
4   cases, that once he read the defendant's letter, had it
5   translated with respect to the defendant's hearing all of
6   these conversations about this guy having intimacy with the
7   defendant's wife, I think in Mr. Mentzer's mind he believed
8   that he could beat this case, and I really believe that for
9   the simple fact that he never really pursued an EED defense
10  because they're complimentary defenses.
11      THE COURT: Okay, that's different.
12      MR. LANGONE: But it still goes to the advice,
13  that state of mind goes to the advice that he would have
14  given Mr. Naqvi, as to whether to take the plea.
15      That's my position, Judge. I think that we have
16  established by a preponderance of the evidence, your Honor,
17  that in fact had Mr. Naqvi known, and had his lawyer --
18  let's assume that Mr. Naqvi knew that the plea offer was 21
19  years, had his lawyer impressed upon him, as he should have,
20  the real weakness in the case, in going to trial, the real,
21  the vast difference in the punishment and what it would be
22  for the rest of his life, that Mr. Naqvi would have taken
23  it, the 21 years, just as he stands here now ready to take
24  the 21 years. He would have taken it had he been properly
25  advised that that was the appropriate thing to do.

1    And also, as a second part of this, your Honor, as
2  I said at the side-bar, just like to renew my request for
3  reargument with respect to the sentencing issue, that you
4  were bound by the record for purposes of sentencing is not
5  the law, Judge.  Presentence, the defendant's memorandums
6  are included and include letters from family and parents and
7  all kinds of extraneous information that's pertinent to the
8  judge's determination of an appropriate sentence.  I believe
9  that the psychiatric report we submitted indicating, from
10  Dr. Varday (phonetic) indicating what was, you know, the
11  trauma that was going on in his life, aside from what he
12  did, the trauma that resulted in it would have been
13  sufficient in this Court had this Court considered that at
14  the time to mitigate the seriousness with respect to
15  sentence imposed.
16       So I'd ask the Court for reargument on that matter
17  also.
18       Thank you, Judge.
19       THE COURT:  Thank you.  Noted.
20       MR. SASLAW:  May it please the Court, your Honor,
21  what this is is a defendant who committed a cold blooded
22  murder, went to trial, was convicted of it and now wishes
23  that he presented a different defense, a defense which I
24  think everybody around here knows is a very difficult
25  defense to successfully interpose and would in this case at

1  best get him to the same place as the plea offer, which was
2  made and rejected.
3       So, you know, there are a million things I am sure
4  that come to mind in the years since his conviction and
5  imprisonment as to what he might have done, almost everybody
6  rethinks everything.  That's not the basis of an ineffective
7  assistance motion, the burden under Strickland is very high
8  and I don't think the defendant has come close to meeting
9  it.
10       THE COURT:  Thank you.
11       All right, I'm going to adjourn this for decision,
12  put this over into late February.  Court has several
13  decisions ahead of this.
14       MR. SASLAW:  Late February I'm so far available
15  every single day, so pick a day.
16       MR. LANGONE:  Thank you, your Honor.  Do we come
17  back?
18       THE COURT:  You're welcome to come back, I don't
19  see why not.  I'll be here.
20       MR. LANGONE:  I understand, your Honor.  I mean,
21  do you want us back for that?
22       THE COURT:  Yes.
23       How's the 26th?  A Wednesday.
24       MR. LANGONE:  February, Judge?
25       THE COURT:  Correct.

27

Proceedings

1  MR. SASLAW: I'm okay.

2  MR. LANGONE: That's a plan, Judge, thank you.

3  THE COURT: All right, February 26th. Thank you.

4  See you then.

5  MR. SASLAW: Thanks, your Honor.

6  THE COURT: Have a good day. Take care, Counsel.

7  THE CLERK: Defendant to be excused, order

8  satisfied, 2/26.

9  *   *   *   *   *   *

10  The foregoing is certified to be a true and accurate

11  transcript of the original stenographic minutes taken of

12  this proceeding.

Maria E. Edmond, RPR,
Senior Court Reporter

13
14
15
16
17
18
19
20
21
22
23
24
25

28

Proceedings

INDEX TO WITNESSES

| The People: | Direct | Cross | Re-direct | Re-cross |
|---|---|---|---|---|
| D. Mentzer | 3 | 6 | 19 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**SUPREME COURT - STATE OF NEW YORK**
**CRIMINAL TERM PART TAP C- QUEENS COUNTY**

PRESENT:

      **HONORABLE KENNETH C. HOLDER,**
      **Justice**

                                   Ind. No. 2848/2006

―――――――――――――――――――――

**THE PEOPLE OF THE STATE OF NEW YORK, :**

                      **Respondent,**      :    Motion: To vacate judgment
                                            of conviction

           **-against-**               :

**TAHIR NAQVI,**                        :
                      **Defendant.**

―――――――――――――――――――――

                                 Richard Langone, Esq.

                                   For the motion

                                 Edward D. Saslaw, Esq., ADA

                                 Opposed

     Upon the foregoing papers, and in the opinion of the Court herein, the motion to vacate judgment of conviction is denied.

DATE: February 26, 2014

                                        KENNETH C. HOLDER, J.S.C.

# *EXHIBIT G*

MEMORANDUM

# SUPREME COURT, QUEENS COUNTY
## CRIMINAL TERM, PART TAP C

---

THE PEOPLE OF THE STATE OF NEW YORK

                            **Respondent,**

TAHIR NAQVI,

                            **Defendant.**

: **BY** Kenneth C. Holder, JSC

: **DATED** February 26, 2014

: **IND. NO.** 2848/2006

---

On June 25, 2009, defendant was convicted, following a jury trial, of Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree.

On September 24, 2009, he was sentenced to an indeterminate prison term of from twenty-five years to life for second-degree murder, and determinate prison terms of fifteen years with five years post-release supervision and seven years with three years post-release supervision, for the second- and third-degree weapon-possession convictions, respectively, and all to run concurrently.

He filed a notice of appeal to the Appellate Division, Second Department, but has not perfected his appeal.

1

On or about December 18, 2012, he filed a motion seeking to vacate his judgment of conviction pursuant to CPL 440.10(1)(h), 440.20, and 440.30, alleging that he was denied the effective assistance of counsel at his trial and sentence because counsel failed to investigate and present an extreme emotional disturbance ("EED") defense, either rather than or in addition to the justification defense he advanced at trial.

The People filed an affirmation in opposition to the motion arguing that: 1) the motion should be summarily denied pursuant to CPL 440.10(2)© because the effectiveness of defendant's counsel is a matter that is apparent on the record and, accordingly, should be reviewed by the appellate court when he perfects his appeal; 2) his claim that trial counsel failed to consider the EED defense should be summarily denied because it is "made solely by the defendant and unsupported by any other affidavit or evidence, and under these and all the other circumstances attending the case, there is no reasonable possibility that such allegation is true" (CPL 440.30[4][d]); 3) the claim should be denied because the record reflects that counsel provided meaningful representation and his choice to assert a justification defense, rather than an EED defense should not be second-guessed simply because it was ultimately unsuccessful.

On July 11, 2013, this Court rendered its decision denying the portion of the motion alleging that defendant's trial counsel was ineffective for failing to investigate and consider an EED defense because the claim relied entirely on defendant's own self-

2

serving affidavit stating that counsel failed to do so (CPL 440.30[4][b]; *People v O'Hara*, 9 Misc 3d 1113[A] [Sup Ct, Kings Cty 2005] [denying motion to vacate judgment without a hearing because the moving papers did not contain sworn allegations or an affidavit from a person having actual or personal knowledge of the underlying facts]). The Court granted an evidentiary hearing concerning whether, in fact, the People had offered defendant a plea bargain and/or whether or not trial counsel advised him of the plea offer.

The hearing was held on October 4, and December 6, 2013. Assistant District Attorney Patrick Lynn O'Connor, defendant and Saima Naqvi testified on defendant's behalf. The People called defendant's trial counsel, Daniel Mentzer, to testify on their behalf. The Court credits the testimony of ADA O'Connor and Mr. Mentzer. The Court credits the testimony of defendant and Mrs. Naqvi, in part, but does not credit their testimony that is inconsistent with the testimony of ADA O'Connor and Mr. Mentzer.

## FINDINGS OF FACT

From approximately June 2008, ADA O'Connor was the prosecutor assigned to handle defendant's case. When he first inherited the case from another ADA, the plea offer to defendant at that time was an offer to plead guilty to Manslaughter in the First Degree with a promised sentence of 25 years. In February 2009, ADA O'Connor memorialized that plea offer in his case synopsis.

3

Shortly before trial, ADA O'Connor's supervisor authorized an amended plea bargain for defendant to plead guilty to Manslaughter in the First Degree with a promised sentence of between 21 to 23 years. Assistant DA O'Connor did not memorialize the offer in writing, but recalled that the sentence promise was within that range. He relayed the revised offer to Mr. Mentzer, but did not recall whether he had spoken to counsel on the telephone or in the courthouse. In response, Mr. Mentzer told him either that he would convey the offer to defendant but did not think that he would accept it, or that he would convey the offer to defendant and see what he says.

Prior to the commencement of trial, Mr. Mentzer informed ADA O'Connor that defendant had rejected the offer. Subsequently, at a bench conference, there was a discussion with the judge about the offer and whether there would be a disposition. Mr. Mentzer informed the judge that defendant had rejected the offer and that both parties were ready for trial.

After the crime, defendant fled the US for a period of time and returned at some point, living in Union, Georgia for approximately six years before he was arrested for the murder. While in Georgia, he met his wife, Saima Naqvi, and admitted to her that he was a fugitive from New York and was wanted for committing a murder. She testified that she advised him to surrender.

4

When defendant returned to the United States, he contacted a lawyer, Sam Schmidt, and asked him to get a plea deal in exchange for his surrender.[1]  Defendant subsequently spoke with a detective in New York, who told defendant that he could not make any deal with him while defendant was a fugitive.

On March 21, 2006, defendant was arrested in Georgia after being a fugitive there for six years and was extradited to New York two days later.[2]  At Riker's Island, defendant spoke with several inmates and two of them recommended Mr. Mentzer because he had been successful in their cases.  He discussed the facts of his case and charges with the inmates, but never discussed plea bargains with them.  Although the two inmates who had recommended Mr. Mentzer were both going to trial in the Bronx and asserting a justification defense, defendant claims that he retained Mr. Mentzer for the purpose of getting a plea offer.[3]

Saima Naqvi contacted Mr. Mentzer and retained him to represent defendant. She only met with him twice and paid him a total of $40,000, in two payments, with the second payment being made approximately three months before the trial.  She was

---

[1]  Defendant testified that the main reason he came back to the US was to surrender to the authorities.  Although he claimed not to know anything about criminal law, he knew enough to hire an attorney specifically for the purpose of engaging in plea negotiations for his surrender.

[2]  Defendant knew that he was facing jail time, but did not want to surrender without a plea deal because he was scared and facing a significant amount of time.

[3]  Mr. Mentzer represented defendant for approximately two years before the trial.

5

never present during any discussions between defendant and Mr. Mentzer, and Mr. Mentzer never had any discussions with her about the facts of defendant's case. Although she visited defendant in jail approximately three times per week for three years, he never spoke to her about a plea bargain.[4] She does not know the difference between a plea bargain and a trial.

Defendant testified that when Mr. Mentzer went to see him at Riker's Island, he listened to tapes that defendant had and told defendant that he had a very good justification defense and was confident he could beat the case. Defendant also testified that he had asked counsel to get the best plea offer he could, but that counsel told him that he does not make plea deals and the case would go to trial. Defendant testified that Mr. Mentzer met with him between six and eight times to prepare for trial. He claims that Mr. Mentzer told him that he was asserting a justification defense, but never told him that it was weak and would be difficult to win at trial. According to defendant, Mr. Mentzer did not discuss the possibility of a lesser included offense or extreme emotional disturbance, although defendant claims that he had told counsel that he had blacked out and should see a psychiatrist. He also claims that counsel never discussed with him a manslaughter plea.

---

[4] She also testified that defendant had never spoken to her about pleading guilty while he was in Georgia; he had said that he wanted to surrender.

6

## The People's Witness

Mr. Mentzer has represented more than 1000 criminal defendants, with approximately seventy to eighty of those cases involving homicides.  Some of those cases went to trial, some were disposed of through a plea, and some were dismissed by the People.

During his representation of defendant, Mr. Mentzer engaged in plea negotiations with ADA O'Connor.  The initial plea offer was 25 years for Manslaughter in the First Degree.  He discussed the offer with defendant and defendant was not interested in any sentence involving more than 10 years.[5]  He negotiated further with the People and was told that they could come down on the sentence one or two years, but that was still no where near the time that defendant was willing to accept. Defendant refused to accept a sentence of more than 10 years because of his age - - 51 or 52 at the time.

He also discussed with defendant the potential defenses: 1) he didn't commit the crime;  2)  justification;  and  3)  extreme  emotional  disturbance.    Given  defendant's unwillingness to accept Manslaughter and 25 years, and for other reasons, he did not believe that an EED defense was a good option because it would require conceding the same charge to which he had refused to plead guilty.  He also believed that justification

---

[5] Defendant is the first of Mr. Mentzer's clients to claim that he did not inform him of a plea offer.

would be a tough defense and told defendant so.  He never made representations that he would get defendant exonerated based on a justification defense.

One of Mr. Mentzer's former clients, Usama Murza, who had been acquitted of murder based on a justification defense, referred defendant to him.  At that time, Mr. Mentzer had won approximately six or seven cases on justification within eight or nine years prior to meeting defendant.

Defendant's wife first contacted him and retained him.  His fee was $40,000, with $15,000 paid up front and $25,000 paid before trial.

## CONCLUSIONS OF LAW

A judgment of conviction is presumed valid, and the party challenging its validity has the burden of coming forth with allegations sufficient to create an issue of fact (*People v Session*, 34 NY2d 254, 255-56 [1974]).  While the production of contrary evidence will satisfy the burden of going forward and eliminate the presumption of regularity from the case, bare allegations are insufficient to carry this evidentiary burden (*supra* at 256).

At a hearing ordered pursuant to CPL 440, the defendant has the burden of proving by a preponderance of credible evidence every fact essential to support the motion (*see* CPL 440.30(6); *People v Bridget*, 73 AD2d 291 [2d Dept 1980]).  At the

8

hearing, the court becomes the finder of fact and applies the same rules in evaluating the credibility of witnesses as a jury would be charged to do at a criminal trial.

The credible testimony at the hearing established that defendant fled the country for a period of time after the murder and returned to the US, at some point, residing in Georgia. He met and married his wife when he returned, admitted to her that he was a fugitive from New York and was wanted for murder. Defendant contacted an attorney, Sam Schmidt, and asked him to contact the case detective, in New York, to tell the detective that he wanted to surrender but needed to know how much time he would get. The detective told defendant that he could not make a deal with a fugitive. Thereafter, defendant did not turn himself in to the authorities, but continued living on the lam in Georgia for approximately six years before he was arrested and extradited to New York.

The credible testimony also established that defendant met an inmate named Usama Murza while he was at Riker's Island. Murza had been charged with murder, was ultimately acquitted of the murder based upon a justification defense, and recommended his attorney, Mr. Mentzer, to defendant. Defendant also spoke with another inmate who was going to trial in the Bronx, asserting a justification defense and had recommended Mr. Mentzer. Defendant discussed the charges against him and the facts of his case, but never discussed plea bargains with either of those inmates.

Defendant's wife contacted Mr. Mentzer and retained him to represent defendant. She paid him a total of $40,000 in two payments, with the second payment being made

9

a few months prior to defendant's trial.  Mrs. Naqvi never had any discussions with Mr. Mentzer about the facts of defendant's case and was not present during any discussions between defendant and Mr. Mentzer.  While she and defendant were in Georgia, defendant never spoke to her about a plea bargain and she does not know the difference between a plea bargain and a trial.

When ADA O'Connor was first assigned to defendant's case, the plea offer that had been conveyed to defendant and rejected was an offer to plead guilty to Manslaughter in the First Degree with a promised sentence of 25 years.  Mr. Mentzer had discussed the offer with defendant, but defendant rejected it.  Defendant, who was 51 or 52 years old at the time, was not interested in any sentence more than ten years because of his age.

Before the trial, ADA O'Connor informed Mr. Mentzer that the revised offer was a plea to Manslaughter in the First Degree and a promised sentence of between 21 to 23 years.  Mr. Mentzer told ADA O'Connor that he would convey the offer to defendant. Mr. Mentzer conveyed the revised offer to defendant and he rejected it because he did not want a sentence higher than ten years.

This Court did not find credible defendant's testimony that he had retained Mr. Mentzer to get the best plea deal possible, did not want to go to trial and that Mr. Mentzer never conveyed the plea offers to him.  Defendant's testimony concerning his desire to surrender when he first went to Georgia and the phone conversation with the

10

case detective demonstrate that defendant's primary concern was the length of time that he would have to serve. Without an assurance as to the number of years he would serve if he surrendered, defendant refused to surrender and, instead, lived on the lam for six years. His actions reflected his failure to voluntarily take responsibility for his crime unless it was on his specific terms.

Defendant's conversations with the inmates who recommended Mr. Mentzer to defendant never involved discussions about plea dispositions. Instead, the evidence reflects that the conversations were about justification defenses, at least one of which was successful, and the facts of their cases and defendant's. These facts all suggest that defendant sought out Mr. Mentzer because of the justification defenses, and not his ability to get defendant the plea disposition he wanted.

Finally, the fact that defendant did not accept the initial offer of Manslaughter in the First Degree and 25 years further supports the view that defendant's primary concern was the length of time he was going to have to serve and, apparently, 25 years was too long for him. Given that, his claim that he would have accepted a plea offer of between 21 and 23 years rings hollow. That was still a substantial amount of time for a man who had never served time before and the Court does not believe defendant's claim that counsel never conveyed the offer and that he would have accepted it at the time.

11

Therefore, defendant has not established by a preponderance of the evidence that his trial counsel failed to advise him of the People's plea offer and that he would have accepted it, in any event.

Ineffective Assistance at Sentence

Defendant also claimed that his trial counsel was ineffective at sentencing because he failed to argue for a lesser sentence based on defendant's alleged extreme emotional disturbance at the time of the shooting and/or mental state at the time of the murder. The Court notes, first, that because defendant fled the jurisdiction and was not apprehended for more than six years after the crime, any psychological examination and/or expert testimony concerning his mental state six years prior would have been suspect given how far removed an examination would have been from the time of the murder, likely inaccurate, and not credible. Secondly, the Court was amply familiar with the factual circumstances of the case and motive – that the victim had been having an affair with defendant's wife. These circumstances were all taken into account by the trial court and counsel was not ineffective for failing to raise this issue at sentencing because it was not credible and would not have had any effect on the Court's sentence.

Accordingly the motion to vacate judgment is denied in its entirety.

12

Order entered.

The clerk of the court is directed to forward a copy of this order to the attorney for the defendant and to the District Attorney.

KENNETH C. HOLDER, J.S.C.

13

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,                :

                               Respondent,    :

    -against-                                                        :

                                         :

TAHIR NAQVI,                                                         :

                         Defendant.   :
------------------------------------------------------------------x

Return Date:
May 16, 2014

**AFFIRMATION IN
OPPOSITION TO
LEAVE TO APPEAL
DENIAL OF MOTION
TO VACATE JUDGEMENT
OF CONVICTION**

Queens County
Indictment Number
2848/06
AD No. 14-3142, 14-3143

      **EDWARD D. SASLAW**, an attorney admitted to practice law in the State of New York, affirms the following statements to be true under the penalties of perjury:

      1.    I am an Assistant District Attorney, of counsel to Richard A. Brown, the District Attorney of Queens County. I am submitting this affirmation in opposition to defendant's motion for leave to appeal the Supreme Court, Queens County order dated February 26, 2014, denying his motion to vacate his judgment of conviction. (A copy of that order is annexed to these papers as Exhibit C). I make the statements in this affirmation upon information and belief, based upon my review of the records and files of the Queens County District Attorney's Office that pertain to this case.

## Factual and Legal Background

2.     On August 14, 1999, at approximately 3:48 pm, in front of a private house at 132-43 Hillside Avenue, a witness observed defendant approach Irfan Naqvi, who was standing by his car with both driver side doors open. The two men argued before defendant pushed his victim from his car to the sidewalk, when the defendant pulled out a black revolver and shoot Irfan Naqvi several times before getting into his own car and leaving the scene.  Police responded and the victim, shot twice in the abdomen and once in the face, was pronounced dead at 3:53 p.m.

3.     Police, investigating the murder, learned that Irfan Naqvi had recently separated from his wife and was having an affair with his own first cousin who was married to defendant.  Irfan Naqvi had made great efforts to secrete the affair from the defendant. At the time he was confronted and shot by defendant, Irfan Naqvi was on his way to a wedding in New Jersey.

4.     In attempting to find and apprehend defendant, a police detective was advised in early 2005, that defendant would call him. On January 19, 2005, the detective received a telephone call from an individual who identified himself as defendant and said he wanted to surrender, but wished to know how much jail time he would get.  The caller also told the detective that most men would have done what he did after what happened between him and Irfan.

5.     Defendant did not surrender, however, but, about one year later, police

2

learned that defendant was living in Columbia, Georgia under an assumed name. On March 26, 2006, at 8:30 a.m., the detective, his partner and Columbia police officers observed defendant coming out of a townhouse at 2700 Double Churches Road, in Columbia. As Columbia police officers executed an arrest warrant for the defendant, the New York detective asked defendant if he knew who the detective was. Defendant replied "Yes, you're the one I spoke to on the 'phone" and acknowledged that he was defendant. Later that day in a police interview room in Georgia, defendant said "I'm glad this is over" and that he knew "this is about my problem with Irfan."

6.      Defendant was charged with Murder in the Second Degree (Penal Law § 125.25[1]), Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03[2]), and Criminal Possession of a Weapon in the Third Degree (Penal Law § 265.02[4]).   Prior to trial, the People advised defense counsel that it would consent to dispose of the case by defendant's plea of guilty to Manslaughter in the First Degree, with a sentence of more than twenty years but defendant rejected that plea offer.

7.      Following a jury trial, defendant was convicted, on June 26, 2009, on all three counts. He was sentenced on September 24, 2009 to an indeterminate term of imprisonment of from twenty-five years to life on the murder count, with the sentences on the weapons counts to be served concurrently. He has not perfected his appeal and is currently serving his sentence.

8.      By papers dated December 3, 2012, he moved to vacate his judgment of conviction pursuant to section 440.10 of the Criminal Procedure Law on the ground that he received ineffective assistance of counsel at trial and sentence because his trial attorney did not present evidence in an attempt to establish the affirmative defense that, at the time he murdered the victim, defendant was "suffering from diminished mental capacity ... due to extreme emotional disturbance" and instead presented what his current attorney describes as a "frivolous justification defense" (Affirmation of Richard M. Langone, Esq., In Support of Motion to Vacate ["Langone aff"] ¶ 3).

9.      Although defendant's motion papers included the report of a clinical pychiatrist who concluded, based on his review of the evidence and interviews of the defendant more than ten years after the crime, that in August, 1999 defendant "was functioning under the influence of an Extreme Emotional Disturbance" (Langone aff, Exhibit A at 19), the only evidence to support the claim that defendant's trial attorney did not consider a defense on that basis came from defendant's self serving affidavit.  None of defendant's papers acknowledged the legalreality that the justification defense counsel pursued, if accepted by the jury, would have resulted in a complete acquittal, while a jury's finding that defendant acted under an "extreme emotional defense" would do no more than render him guilty of manslaughter in the first degree (the same plea defendant rejected), rather than murder in the second degree. *See* P.L. §§ 125.25(1), 125.20(2).

4

10.     On that basis, the People urged, in papers annexed hereto as Exhibit A, that defendant's motion be summarily denied in its entirety since (1) an allegation of fact essential to support the motion was made solely by the defendant and unsupported by any other affidavit or evidence, and there was no reasonable possibility that his unsupported allegation is true, C.P.L. § 440.30(4)(d), and, in any event (2) defendant's claim that he received constitutionally ineffective assistance of counsel was without merit.

11.     By order dated July 11, 2013, annexed to these papers as Exhibit B, Criminal Term denied the motion, in part, but ordered that an evidentiary hearing be held "to establish whether a favorable plea was offered to defendant; and whether or defendant was prejudiced as a result of counsel's alleged failure to advise him of the plea offer." Following the hearing, Criminal Term denied the motion in its entirety by a Memorandum and Order dated February 26, 2014, finding that defendant's trial attorney discussed an initial plea offer under which defendant would be sentenced to serve a twenty-five year prison term on a plea of guilty to Manslaughter in the First Degree, but defendant rejected it and told his attorney that "he was not interested in any sentence involving more than 10 years" (Exhibit C at 7).

12.     The court likewise credited defendant's former attorney's testimony to the effect that "[g]iven defendant's unwillingness to accept Manslaughter and 25 years, and for other reasons, [defendant's former attorney] did not believe that an [extreme emotional] defense was a good option because it would require conceding the same charge to which he

had refused to plead guilty" (Exhibit C at 7). The hearing court further found defendant's testimony that the plea offer was not communicated to him was "not credible" (Exhibit C at 10).

13.    The hearing court further rejected defendant's claim that he received the ineffective assistance of counsel in connection with the proceedings before the court imposed sentence. The judge who decided the motion presided over defendant's trial and said that because "the Court was amply familiar with the factual circumstances of the case and motive - that the victim had been having an affair with defendant's wife-- [those] circumstances were all taken into account by the trial court" (Exhibit C at 12).

14.    The court also noted that "because defendant fled the jurisdiction and was not apprehended for more than six years after the crime, any psychological examination and/or expert testimony concerning his mental state six years prior would have been suspect given how far removed an examination would have been from the time of the murder, likely inaccurate, and not credible" (Exhibit C at 12).

13.    By his current motion, dated April 8, 2014, defendant seeks leave to appeal to this Court from that order of the Supreme Court. As discussed in the People's opposing affirmation and Memorandum of Law and the Supreme Court's opinion, defendant's motion does not present any question of law that warrants further review. Accordingly, defendant's leave application should be denied.

WHEREFORE,  and for the reasons in the court's decision and in the People's opposition to defendant's motion, defendant's application for leave to appeal to this Court should be denied.

Dated:        May 16, 2014
              Kew Gardens, New York


                                          _____
                                          EDWARD D. SASLAW
                                          Assistant District Attorney
                                          (718) 286-5803


To:     Richard Langone, Esq.
        Attorney for Defendant
        Langone & Associates, PLLC
        3601 Hempstead Turnpike, Suite 410
        Levittown, NY 11756

7

# *EXHIBIT A*

SUPREME COURT OF THE STATE OF NEW YORK
QUEENS COUNTY: CRIMINAL TERM: TAP C
----------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                -against-

TAHIR NAQVI,

                       Defendant.
----------------------------------------------------------------x

Return Date:
February 11, 2012

AFFIRMATION IN
OPPOSITION TO
DEFENDANT'S
MOTION TO VACATE
JUDGMENT

Queens County
Indictment Number
2848/06

**EDWARD D. SASLAW,** an attorney admitted to practice law in the State of New York, affirms the following statements to be true under the penalties of perjury:

    1.     I am an Assistant District Attorney, of counsel to Richard A. Brown, the District Attorney of Queens County.  I am submitting this affirmation in opposition to defendant's motion pursuant to Section 440.10 of the Criminal Procedure Law dated December 3, 2012 to vacate his August 20, 2009 judgment of conviction.  I make the statements in this affirmation upon information and belief, based on conversations with Assistant District Attorney Patrick O'Connor and other knowledgeable persons as well as my review of the records and files of the Queens County District Attorney's Office.

    2.     On August 14, 1999, at approximately 3:48 pm, in front of a private house at 132-43 Hillside Avenue, a witness observed defendant approach Irfan Naqvi, who

was standing by his car with both driver side doors open. The two men argued before defendant pushed his victim from his car to the sidewalk, then pull out a black revolver and shoot Irfan Naqvi several times before getting into his own car and leaving the scene. Police responded and the victim, shot twice in the abdomen and once in the face was pronounced dead at 3:53 p.m.

3.       Police, investigating the murder, learned that Irfan Naqvi had recently separated from his wife and was having an affair with his first cousin who was married to defendant and had been attempting to keep defendant in the dark about the affair. At the time he was confronted and shot by defendant, Irfan Naqvi was on his way to a wedding in New Jersey.

4.       In attempting to find and apprehend defendant, a police detective was advised early in 2005, that defendant would call him. On January 19, 2005, the detective received a telephone call from an individual who identified himself as defendant and said he wanted to surrender but wished to know how much jail time he would get. The caller also told the detective that most men would have done what he did after what happened between him and Irfan.

5.       Defendant did not surrender, however, but, about one year later, police learned that defendant was living in Columbia, Georgia under an assumed name. On March 26, 2006, at 8:30 a.m., the detective, his partner and Columbia police officers observed defendant coming out of a townhouse at 2700 Double Churches Road, in Columbia. As

2

Columbia police officers executed an arrest warrant for the defendant, the New York detective asked defendant if he knew who the detective was. Defendant replied "Yes, you're the one I spoke to on the 'phone" and acknowledged that he was defendant. Later that day in an police interview room in Georgia, defendant said "I'm glad this is over" and that he knew "this is about my problem with Irfan."

4.      Defendant was charged with Murder in the Second Degree (Penal Law § 125.25[1]), Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03[2]), and Criminal Possession of a Weapon in the Third Degree (Penal Law § 265.02[4]).    Prior to trial, the People advised defense counsel that it would consent to dispose of the case by defendant's plea of guilty to Manslaughter in the First Degree, but defendant rejected that plea offer.

5.      Following a jury trial, defendant was convicted, on June 26, 2009, on all three counts.  He was sentenced on September 24, 2009 to an indeterminate term of imprisonment of from twenty-five years to life on the murder count, with the sentences on the weapons counts to be served concurrently.  He has not perfected his appeal and is currently serving his sentence.

6.      By papers dated December 3, 2012 he moves to vacate his judgment of conviction pursuant to section 440.10 of the Criminal Procedure Law on the ground that he received ineffective assistance of counsel at trial and sentence because his trial attorney did not present evidence to attempt to establish that, at the time he murdered the victim defendant

3

was "suffering from diminished mental capacity ... due to extreme emotional disturbance" and instead presented what his current attorney describes as a "frivolous justification defense" (Affirmation of Richard M. Langone, Esq., "Langone aff," ¶ 3).

7.      Although defendant's motion papers include the report of a clinical pychiatrist who concluded, based on his review of the evidence and interviews of the defendant more than ten years after the crime that in August, 1999 defendant "was functioning under the influence of an Extreme Emotional Disturbance" (Langone aff, Exhibit A at 19), the only evidence that defendant's trial attorney did not consider a defense on that basis comes from defendant's self serving affidavit. Aside from the inadequacy of such an affidavit as a basis even for a hearing on a motion to vacate, *see* C.P.L. § 440.30(4)(d), as discussed in the People's Memorandum of Law which accompanies this affirmation, none of defendant's papers acknowledge that the justification defense counsel pursued, if accepted by the jury, would have resulted in a complete acquittal, while a jury's finding that defendant acted under an "extreme emotional defense" would do no more than render him guilty of manslaughter in the first degree, rather than murder in the second degree. *See* P.L. §§ 125.25(1), 125.20(2).

8.      Moreover, and for additional reasons more fully set forth in the accompanying Memorandum of Law, defendant's motion should be summarily denied in its entirety since it is based on sufficient facts in the record of the proceedings, C.P.L. §

4

440.10(2)(c) and, in any event, defendant's claim that he was denied the effective assistance of counsel is without merit.

**WHEREFORE**, defendant's motion to vacate his judgment of conviction should be summarily denied.

Dated:       Kew Gardens, New York
             February 8, 2013

                                    _____
                                    Edward D. Saslaw
                                    Assistant District Attorney
                                    (718) 286-5803

To:    Richard Langone, Esq.
       Attorney for Defendant
       Langone & Associates, PLLC
       3601 Hempstead Turnpike, Suite 410
       Levittown, NY 11756

5

SUPREME COURT OF THE STATE OF NEW YORK
QUEENS COUNTY: CRIMINAL TERM: PART TAP C
------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,                  :

                                                      :          **MEMORANDUM OF LAW**

        -against-                                   :

                                                      :

                                                      :          Queens County
                                                                 Indictment Number
TAHIR NAQVI,                                          :          2848/06

                  Defendant.                   :
------------------------------------------------------------------x

## ARGUMENT

### DEFENDANT'S MOTION TO VACATE THE CONVICTION MUST BE DENIED AS PROCEDURALLY BARRED AND MERITLESS.

Defendant's motion to vacate his conviction, is mandatorily procedurally barred.   A motion to vacate a judgment of conviction must be denied if, at the time of the motion, sufficient facts appeared on the record that would have allowed the appellate court to review the claim raised in the motion, but the appellate court did not review the claim because the defendant unjustifiably failed to raise it.  C.P.L. § 440.10(2)(c).

Defendant's papers acknowledge as much since his claim of ineffectiveness is squarely based on a view of the minutes of defendant's trial as evidence that "this is exactly the type of case that the defense of extreme emotional disturbance was intended for; i.e., to empower the jury to exercise mercy to an otherwise good man who could no longer

6

bear to witness another man's destruction of his home and his life" (Defendant's Memorandum of Law at 2. Defendant has not perfected his appeal but, perhaps recognizing the likelihood that an ineffective assistance claim before the Appellate Division on this record will fail, brings this motion to attempt to add to the record defendant's self serving affidavit and a psychiatrist's view of the merits of defendant's claim based, at least in part, on an examination of the defendant more than a decade after his crime. Beyond the dubious nature of these submissions as the basis for a motion to vacate, the statute does not permit defendant to use section 440.10 "as a substitute for direct appeal." *People v. Cooks*, 67 N.Y.2d 100, 103 (1986).

Perhaps more significantly, defendant's motion to vacate on the ground that his trial attorney did not consider interposing the affirmative defense requiring him to establish that at the time of the crime defendant was suffering from an extreme emotional disturbance, *see* P.L. § 125.25(1), is subject to summary denial since it is "made solely by the defendant and .. unsupported by any other affidavit or evidence, and ... under these and all the other circumstances attending the case, there is no reasonable possibility that such allegation is true," C.P.L. § 440.30(4)(d). In *People v. White*, 309 N.Y. 636, 640-641 (1956), the Court of Appeals, reviewing a defendant's motion to vacate a twenty-five year old conviction, held that on such a motion a "defendant is not entitled to a hearing on charges lacking factual support. Due process does not require a court to accept every sworn allegation as true." In codifying such motions, the current article 440 of the Criminal

Procedure Law adopted the *White* formulation, *see, e.g. People v. Session*, 34 N.Y.2d 254, 255, 256 (1974) to provide for the summary denial of the motion as set forth in section 440.30(4)(d).

The retrospective view of a new attorney and a psychiatrist reviewing the trial record and interviewing the defendant over a decade after his conviction that maybe a defense based on the claim that defendant committed his crime while suffering from an extreme emotional disturbance can hardly be the basis for vacating defendant's conviction. *Strickland v. Washington*, 466 U.S. 688, 689 (1984)("It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable"); *People v. Baldi*, 54 N.Y.2d 137, 146 (1981)("trial tactics which terminate unsuccessfully do not automatically indicate ineffectiveness").   The attempt to vacate a murder conviction simply because another attorney has a different view of the best way to defend the case should be summarily denied where the defendant offers nothing but his own opinion and recollection to support the claim that the defense was not considered and rejected.[1] That is particularly so here, where ample reasons to reject the defense are apparent either because it was not likely to succeed or

---

[1] Defendant apparently rejected an offer to permit him to dispose of the charges against him by pleading guilty to Manslaughter in the First Degree, the very crime of which he would be convicted had he successfully interposed a defense based on his claim to be suffering from an "extreme emotional disturbance." His rejection of the plea offer strongly suggests that, despite his claims now, defendant at trial was seeking a complete acquittal based on justification since he did not have to go to trial to dispose of the case with a conviction on the lesser crime.

8

because, even if it did, defendant would be subject to significant periods of incarceration whereas if he was acquitted based on the defense he did interpose, the case would be over without a conviction, much less a sentence.[2]

The constitutional guarantee of the right to counsel provides the defendant with the right to the reasonably effective assistance of counsel, gauged by prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish that counsel was constitutionally ineffective, a defendant must show that his attorney committed errors so egregious that he did not function as counsel within the meaning of the Constitution, and that the defendant was actually prejudiced by counsel's deficient performance. *Id.*

Trial counsel's representation of defendant meets the constituional requirements when "the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation." *See People v. Benevento*, 91 N.Y.2d 708, 712 (1998), *quoting People v. Baldi*, 54 N.Y.2d at 147. To prevail upon a claim of ineffective assistance of

---

[2] Defendant's alternative argument, that his trial attorney was ineffective for failing to bring to the sentencing judge's attention his client's mental state, comes nowhere close to demonstrating any "prejudice" since, as his attorney acknowledges, the judge heard all of the evidence in the case, defense counsel's argument as to the mitigating factors that might apply to the case and observed himself, in sentencing the defendant, that defendant "drove [him]self into a frenzied rage," before killing his victim. (Defendant's Memorandum of Law at 16). Current defense counsel's rampant and utterly baseless speculation as to what sentence "the court more than likely would" have imposed, Langone aff, ¶¶ 4, 23, is hardly a sufficient basis for upsetting this conviction.

counsel, a defendant must overcome the strong presumption that defense counsel rendered effective assistance. *See People v. Myers*, 220 A.D.2d 461 (2d Dept. 1995).

Since "[w]hat constitutes effective assistance is not and cannot be fixed with precision, but varies according to the particular circumstances of each case," *People v. Rivera*, 71 N.Y.2d 705, 708 (1988), any court's scrutiny of counsel's action should be "highly deferential." *Strickland*, 466 U.S. at 689. Unless a defendant demonstrates "the absence of strategic or other legitimate explanations" to pursue a trial strategy, defense counsel will be presumed to have rendered adequate assistance to the defendant. *Id.* at 709; *see People v. Caban*, 5 N.Y.3d 143, 152 (2005); *People v. Taylor*, 1 N.Y.3d 174, 177 (2003); *People v. Ryan*, 90 N.Y.2d 822, 823 (1997); *People v. Tonge*, 93 N.Y.2d 838, 840 (1999). A court can not "second-guess whether a course chosen by defendant's counsel was the best trial strategy, or even a good one, so long as defendant was afforded meaningful representation." *See People v. Satterfield*, 66 N.Y.2d 796, 799-800 (1985); *see also People v. Rivera*, 71 N.Y.2d at 708-09 ("A contention of ineffective assistance of trial counsel requires proof of less than meaningful representation, rather than simply with strategies and tactics); *People v Underdue*, 89 A.D.3d 1132, 1134 (3d Dept. 2011)(where defendant did not present a defense based on extreme emotional distress, his motion for 440 relief was denied since "[d]efendant has not shown the absence of any legitimate explanation for counsel's pursuit of this defense strategy, and a simple, hindsight disagreement with trial tactics or strategy is insufficient to establish a lack of meaningful representation.")

The record of the trial sharply contradicts the claim that the defendant received ineffective assistance of counsel particularly based on a supposed defense that he was suffering from an extreme emotional disturbance when he murdered his victim. Beyond the well established fact that such a defense rarely, if ever, succeeds at a jury trial, *see, e.g.,* C. Slobogin, *Experts, Mental States, and Acts*, 38 Seton Hall Law Review 1009, 1018 (2008), available at http://erepository.law.shu.edu/shlr/vol38/iss3/9; Kirschner and Galperin, *The Defense of Extreme Emotional Disturbance in New York County: Pleas and Outcomes*, 10 Behav. Sci. & Law 47, 49 (2002), the evidence at defendant's trial strongly contradicts such a claim and it is hardly likely that a request to instruct the jury on the defense would have even been granted.

Rather than showing defendant to be acting under the influence of any extreme emotional disturbance, the evidence showed defendant's actions as planned and deliberate, that defendant displayed no extreme motion while killing his victim, and his conduct after his crime displayed his consciousness of guilt. *See People v. Roche,* 98 N.Y.2d 70, 77 (2002)(defendant's actions after the crime to attempt to cover it up was "inconsistent with the loss of self-control associated with the defense"); *People v. Moronta,* 96 A.D.3d 418, 420 (1st Dept. 2012) ("planned and deliberate character of the attack [are] qualities inconsistent with an extreme emotional disturbance," internal quotation marks omitted); *People v. Acevedo,* 56 A.D.3d 341 (1st Dept. 2008)(same). Evidence showing that defendant bought a used car on the street with a working truck lock a short time before the killing, then waited

11

in that vehicle with a newspaper and a meal down the block from his victim's home on a day

when he knew the victim was preparing to go to a family wedding.  When the victim, Irfan,

emerged from his home dressed in full Pakistani wedding dress and began to walk to his car,

defendant pulled his vehicle up to first box in Irfan's vehicle before shooting at him.

Far from showing defendant to be acting under an extreme emotional

disturbance, this evidence, including the positioning of where defendant stopped his vehicle

when he got out to shoot Irfan and that defendant's trunk lock was broken in a way so that

it was unnecessary to use a key to open it, suggested that what defendant planned to do was

kill Irfan on the street and then put his body in his vehicle's trunk and drive off.  Those plans

apparently changed when Irfan, having been hit twice, fell to the ground and managed to

move too far away from the trunk of defendant's vehicle.  Instead, defendant proceeded to

drag his body on to the sidewalk where he delivered the fatal shot to Irfan's head at point

blank range.[3]  Defendant then walked back to his car and drove off.

All of this was witnessed by a teenager standing about twenty feet away who

testified that defendant did not say one word and stared at her in the face as he delivered the

fatal shot and calmly walked back to his car.  After the killing, defendant abandoned the car

---

[3] Defendant's current attorney believes that evidence of defendant's dragging the victim's body before firing the fatal shot "doomed" the justification defense (Defendant's Memorandum of Law at 18) as it may well have done.  By his own description of his trial testimony, however, defendant both denied dragging the body and that he was capable of retreating since he was "paralyzed by fear at the time" (Langone aff, ¶¶ 7, 10, 11, 16).  Defendant's Memorandum of Law at 4).  Presumably, defendant's trial attorney was entitled to rely on his client's account and argue that the eyewitness was incorrect, just as the jury was entitled to come to the opposite conclusion.

and escaped from New York before being apprehended seven years later while working in a convenience store in Georgia.  That defendant's current attorney believes an argument could be fashioned that despite all of this, defendant would have been entitled to an instruction that the jury consider whether defendant acted under an extreme emotional disturbance, *but see People v. Walker*, 64 N.Y.2d 741, 743 (1984), or that a jury would have seriously considered much less accepted such a defense, *but see People v. Casassa*, 49 N.Y.2d 668, 680-681 (1980)(jury can mitigate offense where it finds "the murder .... [to be]an understandable human response deserving of mercy")  does not mean that another attorney might not have reasonably reached another conclusion.  The failure to make an argument of "uncertain efficacy" cannot form the basis of a finding of ineffectiveness, *People v. Borrell*, 12 N.Y.3d 365, 369 (2009).  Indeed, "errors by counsel where the overall representation was nonetheless capable of characterization as 'meaningful' do not constitute ineffectiveness,  *id.* at 368, *quoting People v. Flores*, 84 N.Y.2d 184 (1994)  including decisions by counsel which  retrospectively are "errors in judgment," *People v. DeMauro*, 48 N.Y.2d 892, 894 (1979), or even the result of "poor judgment," *People v. Jackson*, 52 N.Y.2d 1027, 1029 (1981) and nothing that defendant points to now even approaches that standard.

Indeed, the burden is on the defendant to show that there was no "strategic or other legitimate explanations" for trial counsel to conclude against presenting a defense based on defendant's supposed "extreme emotional disturbance." *People v. Taylor*, 1 N.Y.3d 174, 177

13

(2003).   Cf. People v Colville, 20 N.Y.3d 20, 30-31 (2012), *citing and quoting from United States v Mays*, 466 F.3d 335, 342 (5th Cir 2006) ("In deciding whether to request (a lesser-included offense) instruction, defense counsel must make a strategic choice: giving the instruction may decrease the chance that the jury will convict for the greater offense, but it also may decrease the chance of an outright acquittal").

Defendant's reference to federal habeas cases notwithstanding, defendant is no longer permitted to circumvent the requirement that he show the absence of any reasonable explanation for his attorney's determination as to the best way to defend a case simply by filing a habeas petition to a federal court to allow it to decide whether an attorney should have "investigated" the applicability of a defense. *See e.g., Renico v. Lett*, 559 U.S. ___, 130 S. Ct. 1855, 1862 (2010); *Bell v. Cone*, 535 U.S. 685 (2005).   Hence, the Magistrate Judge's Report recommending the grant of a habeas petition in *Lopez v. Ercole*, 2010 U.S. Dist. LEXIS 39274 (S.D.N.Y. Apr. 21, 2010), which, three years later, has neither been accepted or rejected by the District Judge to whom it was submitted, is hardly as binding on this Court as defendant suggests (Defendant's Memorandum of Law at 25-27).

Indeed, the Magistrate Judge's conclusion in that case that it could find "no cogent rationale for [defendant's trial attorney] choosing not also to pursue also a defense of extreme emotional disturbance" *Lopez v. Ercole*, slip op at 102, is almost precisely what current federal law forbids a federal habeas court from reaching.  Whatever the Magistrate Judge may have thought, the First Department quite to the contrary reviewed the very same case and held that "an extreme emotional disturbance defense, upon which a defendant bears

14

the burden of proof, would have been weak at best under the facts presented, and there does not appear to have been a reasonable view of the evidence that would have obligated the court to instruct the jury on that defense .... Counsel could have reasonably concluded that an extreme emotional disturbance defense would have confused the jury and detracted from the justification defense. Counsel could also have reasonably concluded that extreme emotional disturbance, a mitigating defense, would have reduced defendant's chances for a complete acquittal." *People v. Lopez*, 36 A.D.3d 431, 432 (1st Dept. 2007).

If, then, defendant is correct that his case is "on-all-fours with" *Lopez*, his motion should be denied. For any defendant to be entitled to a new trial when his first defense fails, simply by showing a basis for another attorney to defend him under new theory, would seriously distort the process by which criminal cases are adjudicated and is inconsistent with the presumption that defendant received the effective assistance of counsel at trial. Indeed, defendant's papers come nowhere close to to demonstrating, as he would have to in order to succeed on this motion, that he did not receive a fair trial because counsel's conduct was both "egregious and prejudicial." *People v. Benevento*, 91 N.Y.2d at 713; *People v. Hobot*, 84 N.Y.2d 1021, 1022 (1995).

In sum, defendant's claim of ineffectiveness is barred as a basis for a motion to vacate since it is based on the record and can be raised on appeal. The argument is, moreover, utterly meritless in that it is "speculative and reflect[s] efforts to second-guess trial

15

strategy," *People v. DeMarco*, 33 A.D.3d 1045 (3rd Dept. 2006) rather than any real claim of ineffectiveness.

## CONCLUSION

For the reasons set forth above and in the accompanying affirmation, defendant's to vacate the judgment of conviction should be summarily denied.

Respectfully submitted,

RICHARD A. BROWN
District Attorney
Queens County

JOHN CASTELLANO
EDWARD D. SASLAW
    Assistant District Attorneys
      of Counsel

February 8, 2013

16

# *EXHIBIT B*

**SUPREME COURT - STATE OF NEW YORK**
**CRIMINAL TERM PART TAP C- QUEENS COUNTY**

PRESENT:

<u>HONORABLE KENNETH C. HOLDER,</u>
**Justice**

Ind. No. 2848/2006

THE PEOPLE OF THE STATE OF NEW YORK, :

                    **Respondent,**      :    Motion: To vacate judgment
                                         of conviction

          -against-           :

TAHIR NAQVI,

                   **Defendant.**      :

Richard Langone, Esq.

For the motion

Edward D. Saslaw, Esq., ADA

Opposed

      Upon the foregoing papers, and in the opinion of the Court herein, the motion to vacate judgment of conviction is denied, in part, and an evidentiary hearing is granted to establish whether a favorable plea was offered by the People to defendant; if so, whether counsel communicated the plea to defendant; and whether or not defendant was prejudiced as a result of counsel's alleged failure to advise him of the plea offer (see *Lafler v Cooper* (__ US __, 132 S Ct 1376 [2012]) and *Missouri v Frye* (__ US __, 132 S Ct 1399 [2012]).

DATE: July 11, 2013

KENNETH C. HOLDER, J.S.C.

MEMORANDUM

# SUPREME COURT, QUEENS COUNTY
## CRIMINAL TERM, PART TAP C

---

**THE PEOPLE OF THE STATE OF NEW YORK**

: **BY** Kenneth C. Holder, JSC

**Respondent,**

: **DATED** July 11, 2013

**TAHIR NAQVI,**

: **IND. NO.** 2848/2006

**Defendant.**

---

On June 25, 2009, defendant was convicted, following a jury trial, of Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree.

On September 24, 2009, he was sentenced to an indeterminate prison term of from twenty-five years to life for second-degree murder, and determinate prison terms of fifteen years with five years post-release supervision and seven years with three years post-release supervision, for the second- and third-degree weapon-possession convictions, respectively, and all to run concurrently.

He filed a notice of appeal to the Appellate Division, Second Department, but has not perfected his appeal.

1

On or about December 18, 2012, he filed the instant motion seeking to vacate his judgment of conviction pursuant to CPL 440.10(1)(h), 440.20, and 440.30, alleging that he was denied the effective assistance of counsel at his trial and sentence because counsel failed to investigate and present an extreme emotional disturbance ("EED") defense, either rather than or in addition to the justification defense he advanced at trial. In support of this claim, defendant has submitted the report of a clinical psychiatrist who interviewed him in February 2012 and reviewed the case and concluded that at the time of the crime in August 1999, defendant was functioning under the influence of an extreme emotional disturbance.  Defendant also has submitted a notarized letter claiming that counsel failed to inform him of any offer to plead guilty to Manslaughter in the First Degree to dispose of the charges against him and that he had told counsel that he wanted the best plea deal possible and did not want to go to trial.[1]

The People oppose the motion arguing that: 1) the motion should be summarily denied pursuant to CPL 440.10(2)© because the effectiveness of defendant's counsel is a matter that is apparent on the record and, accordingly, should be reviewed by the appellate court when he perfects his appeal; 2) his claim that trial counsel failed to consider the EED defense should be summarily denied because it is "made solely by the defendant and unsupported by any other affidavit or evidence, and under these and

---

[1]   The People stated in their affirmation in opposition to defendant's 440 motion that "[p]rior to trial, the People advised defense counsel that it would consent to dispose of the case by defendant's plea of guilty to Manslaughter in the First Degree, but defendant rejected that plea offer."

2

all the other circumstances attending the case, there is no reasonable possibility that such allegation is true" (CPL 440.30[4][d]); 3) the claim should be denied because the record reflects that counsel provided meaningful representation and his choice to assert a justification defense, rather than an EED defense should not be second-guessed simply because it was ultimately unsuccessful.

For the following reasons, the motion to vacate judgment is denied, in part, and an evidentiary hearing is granted on the *Lafler v Cooper* (__ US __, 132 S Ct 1376 [2012]) and *Missouri v Frye* (__ US __, 132 S Ct 1399 [2012]) issue.

## CONCLUSIONS OF LAW

A judgment of conviction is presumed valid, and the party challenging its validity has the burden of coming forth with allegations sufficient to create an issue of fact (*People v Session*, 34 NY2d 254, 255-56 [1974]).  While the production of contrary evidence will satisfy the burden of going forward and eliminate the presumption of regularity from the case, bare allegations are insufficient to carry this evidentiary burden (*supra* at 256).

Criminal Procedure Law 440.30(4)(b) allows a court to deny a motion to vacate judgment if the motion is based on the existence or occurrence of facts and does not contain sworn allegations substantiating or tending to substantiate all of the essential facts necessary to decide the motion (*People v Brown*, 56 NY2d 242, 246 [1982]; see

3

*People v Taylor*, 211 AD2d 603 [1st Dept 1995]; *People v O'Hara*, 9 Misc 3d 1113[A] [Sup Ct, Kings Cty 2005][denying motion to vacate judgment without a hearing because the moving papers did not contain sworn allegations or an affidavit from a person having actual or personal knowledge of the underlying facts]).

What constitutes effective assistance of counsel varies according to the unique circumstances of each representation (*People v Benevento*, 91 NY2d 708, 712 [1988]). Generally, so long as the evidence, the law, and the circumstances, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will be met (*People v Henry*, 95 NY2d 563 [2000], citing *People v Benevento*, *supra* at 712; *People v Baldi*, 54 NY2d 137,147 [1981]).

To establish that counsel failed to provide meaningful representation, a defendant must "'demonstrate the absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct" *(see People v Caban*, 5 NY3d 143, 152 [2005], quoting *People v Rivera*, 71 NY2d 705, 709 [1988]).

In addition, he must establish that as a result of counsel's alleged shortcomings, he did not receive a fair trial because counsel's conduct was both "egregious and prejudicial" (*People v Benevento*, *supra* at 713). This prejudice component "focuses on the fairness of the process as a whole," rather than on the particular deficiency's impact

4

on the outcome of the case (*People v Ozuna*, 7 NY3d 913, 915 [2006]; *People v Henry*, *supra* at 566; *People v Benevento*, *supra* at 714).

Thus, in applying the meaningful representation standard, "courts should not confuse true ineffectiveness with losing trial tactics or unsuccessful attempts to advance the best possible defense" (*People v Henry*, *supra* at 565). "The Constitution guarantees a defendant a fair trial, not a perfect one" (*People v Henry*, *supra*, citing *Delaware v Van Arsdall*, 475 US 673, 681 [1986]). Indeed, "[i]solated errors in counsel's representation generally will not rise to the level of ineffectiveness, unless the error is so serious that defendant did not receive a 'fair trial'" (*People v Henry*, *supra* at 565-66, citing *People v Flores*, 84 NY2d 184, 187 [1994]). Disagreement with trial strategies, tactics or the scope of possible cross-examination, weighed long after the trial, is insufficient (*People v Benevento*, *supra*; *People v Benn*, 68 NY2d 941, 942 [1986]).

Claims of ineffective assistance of counsel may be denied without delving into the factual accuracy of the allegations where an inspection of the trial record reveals that the factual basis, if true, would at most show a tactical error by counsel, as opposed to denial of meaningful representation (*see People v Benevento*, *supra*; *People v Satterfield*, 66 NY2d 796 [1985]).

Under the federal standard, defendant must show that counsel's performance fell below an objective standard of reasonableness and that "there is a reasonable

5

probability that but for counsel's . . . errors, the result of the proceeding would have been different" (*Strickland v Washington*, 466 US 668, 687-88, 694 [1984]). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" (*Strickland v Washington*, supra at 694).

"The Sixth Amendment right to effective assistance of counsel extends to the consideration of plea offers that lapse or are rejected" (*Missouri v Frye*, 132 S Ct 1399, 1402-04 [2012]; *Lafler v Cooper*, 132 S Ct 1376 [2012]). Defense counsel has a duty to communicate formal offers by the prosecution to accept a plea on terms and conditions that are favorable to the accused (*Missouri v Frye*, supra at 1402). Under *Strickland*, even if a defendant can establish that counsel's performance was deficient under the performance prong, he must also establish that he was prejudiced, that is, that there is a reasonable probability both that he would have accepted the more favorable plea offer had he been afforded effective assistance of counsel, and that the plea would have been adhered to by the prosecution and accepted by the court (*see Missouri v Frye*, supra at 1402-03).

To the extent that defendant claims that his trial attorney was ineffective for failing to investigate and consider presenting an EED defense at trial, his claim in that regard relies entirely upon his own self-serving affidavit stating that his attorney failed to do so. Under these circumstances, the Court finds that defendant's moving papers are insufficient to raise an issue of fact with respect to whether counsel, in fact, investigated

6

and/or considered an EED defense and, accordingly, the motion to vacate judgment based on counsel's failure to investigate and consider an EED defense is summarily denied (*see* CPL 440.30[4][b]; *People v O'Hara, supra*).

Nevertheless, a review of the trial record reflects that counsel was prepared, amply familiar with the case and pursued a legitimate trial strategy of establishing a justification defense based upon the factual background of the case and defendant's version of the events. Before trial, counsel filed appropriate motions seeking discovery and suppression of statements and identification testimony. He appropriately challenged the admissibility of defendant's statements at the suppression hearing that had been granted as a result of the omnibus motion.

At trial, and in keeping with his strategy, he participated in jury selection, delivered a cogent opening statement, cross-examined witnesses and impeached them where appropriate, and presented a defense in which he called defendant to testify and succeeded in obtaining a ruling allowing specific acts of violence by the victim that were known to the defendant to support defendant's claim that he reasonably feared for his life when he shot the victim and did so in self defense. Finally, counsel gave a strong summation that focused on the evidence that supported his client's claim of self defense.

Based upon all of these circumstances, there is no doubt that defendant was provided meaningful representation under the New York standard. Under the federal

standard as well, defendant has not demonstrated that counsel's actual performance fell below an objective standard of reasonableness and that there is a reasonable probability that the verdict would have been more favorable to defendant had counsel chosen to present an EED defense.

Accordingly, the motion to vacate judgment on ineffective-assistance grounds with respect to trial counsel's failure to present an EED defense is denied.

The People, in their affirmation in opposition to the 440 motion, stated that an offer for defendant to plead guilty to Manslaughter in the First Degree had been communicated to defendant's attorney at some point before trial. Defendant has submitted a notarized letter stating: 1) that his trial attorney, Daniel Mentzer, never informed him before or during the trial that the People had offered a plea; 2) that he had told his attorney to get him the best plea offer possible; and 3) that he did not want to go to trial.

Under the circumstances, an issue of fact has been raised with respect to whether or not the People offered defendant a plea bargain and/or whether or not his trial attorney advised him of the plea offer. Under *Missouri v Frye* (*supra*) and *Lafler v Cooper*, defense counsel has a duty to communicate favorable plea offers to a defendant and, under certain circumstances, the failure to do so may constitute ineffective assistance of counsel.

8

Accordingly, an evidentiary hearing is ordered to establish whether a favorable plea was offered by the People to defendant; if so, whether counsel communicated the plea to defendant; and whether or not defendant was prejudiced as a result of counsel's alleged failure to advise him of the plea offer.

Order entered.

The clerk of the court is directed to forward a copy of this order to the attorney for the defendant and to the District Attorney.

_____
KENNETH C. HOLDER, J.S.C.

9

# *EXHIBIT C*

SUPREME COURT - STATE OF NEW YORK
CRIMINAL TERM PART TAP C- QUEENS COUNTY

PRESENT:

HONORABLE KENNETH C. HOLDER,
Justice

Ind. No. 2848/2006

THE PEOPLE OF THE STATE OF NEW YORK, :

                        Respondent,      :    Motion: To vacate judgment
                                               of conviction

         -against-                 :

TAHIR NAQVI,

                       Defendant.   :

Richard Langone, Esq.

For the motion

Edward D. Saslaw, Esq., ADA

Opposed

Upon the foregoing papers, and in the opinion of the Court herein, the motion to vacate judgment of conviction is denied.

DATE: February 26, 2014

KENNETH C. HOLDER, J.S.C.

MEMORANDUM

## SUPREME COURT, QUEENS COUNTY
## CRIMINAL TERM, PART TAP C

THE PEOPLE OF THE STATE OF NEW YORK

                         **Respondent,**

TAHIR NAQVI,

                         **Defendant.**

: **BY** Kenneth C. Holder, JSC

: **DATED** February 26, 2014

: **IND. NO.** 2848/2006

On June 25, 2009, defendant was convicted, following a jury trial, of Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree.

On September 24, 2009, he was sentenced to an indeterminate prison term of from twenty-five years to life for second-degree murder, and determinate prison terms of fifteen years with five years post-release supervision and seven years with three years post-release supervision, for the second- and third-degree weapon-possession convictions, respectively, and all to run concurrently.

He filed a notice of appeal to the Appellate Division, Second Department, but has not perfected his appeal.

1

On or about December 18, 2012, he filed a motion seeking to vacate his judgment of conviction pursuant to CPL 440.10(1)(h), 440.20, and 440.30, alleging that he was denied the effective assistance of counsel at his trial and sentence because counsel failed to investigate and present an extreme emotional disturbance ("EED") defense, either rather than or in addition to the justification defense he advanced at trial.

The People filed an affirmation in opposition to the motion arguing that: 1) the motion should be summarily denied pursuant to CPL 440.10(2)© because the effectiveness of defendant's counsel is a matter that is apparent on the record and, accordingly, should be reviewed by the appellate court when he perfects his appeal; 2) his claim that trial counsel failed to consider the EED defense should be summarily denied because it is "made solely by the defendant and unsupported by any other affidavit or evidence, and under these and all the other circumstances attending the case, there is no reasonable possibility that such allegation is true" (CPL 440.30[4][d]); 3) the claim should be denied because the record reflects that counsel provided meaningful representation and his choice to assert a justification defense, rather than an EED defense should not be second-guessed simply because it was ultimately unsuccessful.

On July 11, 2013, this Court rendered its decision denying the portion of the motion alleging that defendant's trial counsel was ineffective for failing to investigate and consider an EED defense because the claim relied entirely on defendant's own self-

2

serving affidavit stating that counsel failed to do so (CPL 440.30[4][b]; *People v O'Hara*, 9 Misc 3d 1113[A] [Sup Ct, Kings Cty 2005] [denying motion to vacate judgment without a hearing because the moving papers did not contain sworn allegations or an affidavit from a person having actual or personal knowledge of the underlying facts]). The Court granted an evidentiary hearing concerning whether, in fact, the People had offered defendant a plea bargain and/or whether or not trial counsel advised him of the plea offer.

The hearing was held on October 4, and December 6, 2013. Assistant District Attorney Patrick Lynn O'Connor, defendant and Saima Naqvi testified on defendant's behalf. The People called defendant's trial counsel, Daniel Mentzer, to testify on their behalf. The Court credits the testimony of ADA O'Connor and Mr. Mentzer. The Court credits the testimony of defendant and Mrs. Naqvi, in part, but does not credit their testimony that is inconsistent with the testimony of ADA O'Connor and Mr. Mentzer.

## FINDINGS OF FACT

From approximately June 2008, ADA O'Connor was the prosecutor assigned to handle defendant's case. When he first inherited the case from another ADA, the plea offer to defendant at that time was an offer to plead guilty to Manslaughter in the First Degree with a promised sentence of 25 years. In February 2009, ADA O'Connor memorialized that plea offer in his case synopsis.

3

Shortly before trial, ADA O'Connor's supervisor authorized an amended plea bargain for defendant to plead guilty to Manslaughter in the First Degree with a promised sentence of between 21 to 23 years. Assistant DA O'Connor did not memorialize the offer in writing, but recalled that the sentence promise was within that range. He relayed the revised offer to Mr. Mentzer, but did not recall whether he had spoken to counsel on the telephone or in the courthouse. In response, Mr. Mentzer told him either that he would convey the offer to defendant but did not think that he would accept it, or that he would convey the offer to defendant and see what he says.

Prior to the commencement of trial, Mr. Mentzer informed ADA O'Connor that defendant had rejected the offer. Subsequently, at a bench conference, there was a discussion with the judge about the offer and whether there would be a disposition. Mr. Mentzer informed the judge that defendant had rejected the offer and that both parties were ready for trial.

After the crime, defendant fled the US for a period of time and returned at some point, living in Union, Georgia for approximately six years before he was arrested for the murder. While in Georgia, he met his wife, Saima Naqvi, and admitted to her that he was a fugitive from New York and was wanted for committing a murder. She testified that she advised him to surrender.

4

When defendant returned to the United States, he contacted a lawyer, Sam Schmidt, and asked him to get a plea deal in exchange for his surrender.[1]  Defendant subsequently spoke with a detective in New York, who told defendant that he could not make any deal with him while defendant was a fugitive.

On March 21, 2006, defendant was arrested in Georgia after being a fugitive there for six years and was extradited to New York two days later.[2]  At Riker's Island, defendant spoke with several inmates and two of them recommended Mr. Mentzer because he had been successful in their cases.  He discussed the facts of his case and charges with the inmates, but never discussed plea bargains with them.  Although the two inmates who had recommended Mr. Mentzer were both going to trial in the Bronx and asserting a justification defense, defendant claims that he retained Mr. Mentzer for the purpose of getting a plea offer.[3]

Saima Naqvi contacted Mr. Mentzer and retained him to represent defendant.  She only met with him twice and paid him a total of $40,000, in two payments, with the second payment being made approximately three months before the trial.  She was

---

[1]  Defendant testified that the main reason he came back to the US was to surrender to the authorities.  Although he claimed not to know anything about criminal law, he knew enough to hire an attorney specifically for the purpose of engaging in plea negotiations for his surrender.

[2]  Defendant knew that he was facing jail time, but did not want to surrender without a plea deal because he was scared and facing a significant amount of time.

[3]  Mr. Mentzer represented defendant for approximately two years before the trial.

never present during any discussions between defendant and Mr. Mentzer, and Mr. Mentzer never had any discussions with her about the facts of defendant's case. Although she visited defendant in jail approximately three times per week for three years, he never spoke to her about a plea bargain.[4] She does not know the difference between a plea bargain and a trial.

Defendant testified that when Mr. Mentzer went to see him at Riker's Island, he listened to tapes that defendant had and told defendant that he had a very good justification defense and was confident he could beat the case. Defendant also testified that he had asked counsel to get the best plea offer he could, but that counsel told him that he does not make plea deals and the case would go to trial. Defendant testified that Mr. Mentzer met with him between six and eight times to prepare for trial. He claims that Mr. Mentzer told him that he was asserting a justification defense, but never told him that it was weak and would be difficult to win at trial. According to defendant, Mr. Mentzer did not discuss the possibility of a lesser included offense or extreme emotional disturbance, although defendant claims that he had told counsel that he had blacked out and should see a psychiatrist. He also claims that counsel never discussed with him a manslaughter plea.

---

[4] She also testified that defendant had never spoken to her about pleading guilty while he was in Georgia; he had said that he wanted to surrender.

### The People's Witness

Mr. Mentzer has represented more than 1000 criminal defendants, with approximately seventy to eighty of those cases involving homicides. Some of those cases went to trial, some were disposed of through a plea, and some were dismissed by the People.

During his representation of defendant, Mr. Mentzer engaged in plea negotiations with ADA O'Connor. The initial plea offer was 25 years for Manslaughter in the First Degree. He discussed the offer with defendant and defendant was not interested in any sentence involving more than 10 years.[5] He negotiated further with the People and was told that they could come down on the sentence one or two years, but that was still no where near the time that defendant was willing to accept. Defendant refused to accept a sentence of more than 10 years because of his age - - 51 or 52 at the time.

He also discussed with defendant the potential defenses: 1) he didn't commit the crime; 2) justification; and 3) extreme emotional disturbance. Given defendant's unwillingness to accept Manslaughter and 25 years, and for other reasons, he did not believe that an EED defense was a good option because it would require conceding the same charge to which he had refused to plead guilty. He also believed that justification

---

[5] Defendant is the first of Mr. Mentzer's clients to claim that he did not inform him of a plea offer.

7

would be a tough defense and told defendant so. He never made representations that he would get defendant exonerated based on a justification defense.

One of Mr. Mentzer's former clients, Usama Murza, who had been acquitted of murder based on a justification defense, referred defendant to him. At that time, Mr. Mentzer had won approximately six or seven cases on justification within eight or nine years prior to meeting defendant.

Defendant's wife first contacted him and retained him. His fee was $40,000, with $15,000 paid up front and $25,000 paid before trial.

## CONCLUSIONS OF LAW

A judgment of conviction is presumed valid, and the party challenging its validity has the burden of coming forth with allegations sufficient to create an issue of fact (*People v Session*, 34 NY2d 254, 255-56 [1974]). While the production of contrary evidence will satisfy the burden of going forward and eliminate the presumption of regularity from the case, bare allegations are insufficient to carry this evidentiary burden (*supra* at 256).

At a hearing ordered pursuant to CPL 440, the defendant has the burden of proving by a preponderance of credible evidence every fact essential to support the motion (*see* CPL 440.30(6); *People v Bridget*, 73 AD2d 291 [2d Dept 1980]). At the

8

hearing, the court becomes the finder of fact and applies the same rules in evaluating the credibility of witnesses as a jury would be charged to do at a criminal trial.

The credible testimony at the hearing established that defendant fled the country for a period of time after the murder and returned to the US, at some point, residing in Georgia. He met and married his wife when he returned, admitted to her that he was a fugitive from New York and was wanted for murder. Defendant contacted an attorney, Sam Schmidt, and asked him to contact the case detective, in New York, to tell the detective that he wanted to surrender but needed to know how much time he would get. The detective told defendant that he could not make a deal with a fugitive. Thereafter, defendant did not turn himself in to the authorities, but continued living on the lam in Georgia for approximately six years before he was arrested and extradited to New York.

The credible testimony also established that defendant met an inmate named Usama Murza while he was at Riker's Island. Murza had been charged with murder, was ultimately acquitted of the murder based upon a justification defense, and recommended his attorney, Mr. Mentzer, to defendant. Defendant also spoke with another inmate who was going to trial in the Bronx, asserting a justification defense and had recommended Mr. Mentzer. Defendant discussed the charges against him and the facts of his case, but never discussed plea bargains with either of those inmates.

Defendant's wife contacted Mr. Mentzer and retained him to represent defendant. She paid him a total of $40,000 in two payments, with the second payment being made

9

a few months prior to defendant's trial. Mrs. Naqvi never had any discussions with Mr. Mentzer about the facts of defendant's case and was not present during any discussions between defendant and Mr. Mentzer. While she and defendant were in Georgia, defendant never spoke to her about a plea bargain and she does not know the difference between a plea bargain and a trial.

When ADA O'Connor was first assigned to defendant's case, the plea offer that had been conveyed to defendant and rejected was an offer to plead guilty to Manslaughter in the First Degree with a promised sentence of 25 years. Mr. Mentzer had discussed the offer with defendant, but defendant rejected it. Defendant, who was 51 or 52 years old at the time, was not interested in any sentence more than ten years because of his age.

Before the trial, ADA O'Connor informed Mr. Mentzer that the revised offer was a plea to Manslaughter in the First Degree and a promised sentence of between 21 to 23 years. Mr. Mentzer told ADA O'Connor that he would convey the offer to defendant. Mr. Mentzer conveyed the revised offer to defendant and he rejected it because he did not want a sentence higher than ten years.

This Court did not find credible defendant's testimony that he had retained Mr. Mentzer to get the best plea deal possible, did not want to go to trial and that Mr. Mentzer never conveyed the plea offers to him. Defendant's testimony concerning his desire to surrender when he first went to Georgia and the phone conversation with the

case detective demonstrate that defendant's primary concern was the length of time that he would have to serve. Without an assurance as to the number of years he would serve if he surrendered, defendant refused to surrender and, instead, lived on the lam for six years. His actions reflected his failure to voluntarily take responsibility for his crime unless it was on his specific terms.

Defendant's conversations with the inmates who recommended Mr. Mentzer to defendant never involved discussions about plea dispositions. Instead, the evidence reflects that the conversations were about justification defenses, at least one of which was successful, and the facts of their cases and defendant's. These facts all suggest that defendant sought out Mr. Mentzer because of the justification defenses, and not his ability to get defendant the plea disposition he wanted.

Finally, the fact that defendant did not accept the initial offer of Manslaughter in the First Degree and 25 years further supports the view that defendant's primary concern was the length of time he was going to have to serve and, apparently, 25 years was too long for him. Given that, his claim that he would have accepted a plea offer of between 21 and 23 years rings hollow. That was still a substantial amount of time for a man who had never served time before and the Court does not believe defendant's claim that counsel never conveyed the offer and that he would have accepted it at the time.

11

Therefore, defendant has not established by a preponderance of the evidence that his trial counsel failed to advise him of the People's plea offer and that he would have accepted it, in any event.

Ineffective Assistance at Sentence

Defendant also claimed that his trial counsel was ineffective at sentencing because he failed to argue for a lesser sentence based on defendant's alleged extreme emotional disturbance at the time of the shooting and/or mental state at the time of the murder. The Court notes, first, that because defendant fled the jurisdiction and was not apprehended for more than six years after the crime, any psychological examination and/or expert testimony concerning his mental state six years prior would have been suspect given how far removed an examination would have been from the time of the murder, likely inaccurate, and not credible. Secondly, the Court was amply familiar with the factual circumstances of the case and motive -- that the victim had been having an affair with defendant's wife. These circumstances were all taken into account by the trial court and counsel was not ineffective for failing to raise this issue at sentencing because it was not credible and would not have had any effect on the Court's sentence.

Accordingly the motion to vacate judgment is denied in its entirety.

12

Order entered.

The clerk of the court is directed to forward a copy of this order to the attorney for the defendant and to the District Attorney.

KENNETH C. HOLDER, J.S.C.

13

*Seslaw / Mastis*

## Supreme Court of the State of New York
## Appellate Division : Second Judicial Department

M177273
L/

WILLIAM F. MASTRO, J.

2014-03142, 2014-03143

DECISION & ORDER ON APPLICATION

The People, etc., plaintiff,
v Tahir Naqvi, defendant.

(Ind. No. 2848/06)

　　　　Application by the defendant pursuant to CPL 450.15 and 460.15 for a certificate granting leave to appeal to this Court from two orders of the Supreme Court, Queens County, dated July 11, 2013, and February 26, 2014, respectively, which has been referred to me for determination.

　　　　Upon the papers filed in support of the application and the papers filed in opposition thereto, it is

　　　　ORDERED that the application is denied.

WILLIAM F. MASTRO
Associate Justice

August 20, 2014

PEOPLE v NAQVI, TAHIR